1

1                    UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF NEW YORK
2

3    - - - - - - - - - - - - - - - X
                                        CV 01-7421
4    ORVILLE ETORIA,

5                 Plaintiff,

6                 v.                     United States Courthouse
                                        Brooklyn, New York
7    FLOYD BENNETT,

8                                       November 19, 2003
                 Defendant.             1:30 p.m.
9
     - - - - - - - - - - - - - - - X
10

11                   TRANSCRIPT OF HEARING
                     BEFORE THE HONORABLE JACK B. WEINSTEIN
12                   UNITED STATES DISTRICT JUDGE.

13
     APPEARANCES:
14
     For the Petitioner:         URSULA BENTELE, ESQ.
15                               OLIVIER WILKINS
                                 AMITY BOYE
16                               DANIELE FEMAN
                                 AYODELE JONES
17
     For the Respondent:         SHULAMIT ROSENBLUM, ESQ.
18                               SHERYL ANANIA, ESQ.
                                 District Attorney's Office
19                               Kings County

20
     Court Reporter:             Burton H. Sulzer
21                               225 Cadman Plaza East
                                 Brooklyn, New York 11201
22                               (718) 260-4526
                                 Fax (718) 260-4504
23

24
     Proceedings recorded by mechanical stenography, transcript
25   produced by CAT.



*Burton H. Sulzer, OCR, CRR, CSR, CM*

1              (Case called.)

2              THE CLERK:   On the telephone, give your name,

3    please.

4              THE PETITIONER:   Orville Etoria.

5              THE COURT:   Counsel note your appearances, please.

6    For the petitioner?

7              MS. BENTELE:   Ursula Bentele, Brooklyn Law School.

8    With me are Olivier Wilkins, Amity Boye, Danielle Feman and

9    Ayodele Jones.

10             THE CLERK:   For the respondent.

11             MS. ROSENBLUM:   Shulamit Rosenblum, Assistant

12   District Attorney in the office of Kings County District

13   Attorney, Charles J. Hynes, for the respondent.

14             MS. ANANIA:   And Sheryl Anania, Office of the

15   Kings County District Attorney.

16             THE COURT:   Mr. Etoria --

17             THE PETITIONER: Yes.

18             THE COURT:   This is the judge speaking.   Everything

19   is being taken down by the reporter in open court.   You can

20   talk if you wish, but you'll be sworn before you talk.

21             I suggest, since you have good counsel, that you

22   listen.   Do you understand?

23             THE PETITIONER:   Yes.

24             THE COURT:   After the hearing is completed, there

25   will be a transcript and that transcript will be made

1    available to you.

2              Do you understand me?

3              THE PETITIONER:  Yes.  Yes, Judge.

4              THE COURT:  All right.  Do you have any trouble

5    understanding English?

6              THE PETITIONER:  No, no, I don't.

7              THE COURT:  All right.

8              MS. ROSENBLUM:  If I may?  Before we take any

9    evidence in this case, I would simply like to note that any

10   evidence that is now introduced into the record regarding the

11   defendant's competency at the time of trial was certainly not

12   before the state trial court and would not be relevant to

13   whether the state court reasonably determined not to grant a

14   hearing or to inquire into competency, and also would not be

15   exhausted.  Thank you.

16             THE COURT:  It might bear on competency of counsel

17   in not assembling it.

18             MS. ROSENBLUM:  That's true, your Honor, except

19   for the fact if counsel was unaware of it, or if there was

20   nothing before the state court to indicate that he was aware

21   of it, again, no one could make a determination based on that

22   evidence since it wasn't made known at any point.

23             THE COURT:  I understand your position.

24             MS. ROSENBLUM:  All right.

25             THE COURT:  I'll hear from the petitioner.

4

1          MR. WILKINS:   Good afternoon, your Honor.

2          MS. BOYE:   Your Honor, we would like to proceed by

3   first handing out some exhibits.  It doesn't constitute

4   evidence, it's just for ease of reference.  This is nothing

5   new.

6          THE COURT:  All right.  I will take it.

7          MS. BOYE:  It includes some excerpts from the

8   transcript that we will be specifically talking about as well

9   as things that are already included in the record.

10          The only thing that isn't included in the record is

11   the first item, which comes from the court record from a 1981

12   arrest.  The petitioner was evaluated for competency.

13          THE COURT:  All right.  That will be marked.  It's

14   all in evidence.

15          MS. BOYE:  We would next like to present testimony

16   starting with the petitioner and ending with brief testimony

17   by the petitioner's mother, who is sitting in the back of the

18   galley right now, Mrs. Dolores Etoria.

19          Mr. Olivier Wilkins will be conducting the

20   examination of the witnesses, but during that examination we

21   would like to have Miss Etoria remain outside and then for

22   her testimony we'll have her come in.

23          THE COURT:  All right.  Remain outside, madam,

24   please.

25          MS. BOYE:  After that, we would be happy to

O. Etoria - direct - wilkins                5

1   respond to any legal issues that your Honor would like to

2   address.   We have divided the issues among us and are

3   prepared to respond.

4             THE COURT:   Swear the petitioner, please.

5             THE CLERK:   Do you understand your obligation to

6   tell the truth, the whole truth and nothing but the truth

7   under penalty of perjury?

8             THE PETITIONER:   I do.

9             THE COURT:   Keep your voice up.   Are you standing

10  next to the phone?

11            THE WITNESS:   I am right next to the phone.

12            THE COURT:   All right.   Keep your voice up.   It's

13  hard to hear you.

14            THE WITNESS:   Your Honor, I just haven't heard

15  anything at all that was just said in the courtroom, but I

16  just wanted you to know that.

17            THE COURT:   When you're questioning him, keep your

18  voices up and get close to the phone, please.

19  O R V I L L E      E T O R I A,

20       called as a witness, having been first duly sworn,

21       was examined and testified as follows:

22  DIRECT EXAMINATION

23  BY MR. WILKINS:

24  Q    Mr. Etoria, good afternoon.   This is Olivier Wilkins

25  here.   Do you hear me?

1   A   Yes.

2   Q   Okay.  How do you feel today?

3   A   Not too good, not too bad.

4   Q   Well, I hope you feel better by the time I start asking

5   you questions.  Okay.  Mr. Etoria, where are you right now?

6   A   Shawangunk Correctional Institution.

7   Q   Mr. Etoria, you are with us on the phone today with

8   regard to a hearing.  Is that correct?

9   A   Yes.

10  Q   Do you know the purpose of this hearing?

11  A   It has to do with a petition.

12  Q   I beg your pardon.  Would you repeat your answer,

13  please.

14  A   It has to do with a habeas corpus petition.

15  Q   Yes.  Mr. Etoria, do you know why you are in prison

16  right now?

17  A   I have been convicted of a homicide.

18  Q   Do you recall the events that led to your arrest?

19  A   No.

20  Q   Sir, why do you not remember these events?

21  A   Mainly because I was -- I was using drugs at that time.

22  Q   You said you were using a lot of drugs around that time.

23  You mean at the time of your conviction or at the time of the

24  crime?

25  A   I was using a lot of drugs both around the time of my --

1  of what had happened at that time and my conviction.

2  Q    Okay.  Are there other instances where you do not

3  remember what--

4         THE COURT:  What drugs?  What drugs were you using?

5         THE WITNESS:  Cocaine.

6         THE COURT:  Cocaine and what else?

7         THE WITNESS:  Marijuana and --

8         THE COURT:  What else?

9         THE WITNESS:  Heroin.  Heroin.

10        THE COURT:  Were you under drugs when you were

11 being tried?

12        THE WITNESS:  Yes.

13        THE COURT:  Weren't you incarcerated?

14        THE WITNESS:  Yes.

15        THE COURT:  How long had you been incarcerated

16 before the trial?

17        THE WITNESS:  About six months.

18        THE COURT:  Six months?

19        THE WITNESS:  Six months.

20        THE COURT:  Where were you getting the drugs while

21 you were incarcerated?

22        THE WITNESS:  I was getting some from the guys.

23        THE COURT:  What guys?

24        THE WITNESS:  Some guys in the jail.

25        THE COURT:  What were you using for money?

1            THE WITNESS:  Sometimes when I hold stuff for them

2   I get to use as my pay.

3            THE COURT:  You hold stuff, you mean you were

4   holding drugs for them?

5            THE WITNESS:  Yes.

6            THE COURT:  What jail were you in while you were

7   awaiting trial?

8            THE WITNESS:  Rikers Island.

9            THE COURT:  During that period, you tell me you

10  were using heroin, cocaine and marijuana?

11           THE WITNESS:  Yes.

12           THE COURT:  You were holding drugs for others with

13  the purpose of assisting them in distributing drugs?

14           THE WITNESS:  I don't know if I was assisting them.

15           THE COURT:  Have you explained to your client his

16  self-incrimination rights?

17           He's just told me he's committed serious crimes

18  that could send him away for the rest of his life.

19           Do you want him to continue to testify?

20           MS. BENTELE:  Yes, your Honor.

21           THE COURT:  All right.  Continue.

22  BY MR. WILKINS:

23  Q    Mr. Etoria, this is Olivier again.  Are there -- I asked

24  you earlier if you did not remember the events that led to

25  your arrest and you answered that you did not.

1          Are there other instances where you do not remember
2     what goes on?
3     A    Yes.
4     Q    Your answer was yes?
5     A    Other instances that I remember something else.
6     Q    When you do not remember --
7              THE COURT:  Sir, you can speak louder than that.
8     If you can't keep your voice up by shouting back into that
9     phone, I'm going to cut this hearing off.
10             Do you understand?
11             THE WITNESS:  Yes, your Honor.
12             THE COURT:  Get close to that phone and shout your
13    answers.  I don't want this hearing unnecessarily extended.
14    Am I clear?
15             THE WITNESS:  Yes, your Honor.
16             THE COURT:  All right.  Then pull yourself together
17    and clear up your voice.
18             Let's proceed.
19             MR. WILKINS:  Thank you, your Honor.
20    Q    Mr. Etoria, when did this first start happening?
21    A    When did what first start happening?
22    Q    When you started not remembering things.  When did that
23    first start?
24    A    At a very young age when I was eight.
25    Q    What happened at that time?

1    A    I was in a car accident.  I ran across the street to

2    catch a bus and I was hit by a car.

3    Q    Where were you hit?

4    A    In my head -- my whole body and my head hit the car and

5    I fell back and hit my head on the ground.

6    Q    Have you ever had any other head injuries?

7    A    Yes.

8    Q    When did that happen?

9    A    When I was a little older, 17, I got hit in the head

10   with a baseball bat.

11   Q    Were there other instances where -- were you actually --

12   I'm sorry, were you actually hospitalized for these injuries,

13   sir?

14   A    No, not for any of these two, no.  I went to the

15   hospital when I was 17, but just for the night.  They just

16   patched me up and sent me on my way.

17   Q    Have you ever been hospitalized, Mr. Etoria?

18   A    Yes.

19   Q    When would that be?

20   A    In 1981 and 1985.

21   Q    Mr. Etoria, would you describe the instance under which

22   you were hospitalized in 1981.

23   A    I was sent to the Kings County psychiatric department

24   for an evaluation.

25   Q    What was the result of that evaluation, Mr. Etoria?

1   A    Unspecified diagnosis.

2   Q    Sir, do you mean unspecified personality disorder?

3   A    Yes.

4   Q    Thank you.  Were there other instances when you were

5   hospitalized after 1981?

6   A    Yes.

7   Q    What were those, sir?

8   A    1985.

9   Q    Could you tell us what happened in 1985.

10  A    I was in the house and I started breaking up the house

11  and stuff, and my family, my mother, my family had to call

12  the police to take me to the hospital.

13  Q    Were you diagnosed at that time, sir?

14  A    Yes.

15  Q    What was the diagnosis?

16  A    Schizophreniform disorder.

17  Q    Have you ever been put on medication as a result of this

18  hospitalization?

19  A    Yes.

20  Q    Could you describe what these medications were?

21  A    It was something by the name of Haldol.

22  Q    Haldol?

23  A    Yes.

24  Q    And were you ever treated with psychotherapy at any of

25  those hospitalizations or as a result of those

O. Etoria - direct - Wilkins                    12

1  hospitalizations?

2  A     I was put on an outpatient basis after I came out the

3  hospital.

4  Q     Okay.  Sir, earlier you --

5             THE COURT:  Is he under medication now?  Ask him.

6  Q     I'm sorry?

7  A     They could hear me now?

8  Q     Yes.

9  A     All right.

10  Q     Sir, are you on medication now?

11  A     No.

12  Q     You mentioned earlier that you had head injuries when

13  you were a child.  Do you have any ongoing problems as a

14  result of these head injuries?

15  A     Yes.  I get severe headaches, make my head feel like a

16  band, like I hurt my head a lot.

17  Q     Do you still feel those headaches today?

18  A     Yes.  Sometimes they come and sometimes they go.

19  Q     Mr. Etoria, if anything, what do you do to cure these

20  headaches or to alleviate these headaches?

21  A     Right now, no, but before I used to use a lot of drugs

22  so the headache go away.  Now I can't do nothing for that

23  right now.

24  Q     Okay.  Earlier you mentioned that you started taking

25  drugs when you were very young.  Is there any point in your

O. Etoria - direct - Wilkins                13

1   life where you have used drugs more intensively than others?

2   A    Yes.

3   Q    When would that be?

4   A    When my headaches start hurting me.

5   Q    The purpose of this hearing today is to discuss the

6   events around your arrest and around the crime you were

7   accused for and convicted for in 1996.

8           At that time were you using drugs?

9   A    Yes.

10  Q    Would you describe your drug intake at that time.

11  A    I was snorting and smoking marijuana, two and tree bags

12  of heroin a day at the time, a day.

13  Q    Mr. Etoria, could you be maybe specific as to when

14  exactly this took place in 1996 or when it started or when it

15  continued?

16  A    It started about around my birthday.  Exactly it

17  started, I was celebrating my birthday.

18  Q    When is your birthday, Mr. Etoria?

19  A    April 21.

20  Q    Okay.

21  A    I just started.  At the time, before I know, I started

22  using hard drugs again.

23  Q    Yes.

24  A    And, you know, I used drugs to try to stop my headaches

25  also.

O. Etoria - direct - wilkins                14

1  Q    Okay.  So in 1986 you just said that you used drugs
2  extensively around your birthday and that continued up until
3  your trial and your conviction; correct?
4  A    Yes.
5  Q    How did this increased drug intake affect you?
6  A    It made me wander off trying to find --
7  Q    Could you repeat that, please, Mr. Etoria.
8  A    I said it put me out of my regular thinking, made me
9  wander the streets, sometimes to find drugs.  I be out for
10 days at a time trying to feed my habit and try and get rid of
11 my headaches.
12 Q    Where were you, Mr. Etoria, around your birthday in
13 1996?
14 A    I was in Philadelphia.
15 Q    Did you remain in Philadelphia --
16 A    No.
17 Q     -- in the summer of 1996?
18 A    No.
19 Q    Where did you go after you were in Philadelphia?
20 A    I came to New York.
21 Q    And where did you go when you came to New York?
22 A    I go sometimes by my friends and by my mother.
23 Q    Why did you go to your mother's?
24 A    I always go to my mother's.
25 Q    Do you remember what you did while you were there?

O. Etoria - direct - Wilkins                    15

1   A    While I was by my mother, I was by New York?

2   Q    Yes.

3   A    Well, I stayed by my friend's when I first went there to

4   New York, then I left and I was on a binge, I was snorting

5   cocaine, smoking marijuana, and heroin in the day, and then I

6   don't remember where I was until maybe about three days, two

7   days before I was arrested.

8   Q    Mr. Etoria, did you at some point leave your mother's

9   house?

10  A    Yes.

11  Q    Why did you leave?

12  A    I went to the store to buy some cigarettes.

13  Q    Did you ever return to your mother's house?

14  A    No.

15  Q    Do you remember exhibiting any weird behavior during

16  that time?

17  A    Yes.

18  Q    Would you describe that behavior?

19  A    I was on the steps one night and I saw the neighbor come

20  out, and he just looked funny to me.  I didn't know, he just

21  scared me for some reason, he just had me scared.

22  Q    Did you have any reasons to be scared, Mr. Etoria?

23  A    No.

24  Q    Are other instances similar instances during that time?

25  A    Yes.

O. Etoria - direct - Wilkins                    16

1   Q    Would you describe them, please.

2   A    I was inside the house and for some reason it just

3   looked like a big man, a big man was coming through the door,

4   through the gate, the man was coming.

5   Q    And just for the record, sir.  Could you tell us exactly

6   when this happened?

7   A    Maybe it's the time right before I was arrested, a

8   couple of days before.  I'm not sure exactly what day.  I

9   know it's couple of days before I was arrested.

10  Q    Mr. Etoria, did any of this happen before?

11  A    You mean if I had this before in my life?

12  Q    If you had these visions, these hallucinations?

13  A    Yes.

14  Q    When would that be?

15  A    Whenever I used a lot of drugs, like that, or whenever I

16  just -- when I'm not myself.

17  Q    Mr. Etoria, do you know why you were arrested?

18  A    Now I do.

19  Q    Did you know at the time when you were arrested why you

20  were in fact arrested?

21  A    No.

22  Q    Why do you not know?

23  A    Because I didn't know I do anything.

24  Q    Do you not remember the day of the incident?

25  A    No.

1   Q    Why not?

2   A    Because I was around wandering and stuff, I didn't

3   know -- I didn't know I did anything, I was just wandering

4   around going looking for stuff to do.

5   Q    When you said you were looking for stuff, do you mean

6   you were looking for drugs?

7   A    Yes.

8   Q    And what happened next?

9   A    I remember I woke up at my mother's house and I was

10  sleeping and talking and trying to wear off how I was

11  feeling.

12  Q    Mr. Etoria, then you got arrested; is that correct?

13  A    Yes.

14  Q    And when you were at Rikers Island, did you have any

15  thoughts about your trial and your defense?

16  A    No.

17  Q    Why did you not have any thoughts about your trial and

18  defense?

19  A    I didn't know I did anything to need to have a defense

20  or nothing.  I thought --

21  Q    Mr. Etoria, can I ask you to speak a little bit louder,

22  please.

23  A    I didn't know I needed a defense.

24  Q    Why did you not know --

25  A    I didn't do anything.

O. Etoria - direct - Wilkins          18

1  Q    I cut you off. Why did you not know you needed a

2  defense lawyer?

3  A    Because I thought they would find out what they want to

4  find out and let me go.

5  Q    Thank you. In weeks shortly before your trial, sir, how

6  were you feeling about what was going to happen to you?

7  A    How I was feeling?

8  Q    Yes, how were you feeling about what was going to happen

9  to you?

10 A    I don't quite understand that specific thing. I was

11 feeling like -- I don't know exactly what you mean.

12 Q    It's okay. I want to talk about your trial right now.

13      Mr. Etoria, do you remember your trial?

14 A    Yes. Some of it. Only when they call me to talk, I

15 remember some of it.

16 Q    When they called you to talk. Do you remember jury

17 selection?

18 A    Some of it.

19 Q    Do you remember the events that followed the jury

20 selection?

21 A    The jury selection? Not really. It depends on --

22 Q    Did you have --

23 A    -- what stage you're talking at. I'm not sure what

24 stage you're talking at.

25 Q    Okay. At the beginning of the trial, did you have any

O. Etoria - direct - Wilkins                    19

1   interactions with the judge?

2   A    Yes.

3   Q    Do you remember these interactions?

4   A    Yes.

5   Q    Would you describe these interactions.

6   A    Oh.  Judge try to tell me I had a right to be present in

7   the courtroom, and at that time I had a right to not to be,

8   to waive my presence in the courtroom.

9         I did not understand how I could be present and not

10  be present at the same time.

11  Q    Sir, do you understand the meaning of the words "waive

12  your right to be present"?

13  A    No.

14  Q    Did you understand then what the meaning of these words

15  was?

16  A    No.

17  Q    Thank you.  Do you remember your attorney?

18  A    I know he was in the courtroom, yes.

19  Q    And who was your attorney?

20  A    A man, Mr. Friedman.

21  Q    Have you had many conversations with your lawyer?

22  A    Now or then?

23  Q    Then.  With Mr. Friedman?

24  A    No.

25  Q    How many conversations have you held in preparation of

O. Etoria - direct - Wilkins                20

1  your defense with Mr. Friedman?

2  A    Before trial, I saw Mr. Friedman two times outside the

3  courtroom, one time for about two minutes and the next time

4  for no more than about five minutes.

5  Q    Mr. Etoria, what do you remember of your trial?

6  A    That the judge called to me to talk to me sometimes.

7  Q    Yes.  Do you remember anything else about your demeanor

8  during trial, about your feelings during trial?

9  A    I was scared 'cause I thought they was about to get me.

10  When I walk in the trial, the door, the big bright lights

11  they got on me, it hit me.  It made me feel dizzy and like

12  the room start spinning and people was saying things I

13  couldn't understand.

14  Q    And the judge earlier asked you if you were using drugs

15  during your trial and you answered yes.

16  A    Yes.

17  Q    Okay.  I'd like to at this point discuss some specific

18  points of your trial.  Do you remember when the judge

19  discussed the right to be present at trial, the Parker

20  warnings?

21  A    Yes.

22  Q    What do you remember of that instance?

23  A    She said I got the right to be present in the courtroom

24  and at the same time I don't got the right to be present in

25  the courtroom.

O. Etoria - direct - Wilkins                    21

1   Q    Did you understand at the time what the right to be

2   present in the courtroom was?

3   A    No.

4   Q    Were you ever asked to sign something?

5   A    Yes.

6   Q    What were you asked to sign?

7   A    They asked me to sign some paper saying that they didn't

8   want me in the courtroom and they would put me out.

9   Q    Did you in fact sign that piece of paper?

10  A    No.

11  Q    Who did?

12  A    The lawyer.

13  Q    And did you talk to your attorney at that time?

14  A    Yes.

15  Q    What did you say?

16  A    He said just to answer the questions and he would

17  explain to me later.

18  Q    Did he in fact explain to you later what you were giving

19  up?

20  A    No.

21  Q    Thank you.  Did you -- after being given the Parker

22  warning, do you remember having any other direct interaction

23  with the judge?

24  A    Yes.

25  Q    Would you describe those interactions for us.

O. Etoria - direct - Wilkins                22

1   A    I think I had one or two different instances where I was

2   speaking to the judge.  One time they said I should come back

3   to the bench.

4           Hello?

5   Q    I'm listening to you.

6   A    There was a time they said I should come back to the

7   bench.  So I didn't want -- I was trying to get my lawyer's

8   attention to ask him why wasn't no jurors coming up there,

9   you know.  I thought I was supposed to speak to the jury and

10  tell them something or they ask me questions and I would

11  answer.

12  Q    Mr. Etoria, are you telling us that you understood your

13  right to be present at sidebars to have anything to do with

14  the presence of the jury?

15  A    Yes, that I was supposed to speak to the jury.

16  Q    Was it in fact what you were supposed to do?

17  A    Yes.  That's what I was supposed to do I believed then.

18  Q    That is what you thought you were supposed to do?

19  A    Yes.

20  Q    Okay.  And did you understand what these interactions

21  with the judge were?

22  A    The lawyer told me the jury was already picked and the

23  judge was trying to explain how I could waive my right again,

24  but I was having problem understanding how I could waive my

25  right and be present at the same time or understand.  I did

O. Etoria - direct - Wilkins          23

1    not know how to waive my right and be present at the same
2    time.
3    Q     Yes.  Mr. Etoria, do you remember being in court when
4    the issue of a lesser included offense was mentioned?
5    A     Yes.
6    Q     Could you describe this event.
7    A     The lawyer tell me, and the judge tell me they going to
8    charge me with manslaughter.
9    Q     Yes.
10   A     I thought they was trying to give me a new charge for
11   something I don't know.
12   Q     Were they in fact giving you a new charge?
13   A     At that time, yes, I thought so.
14   Q     And who made the decision to forgo the lesser-included
15   offense?
16   A     The judge.
17   Q     Thank you.  Had you spoken to your attorney about the
18   lesser-included offense and what it meant?
19   A     I spoke to him.  He was trying to explain to me, but I
20   tell him I didn't want no new charge, I didn't want -- I
21   didn't -- why didn't they charge me before when they arrested
22   me?
23          So all of a sudden they want to charge me, and I
24   don't want no new charge they going to give me different
25   charge, somebody's died also they was going to give me.

1  Q    At that point did your attorney ask you about any past

2  mental problems?

3  A    No.

4  Q    Did he ask you any possible past head injuries?

5  A    No.

6  Q    Did he ask you anything about your prior arrests?

7  A    No.

8  Q    Did he ask you why you were not accepting the

9  lesser-included offense, which would give you a lesser

10 sentence?

11 A    No.

12        MR. WILKINS:    Thank you.

13        THE COURT:    Ask him whether he was under my

14 medications during the trial.

15 Q    At that time, during the trial, Mr. Etoria, were you

16 under medication?

17 A    Yes.

18 Q    What medications were you under, Mr. Etoria?

19 A    Cocaine and heroin.

20 Q    Thank you, Mr. Etoria.

21        THE COURT:    Were you under any psychotropic drug

22 that was prescribed by a physician?

23        THE WITNESS:    I can't recall.  I don't think so,

24 your Honor.

25        THE COURT:    So your attorney never saw you take any

1  medication, correct?

2          THE WITNESS:  No.  Not that I can recall.

3          THE COURT:  He did not see you take a medication;

4  is that correct?

5          THE WITNESS:  That's correct, your Honor.

6          THE COURT:  He didn't see you take any heroin or

7  cocaine or marijuana, did he?

8          THE WITNESS:  No, no, no, no he didn't see me doing

9  none of that.

10         THE COURT:  Thank you.

11 BY MR. WILKINS:

12 Q    Mr. Etoria, the prosecution may have some questions for

13 you.  Okay?

14 A    Yes.

15         MR. WILKINS:  Okay.  Thank you.

16         THE COURT:  Any cross?

17         MS. ANANIA:   I have a number of questions.

18         THE COURT:  You better move on here, if you don't

19 mind.

20 CROSS EXAMINATION

21 BY MS. ANANIA:

22 Q    Good afternoon, Mr. Etoria.  My name is Sheryl Anania.

23 I am an Assistant District Attorney with the Kings County

24 DA's office.  I'd like to ask you a few questions, if that's

25 all right?

O. Etoria - cross - Anania                26

1    A    Yes, ma'am.

2    Q    Okay.  Mr. Etoria, you testified that in 1981 you were

3    hospitalized for a brief period of time at Kings County

4    Hospital; is that correct?

5    A    Yes.

6    Q    And do you remember after you were hospitalized you went

7    back to court?

8    A    Yes.

9    Q    And do you remember that you plead guilty to robbery in

10   the second degree?

11   A    Yes.

12   Q    At the time that you plead guilty, did you understand

13   the fact that you were pleading guilty to a violent felony?

14   A    Yes.

15   Q    And did you have an attorney with you at that time?

16   A    Yes.

17   Q    And was that an attorney that was hired by your family?

18   A    I'm not sure.  Maybe.  I know I had an attorney one time

19   I was arrested before by my family, yes.

20   Q    And when you were pleading guilty, were you under the

21   influence of any drugs at that time, in 1981?

22   A    No.

23   Q    But you did say that you had been using drugs before

24   your arrest; is that correct?

25   A    Yes.

O. Etoria - cross - Anania                27

1   Q    But at the time you plead guilty you were not under the
2   influence of drugs?
3   A    No.
4   Q    Now, you were in jail for how long?
5   A    Three years.
6   Q    And during the time you were in jail did you use
7   drugs --
8            THE COURT:   Prison.
9   A    -- back then?
10  Q    Yes.
11  A    Sometimes.
12  Q    While you were in prison?
13  A    Yes.
14  Q    And do you remember when you were released from prison?
15  A    Yes.
16  Q    When was that?
17  A    1984.
18  Q    And when you were released, do you remember what you did
19  when you got out?
20  A    I went home.
21  Q    Did you work?
22  A    I might have gotten a job somewhere, yes.  I might have.
23  I'm not particularly sure.
24  Q    Now, sir, have you completed high school, do you have a
25  high school diploma?

O. Etoria - cross - Anania                    28

1   A    Yes, ma'am.

2   Q    And when did you complete high school?

3   A    I never complete high school.  I got my high school

4   equivalency.

5   Q    When was that?

6   A    In jail.

7   Q    Do you remember when?

8   A    No, not really.

9   Q    But it was sometime your incarceration between '81 and

10  '84?

11  A    Yes.

12  Q    Now, you say that then you went back to the hospital in

13  1985 because you were breaking things up in your household?

14  A    Yes, ma'am.

15  Q    And you -- let me ask you this, sir.  As you're

16  testifying now, is there anything in front of you, any pieces

17  of paper that you're referring to that are helping you recall

18  the dates and what you're testifying about?

19  A    Yes, ma'am.

20  Q    What is it that you're referring to?

21  A    Just scribbles on a piece of paper I scribbled some

22  stuff.

23  Q    And did you scribble down dates that you were in the

24  hospital?

25  A    No.

1  Q    And that you're testifying from your memory?

2  A    From my memory.

3  Q    And what about the fact that you were diagnosed with

4  schizophreniform disorder, is that from your memory or is

5  that something you scribbled down?

6  A    From scribble down and my memory.

7  Q    You do remember that?

8  A    Yes, I do remember that.

9  Q    Now, the medication that you testified that you were

10 prescribed at that time, I believe you testified it was

11 Haldol?

12 A    Yes, ma'am.

13 Q    Is that from your memory that you're testifying?

14 A    From both my memory and the paper I got.

15 Q    Now, when you were released in 1985, can you tell us

16 what you did after that.

17 A    I went home to my mother's house.

18 Q    Did you get a job?

19 A    I don't remember, ma'am.

20 Q    Well, between 1985 and the time you were arrested and

21 charged with murder in 1996, can you give us an idea of what

22 you did in those 11 years?

23      Did you work at any time during that time period?

24 A    Well, I mainly worked for guys and then -- and I take my

25 drugs and use them.

O. Etoria - cross - Anania                    30

1   Q    Did you use drugs for the 11 years between 1985 and

2   1996?

3   A    No, ma'am.

4   Q    When did you stop using drugs after 1985?

5   A    When I came out the hospital, I stopped using drugs for

6   about two years.

7   Q    Did you go to any drug treatment program?

8   A    No.    I went to an outpatient program for my

9   psychological problems and was taking medication.

10  Q    And that was the Haldol?

11  A    Yes, ma'am.

12  Q    And when did you stop going to that program?

13  A    About a couple of months after I went.

14  Q    So you stopped sometime in 1985?

15  A    Maybe.

16  Q    How long were you off drugs?

17  A    About two years.

18  Q    Do you remember when you started using again?

19  A    I don't remember, but it was after two years or so.

20  Q    Then what did you start using?

21  A    Regular cocaine and marijuana and heroin.

22  Q    Were you living at home at that time?

23  A    No, ma'am.

24  Q    Where were you living?

25  A    Away on the streets with friends.

O. Etoria - cross - Anania                31

1   Q    In New York?

2   A    Yes, ma'am.

3   Q    And did there come a point where you moved to

4   Philadelphia?

5   A    Yes, ma'am.

6   Q    When was that?

7   A    About 1989, 1990.  I can't be sure what date, month.

8   Q    Did you have your own apartment there or did you live

9   with friends or family?

10  A    I have my only little room and I stayed with friends,

11  too.

12  Q    Were you working at that time?

13  A    I was working in places that sell stuff, so I could make

14  money.

15  Q    Now, do you remember that you were arrested in 1993 in

16  Philadelphia?

17  A    Yes, ma'am.

18  Q    And do you remember what that was for?

19  A    It was for sale of marijuana.

20  Q    Do you recall that when -- were you using drugs at the

21  time that you were arrested?

22  A    Yes, ma'am.

23  Q    Do you recall that when you were arrested you gave a

24  different name other than Orville Etoria?

25  A    I'm not sure.  I might have.  I'm not sure.

O. Etoria - cross - Anania                    32

1   Q    Do you remember giving the name Michael Robinson?

2   A    No, ma'am.

3   Q    And do you recall whether or not you were -- you plead

4   guilty in that case?

5   A    I plead guilty.

6   Q    And at the time you plead guilty did you understand what

7   you were doing?

8   A    Yes, ma'am.

9   Q    And did you have an attorney in that case?

10  A    Yes, ma'am.

11  Q    And you understood who the judge was and the prosecutor

12  and the defense attorney?

13  A    Yes, ma'am.

14  Q    And do you remember what your sentence was in that case?

15  A    I got a sentence for a misdemeanor and one year

16  probation.

17  Q    Now, you testified that in 1996 you were living at home?

18  A    Yes, ma'am.

19  Q    And I believe you said that you started using drugs

20  around the time of your birthday in April of '96?

21  A    Oh, 1996 or 1986, I got that mixed up with you, ma'am.

22  Q    All right.  There was some confusion in the dates.  Do

23  you remember what year you were arrested for this murder?

24  A    1996.

25  Q    Now, when were you using drugs?  I believe you testified

1   it started around the time of your birthday?

2   A    Yes, ma'am.

3   Q    Prior to your birthday, when was that, in April, before

4   your birthday had you been using drugs?

5   A    No, ma'am, not like the way I was using it that summer.

6   Q    Well, what was the difference?

7   A    The difference is, I was celebrating my birthday.  My

8   friends was around and I started smoking a little marijuana.

9   Q    All right.  That was before your birthday.  Didn't you

10  say after your birthday you started using drugs more?

11  A    That was around my birthday.

12  Q    After your birthday -- do you remember when you were

13  arrested, what month?

14  A    I was arrested in August, they said.

15  Q    Do you remember where you were when you were arrested?

16  A    I was walking from the store going to my mother's house.

17  Q    And the police handcuffed you?

18  A    I don't remember if they handcuff me, they put me in the

19  car, ma'am.

20  Q    Do you remember what precinct they took you to?

21  A    Yes.

22  Q    What precinct?

23  A    77th Precinct.

24  Q    And do you remember the name of the officer who arrested

25  you?

O. Etoria - cross - Anania                34

1   A    No, ma'am.

2   Q    Do you remember how long they kept you in the precinct?

3   A    I believe most of that day.

4   Q    Do you remember if you were placed in any lineups?

5   A    I'm not sure, ma'am.

6   Q    Do you remember when you went to court -- do you

7   remember when you were brought before a judge the first time

8   for your arraignment?

9   A    (No response.)

10  Q    Do you remember you were assigned an attorney, Mr.

11  Kleinman?

12  A    I remember I went in the courtroom with a man.

13  Q    Do you remember whether or not he asked you any

14  questions before you went before the judge?

15  A    No, ma'am, I can't remember if he did.  I can't -- I

16  don't remember.  I can't remember.

17  Q    All right.  Do you remember that you told him that you

18  lived with your mother and that you had lived in Pennsylvania

19  before that?

20  A    I can't remember what exactly I told him.  But I know I

21  was living with -- staying with my mother at that time I was

22  arrested.

23  Q    Did you understand who the judge was when you were

24  brought before the court?

25  A    A man, he was a man.  I understand I was in front of a

1   man.

2   Q    Do you know what his role was?  Did you know what a

3   judge did?

4   A.   At the time I don't know what he was, what they wanted

5   to say.

6   Q    My question to you, sir, is you had been -- you had been

7   before a judge on a number of occasions; is that correct?

8   A    Yes, ma'am.

9   Q    When you were arraigned in this case, did you understand

10  who the judge was?

11  A    I would say yes.

12  Q    Okay.  Did you understand who the prosecutor was?

13  A    He she was a lady standing.  I don't know who she was.

14  Q    Do you understand what a prosecutor is?

15  A    Now I do.

16  Q    Did you understand at that time?

17  A    I'm not sure, ma'am.  I can't recall.

18  Q    Did you understand what the attorney, the man who was

19  standing up for you, the defense attorney, did you understand

20  his role?

21  A    I know he came and asked me question.  I can't be for

22  sure what he was doing.

23  Q    Do you know what bail is?

24  A    Bail?

25  Q    Yes.

O. Etoria - cross - Anania                    36

1   A    Yes.

2   Q    Do you know what remand is?  Do you know what the word

3   "remand" means?

4   A    That's a jail.

5   Q    Do you know whether or not the prosecutor or the defense

6   attorney talked to the judge about any bail in your case?

7   A    No, ma'am.

8   Q    At some point Mr. Friedman was assigned to represent

9   you; is that correct?

10  A    Yes, ma'am.

11  Q    And did you know who he was?

12  A    A man, yes, I know who he was at the time.

13  Q    And what did you think he was there to do for you?

14  A    I don't know.  He never said what he was there to do for

15  me.

16  Q    In other words, you didn't understand that he was

17  representing you as your lawyer?

18  A    I don't know what he was supposed to do, ma'am.

19  Q    You had had attorneys in other cases, right?

20  A    Yes, ma'am.

21  Q    And did you understand what they were there to do?

22  A    Yes, ma'am.

23  Q    Why is it that you didn't understand what Mr. Friedman

24  was there to do?

25  A    Because I'm not -- I don't understand, he never asked me

O. Etoria - cross - Anania                    37

1   any questions.  I didn't know what -- what to say to him.

2   Q     You said that you were on drugs at the time you were

3   arrested.  Correct?

4   A     I was coming off drugs at the time I was arrested.

5   Q     When was the next time that you used drugs after that?

6   A     I was locked up in Rikers Island.

7   Q     When did you first use drugs at that point?

8   A     About three weeks after I got there.

9   Q     How often would you use drugs in jail, in prison?

10            THE COURT:  Jail.

11  Q     Jail.

12  A     As soon as I could get it I started using a little

13  marijuana at first.

14  Q     Now, do you recall being brought to court on a number of

15  occasions and appearing in front of the judge on your case?

16  A     They just took me to court and took me back out the

17  courtroom.

18  Q     And do you remember that there were several different

19  judges that were on the bench when you were brought to court,

20  that you had to appear before different judges?

21  A     I don't remember, ma'am.

22  Q     Do you remember seeing Mr. Friedman in court every time

23  you were brought to court?

24  A     No, not every time, ma'am.

25  Q     All right.  Were there sometimes the case was called

1  without Mr. Friedman being there with you?

2  A    I don't remember.  Sometime I go I don't see him.

3  Q    Did you ever tell him about your past hospitalizations?

4  A    No, ma'am.

5  Q    Why not?

6  A    I didn't know I have to tell him anything about my

7  hospitalization.

8  Q    Did you ever tell him that you didn't understand what

9  was going on?

10  A    Yes, I've told him I don't understand what's going on.

11  Q    When was that?

12  A    Before we started trial and stuff.

13  Q    What did you tell him you didn't understand?

14  A    The time when the judge always want to talk to me, I

15  always tell him I don't understand everything that they

16  saying.

17  Q    Are you talking about before the trial started?

18  A    No.  I'm talking about instances where the judge called

19  for me to talk to him.

20  Q    You mean during the trial?

21  A    Yes, ma'am.

22  Q    I'm saying to you, before the case ever went to trial,

23  on all the times you had to appear in court before that, did

24  you ever tell him that you didn't understand why you were

25  being charged or what was going on?

O. Etoria - cross - Anania                        39

1  A    He didn't ask me anything and I didn't know I had to
2  tell him anything.
3  Q    All right.  At some point do you remember signing an
4  affidavit in this case?
5  A    I sign -- I don't remember.
6  Q    In December of 2000 you swore to an affidavit, you swore
7  out different facts that you said about Mr. Friedman or about
8  the case, do you remember any of that?
9         Do you have the affidavit with you?
10 A    Yes.  The affidavit -- I have it.
11 Q    If you could look at number 17 on the affidavit -- do
12 you have that in front of you?
13 A    Give me one second.
14         (Pause.)
15         MS. BOYE:   Exhibit H.
16         MS. BENTELE:   The 440, December 12, I think.
17 A    Yes.
18 Q    I believe you said that you thought he was trying to
19 trick you, that you didn't trust him.  Do you remember
20 that?
21 A    Yes, ma'am.
22 Q    When was that, when did you start to believe that?
23 A    When did I start to believe -- start to believe I could
24 not trust him?
25 Q    Yes.

*Burton H. Sulzer, OCR, CRR, CSR, CM*

O. Etoria - cross - Anania          40

1   A    At that time I guess when he said -- he said and she
2   said I shot Garth Frazier, and the officers when they
3   arrested me told me Buffer and Garth Frazier was the same
4   person.
5   Q    The officers told you that at the time you were
6   arrested?
7   A    Yes.
8   Q    And did you know who they were talking about?
9   A    I know who they talking about.
10  Q    Okay.  So you were charged with shooting Garth Frazier,
11  right?
12  A    Yes.
13  Q    You know that that is the allegation in the case, right?
14  A    No.  Now I do, ma'am.
15  Q    You didn't understand that at the time of your trial,
16  that you were accused of murdering someone named Garth
17  Frazier?
18  A    At the time I'm not sure what I understand, ma'am.
19  Q    Are you telling us that at the time you went to trial
20  you did not understand what you were being charged with?
21  A    I know they charge me with a homicide, yes.
22  Q    And it was the homicide of Garth Frazier, right?
23  A    Yes, ma'am.
24  Q    So when Mr. Friedman told you that that was what you
25  were charged with, what about that made you not trust him?

O. Etoria - cross - Anania                    41

1   A    He didn't ask me any questions about who I was, my
2   family or anything, and I didn't know I have to tell him
3   anything.

4   Q    Didn't he ask you if you had an alibi for that date?

5   A    No, ma'am.

6   Q    He never asked you that?

7   A    No, ma'am.

8   Q    He never asked you where you were in between the date of
9   the crime and the date of the arrest?

10  A    No, ma'am, I can't recall he ever asking me that.

11  Q    Do you remember that your defense was that you didn't do
12  this?

13  A    I remember my defense was he said -- who I read now, he
14  said, identification.

15  Q    Not now, but my question to you is back then, do you
16  remember that was your defense?

17  A    Back then I didn't even know I have a defense, ma'am.

18  Q    Do you know what a defense is?

19  A    Now I do.

20  Q    But you didn't know then, is that what you're saying?

21  A    No, ma'am.

22  Q    You also said that you were hearing voices; that is what
23  you said in your affidavit?

24  A    Yes, ma'am.

25  Q    You didn't testify about that before.  Were you hearing

1   voices?

2   A    I didn't testify at trial, so --

3   Q    No, just now.

4   A    I didn't get a chance to speak to the jury.

5   Q    I'm saying now, Mr. Etoria, when you were just

6   questioned by your attorney, you didn't mention that you were

7   hearing voices while you were under the influence of drugs.

8   A    I didn't know I had to tell him, ma'am.

9   Q    When he asked you to describe what you were feeling when

10  you were under drugs, you didn't understand that you had to

11  also say if you were hearing voices?

12  A    Mr. Friedman never asked me --

13  Q    Not Mr. Friedman.  Just a few minutes ago when you were

14  just questioned by Mr. Wilkins and he asked you how you were

15  feeling when you were under drugs, under the influence of

16  drugs.

17  A    That they were laughing at me in the courtroom and

18  calling me loser and telling me to watch Mr. Friedman.

19  That's what you mean?

20  Q    My question to you is, did you ever hear voices?

21  A    Yes, ma'am.

22  Q    Okay.  When was the first time you heard voices?

23  A    I hear voices from when I was young, ma'am.  I hear

24  voices, sometime they speak to me.

25  Q    Is it only that you hear voices when you're under the

O. Etoria - cross - Anania                    43

1  influence of drugs?

2  A    When I'm under the influence of drugs and when I'm not

3  under influence of drugs I hear voices.

4  Q    Have you ever told anyone that you hear voices?

5  A    I don't want to tell nobody.  I don't know I have to

6  tell nobody.

7  Q    When was the first time that you told anyone?

8  A    I told the doctor within time that I hear voices.

9  Q    Now, since the trial, sir, have you used any drugs since

10  you've been in prison?

11  A    Not for a long time, ma'am.

12  Q    How are you feeling?

13  A    Okay.  Better.

14  Q    So you feel at this point that you understand everything

15  that's going on now?

16  A    Around me, yes, ma'am.

17  Q    So would you say that the only time you really don't

18  understand what is going on is when you're under the

19  influence of drugs?

20  A    No.  I wouldn't say that, ma'am.  There is sometime I

21  don't use drugs and I hear voices.  Sometimes my head hurt me

22  a lot and sometimes I withdraw from people and stay to

23  myself, I don't talk to nobody.  I don't tell them, nobody,

24  that I hear.

25  Q    Have you had any psychiatric treatment while you've been

1   I have a right to waive that right, and I was -- how am I

2   supposed to be present and I was supposed not be present at

3   the same time?

4          And then she said something else about the trial,

5   she going to start the trial without me if I'm not there.  So

6   I told her I didn't understand, and Mr. Friedman start

7   talking to me.

8   Q    But you understood the fact that you had the right to be

9   present; is that correct?

10  A    I understand.

11  Q    And you understood that you wanted to be present; is

12  that correct?

13  A    At the time.  But I didn't know how I could be present

14  and not be present at the same time.

15  Q    Okay.  Now, you had every intention of being present for

16  the trial; is that correct?

17  A    I wanted to.

18  Q    You wanted to be?

19  A    Yes.

20  Q    In fact, you wanted to participate in jury selection,

21  isn't that correct?

22  A    I wanted to be there.  I didn't know I was supposed to

23  be in the courtroom.

24  Q    And you wanted to also hear everything that the jurors

25  were saying to the judge and your attorney, isn't that right?

1   A    Everything that every one of them said, ma'am.

2   Q    Exactly.  In fact, you were present, you came up to the

3   sidebar and you were present with all the jurors and with the

4   judge and your attorney, right?

5   A    Yes, but they didn't let me speak to them, ma'am.

6   Q    Because you didn't have a right to speak to them.  Did

7   you not understand that?

8   A    Excuse me.

9   Q    Did you understand that only the attorneys and the judge

10  could ask questions?

11  A    No, ma'am.

12  Q    Okay.  Someone explained that to you, didn't they?

13  A    Who?

14  Q    I'm asking you, did someone explain that to you?

15  A    Not that I could recall.

16  Q    Do you remember after the attorneys finished asking the

17  jurors questions that you had the right to sit down with

18  Mr. Friedman and confer with him, discuss who you wanted on

19  your jury and who you didn't want, do you remember doing

20  that?

21  A    No, ma'am.

22  Q    You don't remember actually discussing who you would

23  strike and who you would keep?

24  A    No, ma'am.

25  Q    You have absolutely no recollection of any of the jury

O. Etoria - cross - Anania                    50

1  selection?

2  A    I never -- I never attend and ask Mr. Friedman who he
3  would pick or not pick, no, I don't -- I don't recall ever
4  doing that.

5  Q    You also testified in terms of the manslaughter charge,
6  you testified that you didn't understand the fact that there
7  wasn't a second person -- withdrawn.  Let me ask you this.

8       Are you saying that you thought there were two
9  people that were murdered and that's why they wanted to add a
10  manslaughter charge?

11  A    Yes, ma'am.

12  Q    Where did you get that idea from?

13  A    First I was charged with murder and then as the trial
14  finish, they said they want to charge me with manslaughter.
15  I said I don't want no charge, you charge me already.  I
16  don't want no more charge.  I didn't know what they meant.

17  Q    Even though you kept asking the court to explain it to
18  you because you told him you didn't understand, the court
19  explained you could get a lesser sentence.  Are you saying --

20  A    They was trying to trick me, the lawyer and the judge
21  was trying to trick me, give me two charge.

22  Q    And but at some point after that, what you're saying is
23  that Jerry Gloster explained it to you and you were able to
24  understand it when he explained it to you but not when your
25  attorney did?

1   A    I don't --

2   Q    Is that correct?

3   A    Yes.

4   Q    You understood it when he explained it but you didn't

5   understand it at the time of trial?

6   A    I wasn't on no drugs at the time Jerry Gloster explain

7   it to me.

8   Q    Mr. Etoria, would it be correct to say that every day of

9   the trial you were under the influence of drugs?

10  A    Most days, yes, ma'am.

11  Q    How many days was the trial, do you remember?

12  A    About three, four days.

13  Q    And you're saying that every -- what time did you get

14  back to Rikers Island at the end of the day?

15  A    I can't recall, ma'am.

16  Q    But it was late, wasn't it?

17  A    Probably.

18  Q    And you're saying that when you got back there you would

19  use drugs either that night or the next morning?

20  A    Yes, ma'am.

21  Q    And you would use it right before you got on the bus to

22  come to court?

23  A    Yes, ma'am.

24        MS. ANANIA:    I don't have any more questions,

25  Mr. Etoria.

O. Etoria - redirect - Wilkins                    52

1          MR. WILKINS:   If I may, can I ask two questions?

2          THE COURT:  Yes, you may have some redirect.

3          MR. WILKINS:   Thank you.

4   REDIRECT EXAMINATION

5   BY MR. WILKINS:

6   Q    Mr. Etoria, can you hear me?

7   A    Yes.

8   Q    This is Olivier again, Olivier Wilkins.

9   A    Yes.

10  Q    I just want to ask you two questions.  At some point you

11  said to the DA that you thought that Mr. Friedman was working

12  against you.  Is that correct?

13  A    Yes.

14  Q    You said that he may have been working against you when

15  he in fact said to you that Buffer claimed that you killed

16  Garth Frazier?

17  A    Yes.

18  Q    Why did that make you suspicious?

19  A    Because the officer -- he's trying to tell me that a

20  dead man said I killed another dead man.  I didn't trust him

21  no more cause these two people is dead, how can I kill them?

22  Q    What do you mean, two dead men, is Mr. Buffer dead?

23  A    Yes.

24  Q    Was he dead at the time when Garth Frazier was dead?

25  A    Yes.

O. Etoria - redirect - Wilkins                          53

1   Q    It is the same person?

2   A    Yes.

3   Q    You're saying Buffer and Garth Frazier are the same

4   person?

5   A    Yes.

6   Q    Thank you.

7        I want to ask you one more question.  You indicated

8   to the prosecutor that you had blackouts during your trial?

9   A    I have blackouts during -- sometimes I be sitting there

10  staring.  If they don't call to me I don't know what they

11  want.  If the judge don't call for me to talk, I don't know I

12  was there sometime.

13  Q    Were you listening to what was going on during those

14  blackouts?

15  A    No.

16  Q    Thank you, Mr. Etoria.

17           THE COURT:  All right.  Thank you, sir.

18           (Witness excused.)

19           THE COURT:  Call your next witness, please.

20  D O L O R E S          E T O R I A,

21      called as a witness, having been first duly sworn,

22      was examined and testified as follows:

23  DIRECT EXAMINATION

24  BY MR. WILKINS:

25  Q    Good afternoon, Mrs. Etoria.  How are you?

D. Etoria - direct - Wilkins                54

1    A    All right.

2    Q    Mrs. Etoria, how do you feel today?

3    A    Well nervous.

4    Q    You're nervous.  That's okay.  I hope I make you feel

5    better asking you these questions.

6              Mrs. Etoria, would you describe for the court and

7    the prosecutor your relationship to Orville.

8    A    He's my son.

9    Q    Do you know why Orville is in prison now?

10   A    I understand that he committed murder.

11             THE COURT:    Keep your voice up.  I can't hear you.

12   A    I understand that he committed murder.

13   Q    Mrs. Etoria, did you attend his trial?

14   A    No.  He asked me not to come.  He begged me not to come.

15   So this is one time I didn't come.

16   Q    Do you know when these events took place?

17   A    From what I understand, it was late in July.

18   Q    And did you see your son during that summer?

19   A    Yes.

20   Q    And do you remember exactly when you saw your son during

21   that summer, that exact period?

22   A    It was towards the end of July and the first week of

23   August.

24   Q    I assume we're talking about July and August 1996; is

25   that correct?

1  A    Yes.

2  Q    Thank you.  Would you describe for us what his demeanor

3  was at that time.

4  A    He was edgy.  If the phone rang, I could see he was not

5  calm, not himself.

6  Q    Were there specific instances where he was not calm and

7  not himself, that you could remember?

8  A    I remember one day I had a neighbor passing by, we were

9  outside, and he became -- he became more angry, like angry to

10 tell him to go away.  So I said to him, that's my neighbor,

11 he's a good person.

12 Q    Was there any reason why the neighbor should have gone

13 away?

14 A    He wasn't bothering him or anything.

15 Q    Would you describe that as irrational behavior from your

16 son?

17 A    Yes.

18 Q    Were you used to these irrational behaviors?

19 A    Sometimes he would scream and yell.

20 Q    Were there other instances where your son did not behave

21 normally during that time?

22 A    In the summer that I saw him, he said he saw this huge

23 person coming through the gate, and I said to him, there is

24 no one there.  For me that was -- I said to him, I think you

25 should see a doctor.  I just couldn't get him to go.

D. Etoria - direct - Wilkins                    56

1    Q    See a doctor?

2    A    Yes.

3    Q    And did he in fact go see a doctor?

4    A    No.

5    Q    You're sure of that?

6    A    Yes.

7    Q    What happened to Orville in August of 1996?

8    A    Well, he was -- he was there with me and I remember this

9    because he had put on a short shirt, and we ate dinner, and

10   he said he was going outside to buy cigarettes.

11          Now he doesn't smoke inside because I cannot allow

12   the smoke for myself, so I notice he didn't come back.  But I

13   said, well, maybe it was just friends or relatives.  Since

14   he's grown I never bother myself, but the following day I

15   said to my sister, You know, he left to buy cigarettes and I

16   don't see him come back.  She said to me, I don't know what

17   to tell you.  But he was arrested.

18   Q    At that time were you aware whether or not Orville had

19   ever undergone a psychiatric evaluation?

20   A    In '85, if I am correct, I came home from work one day

21   and my friend's son stopped me and said don't come in because

22   he was breaking up the place and, you know, he didn't know

23   who was anybody, who anybody was, so just stay outside.

24   After awhile he calmed, he seemed to be able to calm and then

25   I call the cops and they took him to the hospital.

*Burton H. Sulzer, OCR, CRR, CSR, CM*

D. Etoria - direct - Wilkins                    57

1   Q    Is there any reason why he should have acted that way on

2   that day?

3   A    I really don't know.  I can't think of anything.  Unless

4   he was out doing anything other than getting home all right.

5   Q    Were there other circumstances prior to this event when

6   Orville was not himself?

7   A    I think when he went to the hospital.

8   Q    Would you describe, as well as you can, the event that

9   led to the '81 hospitalization.

10  A    I think he was breaking up things like -- what was it,

11  ashtrays and things like that.  I'm not so clear in my mind.

12  Q    Okay.  Do you --

13  A    I think he went to the doctor then in '81.

14  Q    Do you know what the diagnosis was at that time?

15  A    I think it was a behavior problem.  I cannot say for

16  sure what it was called.

17  Q    Do you know if Orville ever took medication as a result

18  of this hospitalization?

19  A    Yes.

20  Q    Do you know what these medications are?

21  A    I don't remember.  I cannot tell you.

22  Q    Do you know if at any time your son was hospitalized for

23  anything else other than this?

24  A    In '79 he was -- the day after I came out, I got a call

25  that he was hit in the head, beaten in the head with a

1   baseball bat and he was at the Jewish Hospital.

2   Q    Mrs. Etoria, I'm sorry to be asking you all these

3   questions, but have you visited him in prison recently?

4   A    Yes.  I always visit him.

5   Q    How is --

6   A    I always visit him.

7   Q    How is his demeanor now?

8   A    He looks so much better.

9   Q    Thank you.  The prosecution may have some questions for

10  you.

11              THE COURT:  Any cross?

12              MS. ANANIA:   Just a few questions, your Honor.

13  CROSS-EXAMINATION

14  BY MS. ANANIA:

15  Q    Did you meet with Mr. Friedman, Mrs. Etoria?

16  A    I don't --

17  Q    Did you ever meet with Orville's lawyer before his

18  trial?

19  A    I believe he called me and told me he would represent

20  him.  But I can't remember meeting with him.  I think I

21  called him back and, from what I understand, it was such a

22  big crime, there was no like no hope for him, so --

23  Q    Did you visit Orville when he was in Rikers Island?

24  A    I visited him there.

25  Q    How many times did you visit him?

D. Etoria - cross - Anania                          59

1   A    I can't say offhand now.  But I know I did visit him
2   when relatives visited him.

3   Q    And a lot of relatives visited him as well?

4   A    What's that?

5   Q    A lot of your relatives visited him as well?

6   A    Yes.

7   Q    Do you know if you visited him more than once?

8   A    I would think so, yes.

9         MS. ANANIA:   Do you have a copy of the visitation
10  records?

11        MR. WILKINS:   No.

12        MS. ANANIA:   I made a copy for you.

13        (Pause.)

14  Q    If I told you that -- do you remember when you went to
15  Rikers Island you had to sign in to visit him?

16  A    I don't remember.

17  Q    Does it sound about right that you probably visited him
18  about once a month or at least six times when he was in
19  Rikers Island?

20  A    Like I say, I can't recall how many times.  But I did
21  visit him a few times.

22  Q    And there were other family members that also visited
23  him that lived at your address?

24        Do the names George McCann, or Margaret Tendall, or
25  Grendal Tendall sound familiar?

D. Etoria - cross - Anania                    60

1   A    My brother, sister, and brother-in-law.

2   Q    And do you remember speaking to him -- let me ask you

3   this, how long would the visits be when you visited him

4   there?

5        Approximately maybe about an hour, would that be

6   about right?

7   A    I don't know.  I don't remember the time.

8   Q    You don't remember.  Do you remember how he appeared

9   when you visited him?

10  A    I'm trying to stretch my memory.

11  Q    Did he appear unusual to you?  I think Mr. Wilkins asked

12  you before, you know, there were times where he wasn't

13  himself?

14  A    Yes.

15  Q    Did he seem himself when he was in Rikers Island?

16  A    I don't think.

17  Q    What seemed to be wrong with him?

18  A    Like confused, like.

19  Q    What was he confused about?

20  A    I don't know.

21  Q    Did he seem to understand why he was being held in

22  Rikers Island?

23       Did he seem to understand what he was being accused

24  of?

25  A    Many times I go, we just talk and then, you know, to

D. Etoria - cross - Anania                    61

1   cheer him up, not to ask him about --

2   Q    Were you concerned that he wasn't able to stand trial

3   because of his mental abilities at that time?

4   A    He didn't stand trial?  I really don't know.

5   Q    Did you have any concerns about the trial and the fact

6   that he didn't seem right to you?

7   A    Yes.  I would have liked to be here, but like I said, he

8   asked me not to come.  So --

9   Q    But you said you spoke to Mr. Friedman, correct?  That

10  would be his attorney, you spoke to him over the telephone?

11  A    Just so that he'll be my son's attorney.

12  Q    Did you ever tell Mr. Friedman anything about your son's

13  past psychiatric history?

14  A    I don't think I was given a chance to do that.  It was

15  like I said, he committed this crime and there was no hope

16  for him.  So I didn't have a chance to say -- talk to him

17  like I'm talking now.

18  Q    But you never -- you never told him about his

19  hospitalizations?

20  A    No.  I didn't have a chance to speak to Mr. Friedman.

21  Q    And you never told him that he had been on any

22  medication?

23  A    No.

24  Q    And you say that there was no hope.  What made you think

25  there was no hope?

D. Etoria - cross - Anania                    62

1   A    Well, if he's my attorney, I would think he would like

2   to spend some time with me to talk to me also, but I didn't

3   get that feeling.  I just felt that this is a hopeless case.

4   Q    Did you ever try to call Mr. Friedman yourself?

5   A    I called him, yes.

6   Q    And how many times -- did he ever call you?

7   A    He called me at first to tell me that he would be his

8   attorney.

9   Q    And then you called him another time?

10  A    Yes.

11  Q    Why did you call him the other time?

12  A    To find out when the trial would be, but --

13  Q    Orville didn't want to put you through that?

14  A    No.

15  Q    Is that what he told you?

16  A    Yes.  I would always be with him whatever, the hospital

17  or whatever, but he did not want me to come this time.

18         MS. ANANIA:   I don't have any other questions.

19  Thank you, Mrs. Etoria.

20         MR. WILKINS:   I just want to thank you for

21  testifying today.

22         THE COURT:  Thank you, madam.  You can go back to

23  the courtroom.

24         (Witness excused.)

25         THE COURT:  Any other witnesses?

D. Etoria - cross - Anania                    63

1          MR. WILKINS:   No, your Honor.

2          THE COURT:   Any other evidence?

3          MS. BENTELE:   No.

4          THE COURT:   All right.

5          MS. BOYE:   Yes.  We just wanted to submit some

6    information on drug use in jails.

7          MS. ANANIA:   Pardon?

8          MS. BOYE:   Drug use in jails --

9          MS. ANANIA:   Your Honor, I object.

10         MS. ROSENBLUM:   Your Honor, I object.  This has

11   nothing to do with this case.

12         THE COURT:   I will take it.  Mark it.

13         MS. BOYE:   I would like to note there is some

14   insinuation in your papers that it's unlikely that he'd be

15   able to get drugs in Rikers, and this is about the

16   availability of drugs.

17         MS. ROSENBLUM:   Nobody is testifying here.  This

18   is simply somebody's report.

19         THE COURT:   Okay.

20         MR. WILKINS:   Thank you, your Honor.

21         THE COURT:   Admitted.  Anything else?

22         MS. BENTELE:   No.

23         THE COURT:   Anything from the respondent?

24         MS. ANANIA:   Yes.  We would like to call

25   Mr. Friedman.

1          THE COURT:   Yes.   Mr. Friedman, stand and face me,

2   please.

3   E D W A R D     F R I E D M A N,

4        called as a witness, having been first duly sworn,

5        was examined and testified as follows:

6   DIRECT EXAMINATION

7   BY MS. ANANIA:

8   Q    Mr. Friedman, did you represent a defendant in this case

9   on trial, Mr. Orville Etoria?

10  A    I did.

11  Q    And do you currently have your file on this case?

12  A    I do not.

13  Q    Why is that?

14  A    I kept my file in an office, when I had an office in

15  Bensonhurst.  The file was in a basement area and there was a

16  flood in the basement and a lot of my files were destroyed.

17  Q    Was that one of them?

18  A    That was one of them.

19  Q    Do you have an independent recollection of the trial in

20  this case?

21  A    I do.

22  Q    Do you remember being assigned to represent Mr. Etoria?

23  A    I do.

24  Q    And did you have discussions with him about your defense

25  of him?

1  A      I did.

2  Q      And could you tell us what your recollections are in

3  terms of how many times you met with him.

4  A      My recollection is that I certainly met with him every

5  time the case was on in court.  I don't recall if I had met

6  with him at Rikers Island or Brooklyn House, wherever he may

7  have been incarcerated.

8          Those times that I did speak with Mr. Etoria about

9  his case became more frequent as the trial approached, and

10 also during the course of the trial I did speak with

11 Mr. Etoria every day of the trial.  There may have been a day

12 the trial was off when I spoke to Mr. Etoria in court.

13 Q      What was your impression from your discussions with him

14 of his mental competence?

15 A      My impression was that he was certainly competent to

16 stand trial in this case.

17 Q      What did you base that on?

18 A      Based upon my speaking with him, his participation in

19 the case, his understanding, not of specifically the

20 principles, but understanding what my role was, what the

21 prosecutor's's role was, what the judge's role was, what his

22 defense was going to be, whether he was going to testify or

23 not, whether any witnesses were going to be called on his

24 behalf.

25 Q      What was the defense in this case?

Friedman - direct - Anania                    66

1  | A     The defense was identification.

2  | Q     Did you discuss that with him?

3  | A     I did.

4  | Q     And do you have a recollection as to whether or not he

5  | participated in the proceedings during the trial?

6  | A     Yes, he did.  He did.  He was there.  There were issues

7  | with regard to voir dire.

8  |          Actually, in pretrial hearings I remember

9  | discussing issues with Mr. Etoria.  At the time of voir dire,

10 | it does stick in my mind that -- it's my usual custom to have

11 | my client maybe take a pencil and paper during jury selection

12 | and give his impressions of the prospective jurors.

13 |          I did -- I remember vividly that he did participate

14 | and discuss what kind of peremptory challenge we were going

15 | to be using and challenges for cause with regard to jury

16 | selection.

17 | Q     Did he ever tell you about any past hospitalizations for

18 | any mental conditions?

19 | A     He did not.

20 | Q     Have you ever seen anyone who is under the influence of

21 | psychotropic drugs, such as cocaine, heroin or marijuana?

22 | A     I've seen people under the influences of

23 | antipsychotropic drugs, and also I have seen people under the

24 | influence of cocaine.

25 | Q     Did you have an opinion as to whether or not during the

1  trial Mr. Etoria was under the influence of drugs?

2  A    My opinion was that he was not under the influence of

3  drugs.

4  Q    What did you base that upon?

5  A    Based upon my observations of him, my communication with

6  him.

7  Q    Did you discuss with him his right to be present at

8  sidebar conferences?

9  A    Yes.  So did the judge.

10 Q    What was his position on that?

11 A    His position with respect to his right to be present

12 sidebar during voir dire was that he didn't want to waive his

13 right to be present at sidebar conversations -- sidebar

14 conferences.

15 Q    Did he explain to you why?

16 A    I don't remember specifically, but I do recall speaking

17 with him about it and explaining to him actually that I would

18 be present during those sidebar conversations; that the

19 sidebar conferences with regard to jury selection would be

20 with regard to the ability of those jurors to sit on that

21 particular -- on his particular case, and actually I advised

22 him that it would be beneficial for him probably not to be

23 present, but that it was his choice, and he chose to be

24 present.

25 Q    Did you also discuss with him at a charge conference the

Friedman - direct - Anania                    68

1   decision on whether or not to request a lesser-included
2   offense?
3   A    It's my recollection that during the course of the trial
4   he had stated, or there was a determination this would be an
5   identification case.
6          I'm not quite clear, but I believe it was the judge
7   who had asked if my client wanted a charge down to
8   manslaughter in the first degree, and I do remember having a
9   conversation with him, it was an off-the-record conversation
10  with him, and he declined to have the judge charge them on
11  manslaughter in the first degree.
12  Q    Did you also discuss with him whether or not he should
13  testify on his own behalf?
14  A    Yes, I did, and the decision --
15  Q    What was your recommendation?
16  A    My recommendation was for him not to testify, and he
17  followed that recommendation.
18  Q    Do you recall after the verdict whether or not you had
19  any discussions with him?
20  A    I did have discussions with him after the verdict.  I
21  remember I probably discussed with him what was going to
22  happen, there was going to be a probation report done --
23  presentence report, excuse me, and that I think there were
24  issues with regard to what he would say to the Department of
25  Probation, and I'm sure I spoke to him on the day of

1   sentence.  I don't recall what was stated.

2          It is my custom and practice to tell people -- tell

3   my clients that they have the right to make a statement

4   during the sentence.  I don't recall that he made a

5   statement, and I did receive a phone call from Mr. Etoria --

6   I don't remember if it was between the date of the verdict

7   and the date of sentence or after that time, however, he

8   thanked me for representing him.

9   Q    Do you recall ever speaking to the defendant's mother?

10  A    I do believe I spoke to her over the phone.  I

11  remember -- may have, I don't have any independent

12  recollection of whether I spoke to her in person.

13  Q    Do you remember speaking to anyone other than his mother

14  in his family?

15  A    I don't recall.

16  Q    Did you learn from anybody that you can recall whether

17  or not he had any psychiatric history?

18  A    I never learned about any psychiatric history --

19  Q    And did --

20  A     -- while I represented him.

21  Q    Did he ever tell you that he was under the influence of

22  drugs at the time of trial?

23  A    No.  It had also been my feeling that since he was

24  incarcerated during the course of the trial that it would

25  have been unlikely that he would be under the influence of

1  drugs, but I certainly didn't see any, anything in his

2  demeanor or his appearance .

3          MS. ANANIA:    Thank you.  I have no further

4  questions.

5          MS. BOYE:    We would like to cross, but the two of

6  us actually might end up doing it, if that's all right with

7  your Honor?

8          THE COURT:  Go ahead.  You can handle it anyway

9  you'd like.

10          MR. WILKINS:    Thank you, your Honor.

11  CROSS-EXAMINATION

12  BY MS. BOYE:

13  Q    Good afternoon, Mr. Friedman.  Do you understand some of

14  the claims that are being made in this habeas proceeding?

15  A    I do.

16  Q    Could you tell us what those claims are?

17  A    It is my understanding that -- and I may be wrong, but

18  just from conversations I have had with counsel, that there

19  is a claim that Mr. Etoria was not competent to proceed on

20  this trial because of psychiatric deficiency.

21  Q    Are you also aware that there is an ineffective

22  assistance of counsel claim being made?

23  A    Not specifically.

24  Q    Did you anticipate that that might be one of the claims?

25  A    I thought it could be.

1  Q    So is it plausible to say that you have an interest in

2  the proceedings here today?

3  A    No specific personal interest myself, but just an

4  interest in divulging to the court what my perceptions were

5  of Mr. Etoria.

6  Q    Prior to trial proceedings, how many times did you --

7  I'm not talking about in-court communications or just

8  communications prior to a court proceeding -- how many times

9  did you talk to him before the trial started?

10  A    I can't say exactly how many times.  Again,

11  unfortunately, because I don't have my file, I don't have my

12  notes, which would have indicated when I spoke to him, but I

13  would imagine generally in the case, again I can't be

14  specific, that it was probably -- it would probably be 15 or

15  20 times.

16              A VOICE:   Hello?

17              THE COURT:  Yes?

18              A VOICE:   I need to know whether this call is

19  going to go past 3:30.

20              THE COURT:  This call will go on until I terminate

21  it.

22              A VOICE:   Say it again.

23              THE COURT:  This is the judge.  This call will go

24  on until I terminate it.

25              A VOICE:   Do you anticipate this call going past

Friedman - cross - Boye                    72

1   3:30 is the question?

2           THE COURT:  You can assume it will.

3           A VOICE:   Thank you.

4           THE COURT:  Yes.  Proceed.

5   BY MS. BOYE:

6   Q    So you don't have any recollection of whether you did or

7   did not have meetings with Mr. Etoria before the trial

8   started?

9   A    I'm not quite sure what you mean meetings.  I mean I met

10  with him in court.  I met with him when his case was on.

11  Q    Before this trial started?

12  A    Before, because there were calendar calls for discovery,

13  for just pretrial motions, so there were probably several of

14  those.

15  Q    Do you remember ever seeing him before any -- outside on

16  a separate day where there were not proceedings, going to

17  visit him at Rikers?

18  A    Again I don't recall.  I may have, I may not have.  But

19  again, I don't have any specific recollection of that.

20  Q    Did you ask him, ask Mr. Etoria about his mental

21  history?

22  A    I don't believe I did.

23  Q    Did you ask him about previous arrests in anticipation

24  of a Sandoval hearing?

25  A    I'm surely I did.

Friedman - cross - Boye                73

1  Q    Did you ask him about the 1981 arrest?

2  A    If there was a 1981 arrest, I probably, and again I have

3  no specific recollection of how I exactly did it, but I

4  probably inquired as to the underlying acts that went with

5  those convictions.

6  Q    So when you say you did indeed inquire about his

7  previous arrests, it's not because you have an independent

8  recollection it's because it's your practice?

9  A    That's correct.

10 Q    Were you aware that in 1981 -- are you aware now that in

11 1981 when he was arrested, a competency exam was ordered?

12 A    I have been told that, yes.

13 Q    Did you ever think that you had communication problems

14 with Mr. Etoria?

15 A    No.

16 Q    No.  I'd like to -- actually, let me give this to you,

17 this has -- have you read the transcript recently in

18 preparation for this testimony?

19 A    I browsed through it, but I'm not -- not in detail.

20 Q    Did the DA supply that to you?

21 A    I looked at it, yes, just before I came in here today.

22 Q    It helped you remember some of these things, some of

23 this refreshed your recollection --

24 A    It did.

25 Q    Actually, I will show this to you.  This is -- this is

Friedman - cross - Boye                    74

1   with respect to the first Parker warnings, the colloquy that
2   occurred between the judge and Mr. Etoria which we were just
3   talking about.

4          You ask if you can confer with your client and the
5   judge allows you, and immediately after your conference, you
6   explain to the judge that he understands.

7   A    Yes.

8   Q    Did you believe that you had adequately explained to him
9   the issue?

10  A    Yes.

11  Q    What did you think then later when the court said in
12  response to defendant's short -- the defendant said:  I have
13  no problems with showing up to court.  The court immediately
14  after that said:  That's not the question I asked you.

15         MS. ANANIA:   What page are you on?

16         MS. BOYE:   Four and five -- my original reference
17  was starting on page three.  Mr. Friedman reports to the
18  court that his client understands after they conferred.

19  Q    What did you think when the court said, that's not the
20  question I've asked you , did you think that maybe he doesn't
21  understand?

22  A    I'm just -- can I read this?

23  Q    Sure.

24  A    I don't have an independent recollection of the
25  colloquy, but I do -- let me take a look.

1          (Pause.)

2    A    If this was a Parker hearing, it was a hearing with

3    regard to his obligation to be present and that he could

4    waive that obligation and, obviously, if Mr. Etoria said, I

5    have no problems with showing up, it probably -- again, it

6    seems to indicate to me, and would have indicated to me at

7    the time --

8              THE COURT:   No, I don't want that.

9              MS. BOYE:   You don't want his answer?

10             THE COURT:   I do not wish this witness to

11   speculate.  I have the record.  If he has no independent

12   recollection, that's enough.

13   BY MS. BOYE:

14   Q    Looking at it now, is it your opinion that at this point

15   it was clear to the court, because of the court's response,

16   that he did not understand?

17             THE COURT:   Don't answer.

18   A    I can't say -- I'm sorry, your Honor.

19             MS. BOYE:   Olivier.

20   CROSS-EXAMINATION

21   BY MR. WILKINS:

22   Q    My name is Olivier Wilkins, again for the record.  Good

23   afternoon, Mr. Friedman.

24   A    Good afternoon.

25   Q    You do mention in your prior testimony with the

1  prosecutors that Mr. Etoria declined the offer of having a

2  lesser-included offense.

3          I ask you to look at Exhibit G, which refers to the

4  lesser-included offense, and I ask you to look at page 373,

5  where you mention, in the middle of the page, I have spoken

6  to him.  Okay?

7  A    Yes.  I'm sorry.  Okay.

8  Q    In the middle of the page, you are quoted as:  Your

9  Honor, with regard to this charge, I have spoken to him.

10 A    Yes.

11 Q    After this, the court presents the idea of the

12 lesser-included charge to Mr. Etoria  and the defendant

13 answered, I do not understand what that means.

14         Does that mean he actually understood?

15 A    I can't answer that question.

16 Q    Okay, thank you.  I want to take you now to page 375.

17 When Mr. Etoria answered to the lesser-included charge: Then

18 why didn't they charge me for that when they arrested me for

19 it?

20         Does that indicate that Mr. Etoria understood what

21 a lesser-included charge was?

22 A    It seems to me he understood.

23 Q    It does?

24 A    Yes.  I can't say exactly what was in his mind at the

25 time, that would be speculation.  But I think those words

1  indicate a knowledge or --

2           THE COURT:  I don't want that.

3           THE WITNESS:  I'm sorry, your Honor.

4  Q    Finally, I want to point to  -- I want to go back to

5  your earlier testimony when you said he declined the

6  lesser-included offense.

7           What do you read at page 375, four lines down from

8  the bottom of the page, from the court:  Then the answer to

9  my question is --

10 A    I'm sorry, I don't follow where you are.

11 Q    Four lines --

12 A    373?

13 Q    375 from the bottom of the page.  You indicated earlier

14 that Mr. Etoria declined the lesser-included offense.  I ask

15 you now to read four lines from the bottom and what is the

16 court's decision.

17 A    This is 375?

18 Q    375, four lines from the bottom, it says the court  --

19 would you read that portion, please.

20 A    Then the answer to that, to my question, is no.

21 Q    Did Mr. Etoria in fact say no?

22 A    I have no independent recollection if he said no.

23 Q    Thank you.

24           MS. BOYE:   I have one last question.

25 BY MS. BOYE:

Friedman - cross - Bowe                    78

1  Q    Earlier you testified that Mr. Etoria knew what your
2  role was, knew what the judge's role was; is that correct?
3  A    That's my recollection.
4  Q    He seemed to know what the roles were of everyone
5  involved in the court.  But going past that, did he seem to
6  have an understanding of the proceedings that were against
7  him, because understanding the proceedings that are against
8  you isn't just about knowing the roles of the individuals in
9  the courtroom?
10 A    Yes.
11 Q    You believe he did?
12 A    I believe he did, and could participate and help in his
13 own defense.
14 Q    Do you think that participation equates understanding
15 the proceedings against you?
16 A    Yes.
17 Q    Thank you.
18          THE COURT:  Is there any reason why you, as the
19 attorney in charge of the case, would have concurred in your
20 client's decision not to have a lesser-included offense
21 charged?
22          THE WITNESS:  In this particular case --
23          THE COURT:  Yes.
24          THE WITNESS:  Can I stand back a second and say
25 that -- I don't know how you wanted me to answer the

Burton H. Sulzer, OCR, CRR, CSR, CM

1  question.  Whether it usually --

2           THE COURT:  I want to understand your tactics in

3  the case.

4           THE WITNESS:  Your Honor, my tactic in this case

5  would have been to probably have it charged down to

6  manslaughter in the first degree although I don't believe

7  that there was a reasonable view of the evidence that

8  supported it, but the judge was offering it.

9           THE COURT:  What was your theory of the case?

10          THE WITNESS:  My theory of the case was that this

11  was a misidentification.  My theory of the case was that

12  although the People don't have to prove motive, they couldn't

13  show a motive, that there was credibility problems with

14  witnesses.

15          THE COURT:  So it was essentially an identification

16  case?

17          THE WITNESS:  Correct.  My recollection was that

18  this was a case involving somebody who walked in into a store

19  and shot somebody three times in the head.

20          So while through the course of the trial I did not

21  anticipate that the linchpin of my case was going to be that

22  the person who did it didn't intend to do it, therefore I

23  wouldn't have anticipated in my strategy that there would be

24  a charge down to manslaughter in the first degree.

25          THE COURT:  Thank you.

Friedman - cross - Bowe                              80

1          MR. WILKINS:   Thank you, your Honor.

2          (Witness excused.)

3          THE COURT:  Any other witness?

4          MS. ANANIA:   No, your Honor.

5          THE COURT:  All right.  I will hear brief argument

6   if you wish.

7          MS. BENTELE:   Your Honor, the students are

8   prepared to address three issues that respondent seems to be

9   focusing on.

10         The respondent is asserting that some of the issues

11  were procedurally defaulted, and they would like to make

12  brief arguments that this is not the case, and Miss Feman is

13  prepared to do that.

14         The second question that seems to be raised by the

15  papers most prominently is the sua sponte court's obligation

16  sua sponte to order a competency examination, and the third

17  issue is the ineffective assistance of counsel.  The second

18  issue, Miss Jones is prepared to address.

19         THE COURT:  The for pedagogical reasons, I would

20  hear you on all those issues.

21         MS. BENTELE:   We appreciate that.

22         THE COURT:  Proceed.

23         MS. FEMAN:   I will begin with the procedural

24  default claim.  There are basically three reasons why these

25  claims aren't procedurally defaulted.

Friedman - cross - Bowe                    81

1          The first was that these issues were raised below
2     and Judge Dowling's order, dated January 17 of 2001,
3     specifically states that after due consideration of the
4     papers submitted herein, this court finds that respondent
5     failed to justify his failure to raise these issues on
6     appeal.  Further, this court finds the motion to be without
7     merit.

8          Clearly, these issues were addressed below and by
9     being so they were not procedurally defaulted.

10         The two other reasons why these issues are not
11    procedurally defaulted are that mental competency claims
12    cannot be procedurally defaulted and, further, ineffective
13    assistance of counsel cannot be procedurally defaulted.

14         In regards to the fact that the competency claims
15    cannot be procedurally barred, in the Second Circuit case of
16    Silverstein versus Henderson, it came down that the New York
17    courts could not constitutionally apply a procedural default
18    rule to a possibly incompetent defendant.

19         If a defendant is incompetent, they cannot waive
20    the right to ask for a competency hearing and, as such, the
21    courts have found that by failing to ask for a competency
22    hearing or to raise that on direct appeal does not
23    procedurally bar that issue.

24         In regards to an ineffective assistance of counsel
25    claim, the Massaro case that came down in April 2003 by the

Friedman - cross - Bowe                    82

1  Supreme Court stated that we do not hold that a failure to
2  raise an ineffective assistance of counsel claim on direct
3  appeal does not bar that claim from being brought in a later
4  appropriate proceeding under habeas corpus.

5          There are plenty of reasons why it was done so.
6  Mainly the fact that a lot of times in an ineffective
7  assistance of counsel claim, there are a lot of things that
8  are not on the record that a client communicates, outside
9  conferences, letters that go back and forth.

10         In the direct appeal, those issues are not going to
11 come into play because it's only based on the record.  The
12 Second Circuit has held the other way, and the Supreme Court
13 kind of said no.  So there's many reasons why.

14         I do, however, want to note for the court that in
15 November of 2003, the Southern District decided to make a
16 slight distinction and hold that the Massaro case only
17 applied to federal prisoners asking for habeas corpus and not
18 state prisoners.

19         What will happen to that we will find out, however
20 they --

21         THE COURT:  We're not bound by the Southern
22 District.

23         MS. FEMAN:   I wanted to bring that out.

24         THE COURT:  Although we treat them with great
25 respect.

1          MS. FEMAN:    Therefore, none of the claims are

2   procedurally barred and they can be brought before the court

3   in this matter.

4          THE COURT:    Yes.

5          MS. JONES:    Good afternoon, your Honor.

6          The trial court had an obligation to sua sponte

7   order a competency hearing for the petitioner, Mr. Orville

8   Etoria.

9          The petitioner's conduct at trial raised a bona

10  fide doubt as to his competence and obligated the trial court

11  to conduct a hearing into his competency to stand trial.

12         In Dasky v. The United States, the Supreme Court

13  stated that a defendant must have sufficient presentability

14  to consult with his lawyer with a reasonable degree of

15  understanding and a rational as well as a factual

16  understanding of the proceedings against him.

17         I am prepared to indicate that there are three

18  distinct instances on the record which indicate that

19  Mr. Etoria did not understand the proceedings before him.

20  Number one are the Parker hearings.  Number two are the

21  sidebar conferences, and number three is the lesser-included

22  offense charge.

23         In regards to the Parker warnings, the petitioner

24  was administered the warnings in accordance with the People

25  v. Parker to insure that he understood that if he was

Friedman - cross - Bowe                    84

1  voluntarily absent from the pretrial hearings or from the
2  trial that the proceedings would continue in his absence. It
3  is illustrative of his difficulty of understanding the
4  proceedings.

5          As the record indicates, the court attempted to
6  explain to petitioner that he had a right to waive his
7  presence at all proceedings.  As the petitioner's attorney
8  informed the court, he understood the trial court attempted
9  again to assure the petitioner that he was aware of these
10 rights.  Petitioner then told the judge that he asked his
11 attorney to explain it.  The court again tried to inform
12 Mr. Etoria of these rights.

13         He believed that he, as Mr. Etoria's testimony
14 elucidated today, he stated he believed that he did not know
15 he was coming into the courtroom, that they wanted to keep
16 him out.  This is why he refused to sign the acknowledgment
17 indicating that he was informed of his Parker warnings.

18         A second time at which Mr. Etoria again indicates
19 that he had trouble understanding the proceedings before him
20 are in regard to the sidebar conferences.

21         The first instance is when the court is informing
22 Mr. Etoria of his right to be present during all sidebar
23 discussions between the lawyers, the jury and the court.

24         The court informed him of his right to waive being
25 present during these discussions.  After conferring with his

1  attorney, petitioner refused to waive his right. The court
2  then explained at depth the exact nature of the discussions
3  and tried telling petitioner that the trial court was not
4  asking him to leave the courtroom.  Instead, petitioner still
5  did not understand the nature of the sidebar conferences and
6  requested that he be present at every last one of them.

7        In regard again to the sidebar conferences and
8  continuation, Mr. Etoria's attorney brought to the attention
9  of the trial court that Mr. Etoria was still confused about
10 the sidebar conferences.  He wanted to know why he had to
11 keep attending.  He wasn't understanding what was going on at
12 these conferences.  He thought at this time that he would be
13 provided the opportunity to speak to the jury or prospective
14 jurors.

15       After the first witness was called, petitioner did
16 not understand what was going on.  He thought that the jury
17 may have been getting mad at him for coming bank and forth in
18 attending the sidebar conferences.

19       Mr. Etoria's lawyer indicated that he no longer
20 wanted to attend these sidebar conferences.  The court again
21 tried to explain to Mr. Etoria that he did have the right to
22 waive attending these sidebar conferences, and he explained
23 to him several times to make sure that he waived it in a
24 constitutionally sufficient manner.  Upon doing so,
25 Mr. Etoria, in an attempt to basically satisfy the court and

1  his attorney, basically said okay.

2       The last and third instance that I'd like to point

3  to is in regard to the lesser-included offense, at this

4  point, with the trial court asking Mr. Etoria and his

5  attorney whether he would have liked to have a

6  lesser-included offense included.

7       At this point, again, Mr. Etoria still demonstrated

8  his misunderstanding of the situation at hand by thinking

9  that there was an additional charge to what he was directly

10  charged with.  He indicates very summarily in the record, I

11  just want to go through this, I want to end this.

12       By him summarily stating that he wants to get

13  through this and end this, again that is a clear indication

14  of him not understanding these three instances in the record

15  and are clear indications of Mr. Etoria at various times

16  during the trial proceedings not understanding what was

17  before him, and it's because of these instances on the record

18  that the trial court had an obligation to request a

19  competency exam.  Thank you.

20       THE COURT:   Thank you.

21       MS. BOYE:   Good afternoon, your Honor.  My name is

22  Amity Boye.

23       Mr. Etoria counsel's performance was deficient and

24  it did pressure Mr. Etoria under the well-established

25  Strickland standard set forth by the Supreme Court.

Friedman - cross - Bowe                    87

1              THE COURT:    What did he do wrong?    I don't
2    understand.

3              MS. BOYE:    Failing to investigate the petitioner's
4    competency after there was clear indicia that he was
5    incompetent.

6              THE COURT:    During the trial, the three points that
7    were already adverted to?

8              MS. BOYE:    The indications of incompetency
9    included, yes, the confused responses during trial during the
10   Parker warnings, the sidebar colloquies, and the colloquy
11   regarding the lesser-included offense, the answers that the
12   defendant gave to the court clearly exhibited that his
13   answers were irrational, and the court was pointing out the
14   fact that he didn't understand that he was saying things that
15   were not correct, and in addition, --

16             THE COURT:    His ultimate decisions were very
17   sensible, weren't they?

18             MS. BOYE:    His ultimate decisions seemed to be
19   made under pressure by the court.

20             THE COURT:    But they were quite sensible, were not
21   they?

22             It's normal for the defendant not to come up to the
23   sidebars when the jury is selected and, in fact that's what
24   he ultimately decided he would want to do.

25             MS. BOYE:    The result might have been sensible,

1    however, from an objective person's point of view.  However,

2    it's clear from Mr. Etoria's testimony that he had no idea

3    whether it was sensible or not --

4              THE COURT:  His testimony today?

5              MS. BOYE:   His testimony today and from the

6    record.

7              THE COURT:  I don't credit his testimony today.  I

8    am depending on the record.  The record shows some confusion,

9    but that is not unusual with respect to a defendant.

10             MS. BOYE:   The record shows confusion that never

11   dissipates.

12             THE COURT:  That what?

13             MS. BOYE:   That never dissipates.  The decisions

14   that he made, while they might have reasonable, are under

15   pressure by the court.

16             It's unclear, since there were multiple occurrences

17   from the trial from the beginning to the end of the trial --

18             THE COURT:  How long does the trial last?

19             MS. BOYE:   Three to four days, I believe.

20             THE COURT:  These are instances of only a few

21   minutes.  The trial judge had the opportunity to observe him

22   during these entire days.

23             His attorney has just testified that he appeared

24   rational.  I don't credit the petitioner's testimony that he

25   was using drugs constantly while he was on Rikers Island,

Friedman - cross - Bowe                    89

1  although I know that there are drugs used there.  That does
2  not seem credible.

3          We have an experienced trial counsel.  All his
4  decisions were perfectly rational.  If the case is tried on a
5  misidentification theory, a lesser-included offense is often
6  quite confusing to the jury and provides for a compromise
7  that many defendants prefer to avoid, particularly in light
8  of his prior crimes.

9          His prior crimes were felonies, were not they, at
10 least one?

11         MS. BENTELE:   At least one, yes.

12         THE COURT:   Even a lesser-included offense would
13 have given him a very long-term, would it not?

14         MS. ROSENBLUM:   It's not clear that it would
15 because of the distance between the times that the felony was
16 committed and this crime was committed.

17         THE COURT:   I see.  That's not unusual where
18 there's an identification defense, particularly here, in view
19 of the lack of any motive.

20         MS. BOYE:   It's not unusual and it may have been a
21 rational decision, but I don't think it was ever communicated
22 to the client from the attorney or from the court that this
23 could be something that is better for you and he didn't -- he
24 thought that he was --

25         THE COURT:   If his attorney says he never, as a

1  tactical matter, considered that, that was thrown up by the

2  judge, I guess, on compassion -- I don't understand quite

3  why --

4           MS. BOYE:   Are you --

5           THE COURT:   I mean, how can you have a

6  lesser-included offense based on the facts in the case?  If

7  he was the person that did the shooting, he went into a

8  store, shot -- what kind of shop was it?

9           MS. BOYE:   A leather goods shop.

10          THE COURT:   A leather goods shop, but they had

11 pinball machines --

12          MS. ROSENBLUM:   It appears to have been some sort

13 of neighborhood hangout.

14          THE COURT:   In any event, he went into the shop, he

15 had a gun -- if he were identified properly -- shot twice,

16 the man is falling, shoots him again as he falls to the

17 ground.

18          A lesser-included offense doesn't make much sense.

19 A misidentification makes sense, although it's a difficult

20 case when one of the identifiers knew him, what, for 18 years

21 or so?  It's a very difficult case.

22          MS. BOYE:   That's very difficult case, too, yes.

23 However, I'm confused as to what relevance your Honor is

24 assigning to the decision being rational, because the

25 decision being rational doesn't necessarily reflect his

1  competence.  I don't think he understood that, that

2  manslaughter is inconsistent with a misidentification theory.

3          THE COURT:  That is true.  But the articulation by

4  a defendant who is ill educated, who has a long history of

5  drugs, who has been in jail for six months, who is faced with

6  a very long-term is not the kind of articulation you find

7  usually in law school classrooms.  People sometimes speak in

8  different ways.

9          So that in assessing what he did and said, I'm

10  looking partly to whether the decision was rational.  Apart

11  from how he articulated it, all three of the decisions seem

12  to me to be quiet rational.

13          MS. BOYE:  The decision at the point in time where

14  he said that he did not want to waive being at sidebar, that

15  he refused to waive.  That might have been a very rational

16  decision.

17          THE COURT:  Later, when he saw that it didn't work

18  too well to come up and down, he said, well, I don't want to

19  be at the sidebar.  That's perfectly sensible.

20          You see, my problem with the case is, I do not see

21  how a trial judge would be sufficiently alerted, given the

22  circumstances of this case, not being alerted to the fact

23  that there were prior problems at all, to say that on my own

24  motion I'm going to require a psychiatric hearing.  That is

25  the difficulty with the case.

Friedman - cross - Bowe                    92

1          MS. BOYE:   If I could move back to the ineffective
2   assistance claim and not what the court --

3          THE COURT:   The question of what?

4          MS. BOYE:    There is some law that says that a
5   counsel is under a duty to investigate mental competence in
6   that the indicia that establishes that duty doesn't have to
7   be as strong as --

8          THE COURT:   Yes, I think that is right.  We have
9   here an attorney who seemed to me to be a responsible person.
10  He says that the man appeared to be competent and rational,
11  he conferred with him repeatedly and the decisions were
12  rational.

13         Part of our problem in these cases is, as you know,
14  that some 40 percent of the people, it's estimated, in prison
15  have mental problems otherwise they wouldn't be involved in
16  crime in the main.

17         So you're dealing with a group of people that don't
18  necessarily alert the responsible attorney or the responsible
19  judge to the possible deep psychiatric problem in the
20  particular case.

21         All of these cases are troublesome.  I didn't want
22  to cut you off.

23         MS. BOYE:   One of the things that I wanted to
24  point out, in addition to confused responses, there seemed to
25  be an inability between defense counsel and the defendant to

Friedman - cross - Bowe                    93

1   communicate.

2           THE COURT:   What basis do you have of that, to say

3   that?

4           MS. BOYE:   There are points in the record where

5   the defense counsel reported that his client understood and

6   what followed is a very lengthy colloquy between the judge

7   and the defendant where it's clear he hadn't understood.

8           THE COURT:   The ones you've referred to?

9           MS. BOYE:   Yes.

10          THE COURT:   I don't think there is sufficient,

11  although you may be right --

12          MS. BOYE:   An inability to communicate with your

13  defendant has been noted in other cases as sufficient indicia

14  to uphold the duty to investigate.

15          THE COURT:   That might go to the inability to

16  communicate with the judge and not with the attorney.  It's a

17  little different when you have a defendant communicating with

18  somebody who is sitting up on a high stage with a robe on

19  than when you're sitting next to an attorney.  But you may be

20  right.

21          MS. BOYE:   In addition, there was the rap sheet

22  that the attorney had in his hand.  There was a 1981

23  conviction, and had it been investigated it would have shown

24  that --

25          THE COURT:   What should the attorney have

Friedman - cross - Bowe                    94

1    investigated?  It was an open and shut case.  The person

2    pleaded guilty.

3            I mean, what would everybody that a person who

4    pleaded guilty to this crime was possibly irrational then or

5    now?  Nothing on the rap sheet that showed that.

6            MS. BOYE:   There is nothing on the rap sheet, but

7    the record itself clearly indicates that days after

8    Mr. Etoria's arrest an evaluation was ordered.  Before

9    indictment, at the first --

10           THE COURT:  This is in what year?

11           MS. BOYE:   1981.  Not that alone, but together,

12   the rap sheet and the duty to have investigated that, both in

13   anticipation of the Sandoval trial and his inability to

14   communicate with the attorney and his confused responses, all

15   together seem to be enough to impose not a duty to ask for a

16   competency hearing but just a duty to investigate, to ask the

17   defendant about the mental history.

18           THE COURT:  It could be.  Most of these people who

19   are involved in these homicides and other crimes have serious

20   records, you know.  It may be placing too heavy a duty on the

21   attorney.

22           MS. BOYE:   There are also cases -- if I could

23   keep going on -- where courts use a confused response to

24   complicated legal issues as indicia of incompetency, an

25   ability not to understand adversarial proceedings or an

Friedman - cross - Bowe                    95

1   ability to understand what the judge is trying to

2   communicate.  So these might be complicated legal issues.

3   There was a concerted attempt both by Friedman and the court

4   to explain that.

5           THE COURT:  Maybe the judge wasn't communicating

6   too well, that may be why it wasn't understood.  It was a

7   little confusing to me when the judge was explaining it, but

8   you may be right.  It's always difficult to communicate in

9   these settings.

10          Yes.  I cut you off again.

11          MS. BOYE:  The standard to impose a duty to

12  investigate was enunciated in a Third Circuit case, just if

13  there was a reason to doubt defendant's ability to understand

14  the proceeding, communicate with counsel and assist in his

15  own defense.

16          We always have to remember that competency isn't

17  just the ability to rationally and factual understand the

18  proceeding against you, it's your ability to also communicate

19  and assist your counsel in the defense .

20          THE COURT:  Here counsel tells us he remembers the

21  case and there was this ability.  Certainly the counsel is

22  more credible than the witness here, who tells me his memory

23  is bad.  He's a criminal, convicted criminal and he has every

24  reason to distort, whereas counsel has no reason to distort.

25          MS. BOYE:  If we could go back to the record.

1  There is a certain point in time when  -- I believe it's the
2  lesser-included offense -- where the court says, Please
3  confer with your client, and they are conferring, and before
4  the court could even have a chance to respond, or before
5  Friedman had a chance to report to the court what had
6  happened, the defendant himself asked if he could speak.

7         That might indicate there was a communication
8  problem between Mr. Friedman and Etoria, that he wanted to
9  speak on his own behalf.

10        THE COURT:  All it indicates is possibly a lack of
11 control by the court, since the client should not have been
12 permitted to talk under those conditions.

13        MS. BOYE:   I will stop talking now.

14        THE COURT:  Keep pushing.

15        MR. WILKINS:   If I may make one point?  I think
16 it's very clear from the record that if Mr. Etoria had
17 understood what the lesser-included offense was, he would
18 have accepted to put it in.

19        THE COURT:  I don't think so, not if he was street
20 smart.

21        The whole theory, which was undoubtedly explained
22 to him, was it was misidentification.  It's very hard to
23 argue to a jury -- you can argue theoretically alternate
24 theories, but in order to really get to a jury you have to
25 have some story line that is consistent.

*Burton H. Sulzer, OCR, CRR, CSR, CM*

Friedman - cross - Bowe                    97

1          If you're arguing to the jury they got the wrong
2    man, but if they got the right man he didn't intend to kill,
3    and three bullets were fired in this way, it doesn't enhance
4    the case, I think. So that the decisions were all rational.
5          MS. BOYE:   I still, frankly, do not understand the
6    relevance of whether the decisions of the defendant, from an
7    objective point of view, were right or wrong.  The question
8    is whether he understood the decisions that he was making,
9    and it clearly doesn't appear from the record that he did.
10         At one point he thought that the Parker warnings to
11   be present at trial were being reiterated when the court was
12   asking him about his right to be present at sidebar.
13         He confounded the difference between the ability to
14   be present at proceedings and the ability to be present at
15   sidebar.  That is a fairly simply legal issue, not as
16   complicated as a lesser-included offense, but he didn't
17   understand.
18         THE COURT:  You have to give me bad marks for that.
19         MR. WILKINS:   If I may add.  I hate to belabor the
20   point --
21         THE COURT:  Don't apologize.  Keep pushing.
22         MR. WILKINS:   I want to -- I will try to convince
23   you that if the defendant said, I do not understand what that
24   means, it probably means that he does not understand.
25         After having said that he did not understand, the

1  court made an attempt to explain again what the

2  lesser-included offense was, what it meant, and the court

3  even stated, the judge even stated, I don't want you to come

4  back at any later point in time and say that nobody told you

5  that you had a right to ask the jury to consider the

6  lesser --

7          THE COURT:   The court was just protecting itself

8  against later criticism unnecessarily.

9          You may be right, a more skillful judge might have

10 been able to communicate at the level of this defendant more

11 effectively.

12         MR. WILKINS:   Not only to communicate, but to

13 explain.  That is really the point.  I mean, the Dasky case

14 does not indicate that Mr. Etoria had to be totally mad in

15 order to be able to be successful in this claim, but he

16 simply does not understand the proceedings.

17         It's clear that we are all reasonable people here

18 and we may differ as to what is not understanding means, but

19 certainly I think that when a person, whether the person is a

20 criminal -- at that time he had not been convicted, clearly,

21 he says, I do not understand, after being told many times

22 what things mean, and he still does not understand.  I think

23 it means he doesn't understand.

24         THE COURT:   Possibly, yes.

25         MR. WILKINS:   Thank you.

Friedman - cross - Bowe                              99

1          MS. BOYE:   Speaking about what understanding means

2     and what it doesn't mean, you gave credit to Mr. Friedman's

3     testimony, but he was defining competence in terms of knowing

4     the role of the attorney -- knowing the role of the judge.

5          THE COURT:   No, I don't think that is fair to the

6     attorney.  He struck me as a competent attorney, competent

7     used in a different sense.

8          MS. BOYE:   I asked him if he thought that

9     participation equated to competence, and I think that it --

10    the DA's papers also referred to this fact, but ability to

11    participate in proceedings does not equate to competency.

12         MR. WILKINS:   I think he also mentioned the fact

13    that in a case that involved as much as 25 years in jail, he

14    only met the defendant twice outside --

15         THE COURT:   That is not what the attorney said.

16         MS. BOYE:   -- before the proceedings begun.

17         MR. WILKINS:   He indicated that he spoke to the

18    defendant many times, as he would if the two were in court.

19    But --

20         THE COURT:   They had many appearances before the

21    trial, which is normal.  I don't think it's fair to the

22    attorney to say he only met twice.

23         MS. BOYE:   But in all those times then that they

24    did meet, he was never asked about his mental competency.

25    Just a small amount of investigation would have revealed

1  quite a bit, prior hospitalization, diagnosis of

2  schizophreniform, alternate personality disorder, multiple

3  immediate traumas, heavy drug use, drug-induced psychosis,

4  psychosis noninduced by drugs, prolonged suffering of severe

5  headaches.

6        THE COURT:  Okay.  Thank you very much.  Did you

7  wanted to respond?

8        MS. ROSENBLUM:   I would like to.

9        I am not going to dwell at length on the procedural

10 aspects of the case, but I would like to note, for example

11 that there is a difference between claims that arise on the

12 face of the record that can be reviewed on direct appeal, and

13 those that arise all off the record.

14       What happened in this case is that the

15 on-the-record events, which were what the court saw and what

16 everybody heard and saw in the courtroom, did not alert

17 either the court or the defense attorney to the existence of

18 incompetence on the defendant's part.  It was very limited

19 discussions.

20       The defendant had limited intelligence.  He may

21 have been reluctant to --

22       THE COURT:  What evidence is there of limited

23 intelligence?

24       MS. ROSENBLUM:   Well, I would say that the way in

25 which he expressed himself and his claims of lack of

1   understanding evince to me that he was either -- he might

2   have been --

3               MR. WILKINS:   Incompetent?

4               MS. ROSENBLUM:   No.  He might have been less

5   educated.

6               I didn't interrupt you; please don't interrupt me.

7               MR. WILKINS:   Please forgive me.

8               MS. ROSENBLUM:   He might have been less educated.

9   He might have had trouble understanding some of these things

10  because these were sophisticated concepts, as far as he was

11  concerned.  He had an emotional investment in the outcome of

12  what was going on and that might have clouded his ability to

13  understand or to communicate.

14              THE COURT:   Yes.

15              MS. ROSENBLUM:   So all of those things come into

16  play when it comes to explanations for why things happened on

17  the record and may have been taken one way or another.

18              Since we are now in the process of reviewing this

19  in a habeas courtroom, the thing that we have to remember is

20  was it reasonable for the state court to conclude on the

21  basis of the trial record that there was nothing to alert

22  either the court or counsel that this person was incompetent,

23  that it was not an unreasonable conclusion for the state

24  court to draw?  Because, after all, if minds can differ as to

25  the way the transcript can be interpreted, then clearly the

1   state court's interpretation was rational.

2           Now, we're coming now to, I should say, reasonable
3   and not an unreasonable application of Supreme Court law.  We
4   have a separate set of claims that was raised in the motion
5   to vacate judgment.

6           In that situation, we have for the first time the
7   defendant brings to the attention of the court the claim that
8   he had mental problems in 1981 in connection with his first
9   arrest.

10          He was examined, he was found fit to proceed, in
11  any event, but he was examined and he pled guilty.  He served
12  time; that in 1985, he came to the attention of the criminal
13  justice system again when he got into this problem at home,
14  after having abused drugs and alcohol -- according to his
15  affidavit -- and binged on all this, all these drugs, and
16  that he got himself into trouble, breaking things up around
17  the house, but after he had been hospitalized for a short
18  period of time, removed from the drugs he was using, given
19  Haldol, even the provisional diagnosis of schizophreniform
20  disorder disappeared and he was discharged from the hospital.
21  There is nothing, no history of any kind indicated between
22  1985 and the time he was arrested.

23          Now, this is now submitted to the court, but the
24  defendant by his own admission said he didn't trust his
25  lawyer, he didn't tell his lawyer anything about himself or

1   his personal history.

2          If you look at the NYSIIS sheet, the rap sheet that

3   indicates when the defendant was arrested and what happened

4   to him, it doesn't even say that there was a competency exam

5   and that the defendant was found fit to proceed.

6          So a lawyer is looking at the papers that are in

7   front of him, he's talking to his client, and his client

8   doesn't tell him anything about his past, and his own

9   observations, according to his testimony, were that the

10  fellow did not seem to be under the influence of drugs, that

11  he was communicating with him and telling him what he needed

12  to know in order to go forward with the defense, how is he

13  supposed to define that there is the existence of some

14  psychiatric or psychological event if the defendant himself

15  won't tell him, and the defendant himself admits that he

16  didn't tell him?

17         Neither did he learn this from any member of the

18  defendant's family, who, incidentally, were visiting him in

19  prison, according to the records.  His mother, who talked to

20  the lawyer said, Well, he wasn't himself some of the time,

21  but even she never mentioned that during the time that he

22  committed this crime he was taking drugs and that he was not

23  himself during the trial.

24         When she visited him in jail, he didn't seem to be

25  so far removed from reality that she was troubled.  Of

Friedman - cross - Bowe                        104

1  course, we have his own self-interested testimony here.  He
2  very selectively remembers what he did and when he was
3  hospitalized and what his injuries were and what the
4  diagnoses were, but he doesn't remember a thing about the
5  events that led up to the crime or what happened during the
6  trial or his ability to communicate with his lawyer.

7          That indicates to me, and I hope to the court, that
8  this is someone who is trying to manipulate the situation,
9  who is cunningly trying to claim that on some occasions he's
10 competent and some he's incompetent when it suits him.

11         The record, as we have it now, indicates that the
12 state court did not unreasonably determine that his lawyer
13 was not ineffective and that there were not sufficient
14 indicia given to either the court or the lawyer for them to
15 believe that this defendant was incompetent and that any
16 further investigation needed to take place in order to
17 determine his competency.

18         There simply were not adequate cues either from the
19 record or from the defendant himself, and for that reason,
20 the state court's decision should be upheld and the writ
21 should be denied.

22         THE COURT:  All right.  This hearing is now closed.
23 The court reserves decision.

24         Is the petitioner without funds?

25         MS. BENTELE:  Yes.

1          THE COURT:  All right.  The reporter will furnish

2    copy -- regular, not daily -- at CJA expense to both the

3    petitioner and the respondent.  Thank you very much.

4          This is finished.  The marshals can return the

5    prisoner.  Thank you.

6               *******

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

| | | |
|---|---|---|
| **'79** | | [1] 104:18 |
| [1] 57:24 | **260-4504** | **Adequately** |
| | [1] 1:22 | [1] 74:8 |
| **'81** | **260-4526** | **Administered** |
| [1]...9 57:9 57:13 | [1] 1:22 | [1] 83:24 |
| | **28** | **Admission** |
| **'83** | [1] 47:2 | [1] 102:24 |
| [1] 28:10 | | **Admits** |
| **'85** | **3** | [1] 103:15 |
| [1] 56:20 | | **Admitted** |
| **'96** | **373** | [1] 63:21 |
| [1] 32:20 | [2] 76:4 77:12 | **Adversarial** |
| **'99** | **375** | [1] 94:25 |
| [1] 45:8 | [5] 76:16 77:7 77:13 77:17 77:18 | **Adverted** |
| | **3:30** | [1] 87:7 |
| **0** | [2] 71:19 72:1 | **Advised** |
| | | [2] 45:12 67:21 |
| **0-7421** | **4** | **Affect** |
| [1] 1:3 | | [1] 14:5 |
| | **40** | **Affidavit** |
| **1** | [1] 92:14 | [7] 39:4 39:6 39:9 39:10 39:11 41:23 102:15 |
| | **440** | **Affidavits** |
| **11** | [1] 39:16 | [1] 45:2 |
| [2] 29:22 30:1 | | **Afternoon** |
| **11201** | **7** | [9] 4:1 5:24 25:22 53:25 70:13 75:23 75:24 83:5 86:21 |
| [1] 1:21 | | **Age** |
| **12** | **718** | [1] 9:24 |
| [1] 39:16 | [2] 1:22 1:22 | **Ago** |
| **15** | **77th** | [1] 42:13 |
| [1] 71:14 | [1] 33:23 | **Ahead** |
| **17** | | [1] 70:8 |
| [4] 10:9 10:15 39:11 81:2 | **A** | **Alcohol** |
| **18** | | [1] 102:14 |
| [1] 90:20 | **Abilities** | **Alert** |
| **19** | [1] 61:3 | [3] 92:18 100:16 101:21 |
| [1] 1:8 | **Ability** | **Alerted** |
| **1981** | [12] 57:20 94:25 95:1 96:13 95:17 95:18 95:21 97:13 | [2] 91:21 91:22 |
| [13] 4:11 10:20 10:22 11:5 26:2 26:21 73:1 73:2 73:10 | 97:14 99:10 101:12 104:8 | **Alibi** |
| 73:11 93:22 94:11 102:8 | **Able** | [1] 41:4 |
| **1984** | [6] 50:23 58:24 61:2 63:15 98:10 98:15 | **Allegation** |
| [1] 47:17 | **Absence** | [1] 40:13 |
| **1985** | [3] 47:6 47:20 84:2 | **Alleviate** |
| [11] 10:20 11:8 11:9 28:13 29:15 29:20 30:1 30:4 30: | **Absent** | [1] 12:20 |
| 14 102:12 102:22 | [1] 84:1 | **Allow** |
| **1986** | **Absolutely** | [1] 56:11 |
| [2] 14:1 32:21 | [1] 49:25 | **Allows** |
| **1989** | **Abused** | [1] 74:5 |
| [1] 31:7 | [1] 102:14 | **Atone** |
| **1990** | **Accepted** | [1] 94:11 |
| [1] 31:7 | [1] 96:18 | **Alternate** |
| **1993** | **Accepting** | [2] 96:23 100:2 |
| [1] 31:15 | [1] 24:8 | **Amity** |
| **1996** | **Accident** | [3] 1:15 2:8 86:22 |
| [12] 13:7 13:14 14:13 14:17 29:21 30:2 32:17 32:21 32: | [1] 10:1 | **Amount** |
| 24 47:3 54:24 56:7 | **Accordance** | [1] 99:25 |
| **1997** | [1] 63:24 | **Anania** |
| [2] 44:6 47:3 | **According** | [20] 1:18 2:14 2:14 25:17 25:21 25:22 47:2 51:24 58: |
| **1:30** | [3] 102:14 103:9 103:18 | 12 58:14 59:9 59:12 62:18 63:7 63:9 63:24 64:7 70:3 |
| [1] 1:8 | **Accused** | 74:15 80:4 |
| | [3] 13:7 40:16 80:23 | **Angry** |
| **2** | **Acknowledgment** | [2] 55:9 55:9 |
| | [1] 84:16 | **Answer** |
| **20** | **Acted** | [10] 6:12 9:4 21:16 22:11 75:9 75:17 76:15 77:8 77:20 |
| [1] 71:15 | [1] 57:1 | 78:25 |
| **2000** | **Acts** | **Answered** |
| [3] 39:6 45:8 45:8 | [1] 73:4 | [8] 8:25 26:15 46:13 47:7 47:15 47:21 76:13 76:17 |
| **2001** | **Add** | **Answers** |
| [1] 81:2 | [2] 50:9 97:19 | [3] 9:13 87:11 87:13 |
| **2003** | **Addition** | **Anticipate** |
| [3] 1:3 81:25 82:15 | [3] 87:15 92:24 93:21 | [3] 70:24 71:25 79:21 |
| **21** | **Additional** | **Anticipated** |
| [1] 13:19 | [1] 66:9 | [1] 79:23 |
| **22** | **Address** | **Anticipation** |
| [1]...21 | [4] 5:2 59:23 80:8 80:18 | [2] 72:23 94:13 |
| **23** | **Addressed** | |
| [1] 99:13 | [1] 81:8 | |
| | **Adequate** | |

**Antipsychotropic**
[1] 68:23
**Anyway**
[1] 70:8
**Apart**
[2] :10
**rtment**
[1] 31:8
**Apologize**
[1] 97:21
**Appeal**
[5] 81:6 81:22 82:3 82:10 100:12
**Appear**
[4] 37:20 38:23 60:11 97:9
**Appearance**
[1] 70:2
**Appearances**
[3] 1:13 2:6 99:20
**Appeared**
[3] 60:8 88:23 92:10
**Appearing**
[1] 37:15
**Application**
[1] 102:3
**Applied**
[1] 82:17
**Apply**
[1] 81:17
**Appreciate**
[1] 80:21
**Approached**
[1] 65:9
**Appropriate**
[1] 82:4
**April**
[6] 13:19 32:20 33:3 45:6 47:2 81:25
**Area**
[1] 64:15
**ue**
[ ] :23 96:23
**Arguing**
[1] 97:1
**Argument**
[1] 80:5
**Arguments**
[1] 80:12
**Arise**
[2] 100:11 100:13
**Arraigned**
[1] 35:9
**Arraignment**
[1] 34:8
**Arrest**
[10] 4:12 6:18 8:25 13:6 26:24 41:9 73:1 73:2 94:8 102:9
**Arrested**
[26] 15:7 16:7 16:9 16:17 16:19 16:20 17:12 23:21 26:19 29:20 31:15 31:21 31:23 32:23 33:13 33:14 33:15 33:24 34:22 37:3 37:4 40:3 40:6 56:17 73:11 76:18 102:22 103:3
**Arrests**
[3] 24:6 72:23 73:7
**Articulated**
[1] 91:11
**Articulation**
[2] 91:3 91:6
**Ashtrays**
[1] 67:11
**Aspects**
[1] 100:10
**Assembling**
[ ] :17
**erting**
[1] 80:10

**Assessing**
[1] 91:9
**Assigned**
[3] 34:10 38:8 64:22
**Assigning**
[1] 90:24
**Assist**
[2] 95:14 96:13
**Assistance**
[7] 70:22 80:17 81:13 81:24 82:2 82:7 92:2
**Assistant**
[2] 2:11 25:23
**Assisting**
[2] 8:13 8:14
**Assume**
[2] 54:24 72:2
**Assure**
[1] 84:9
**Ate**
[1] 56:9
**Attempt**
[3] 85:25 95:3 96:1
**Attempted**
[2] 84:5 84:8
**Attend**
[3] 50:2 54:13 85:20
**Attending**
[3] 85:11 85:18 85:22
**Attention**
[4] 22:8 85:8 102:7 102:12
**Attorney**
[51] 2:12 2:13 2:15 19:17 19:19 21:13 23:17 24:1 24:25 25:23 28:15 26:17 26:18 32:9 32:12 34:10 35:18 35:19 36:6 42:6 48:25 49:4 50:25 61:10 61:11 62:1 62:8 78:19 84:7 84:11 85:1 85:8 86:1 86:5 88:23 89:22 89:25 92:9 92:18 93:16 93:19 93:22 93:25 94:14 94:21 99:4 99:6 99:6 99:15 99:22 100:17
**Attorney's**
[1] 1:18
**Attorneys**
[3] 36:19 49:9 49:16
**August**
[4] 33:14 54:23 54:24 58:7
**Availability**
[1] 63:16
**Available**
[1] 3:1
**Avoid**
[1] 89:7
**Awaiting**
[1] 8:7
**Aware**
[6] 3:20 56:18 70:21 73:10 73:10 84:9
**Awhile**
[1] 56:24
**Ayodele**
[2] 1:16 2:9

**B**

**Bad**
[3] 6:3 95:23 97:18
**Bags**
[1] 13:11
**Bali**
[3] 35:23 35:24 36:6
**Band**
[1] 12:18
**Bank**
[1] 65:17
**Bar**
[2] 81:23 82:3
**Barred**
[2] 61:15 63:2
**Base**

**Baseball**
[2] 10:10 58:1
**Based**
[5] 3:21 65:18 67:5 82:11 90:6
**Basement**
[2] 64:15 64:16
**Basis**
[3] 12:2 93:2 101:21
**Bat**
[2] 10:10 58:1
**Bear**
[1] 3:16
**Beaten**
[1] 57:25
**Became**
[3] 55:9 65:9 65:9
**Beg**
[1] 6:12
**Begged**
[1] 54:14
**Begin**
[1] 80:23
**Beginning**
[2] 18:25 88:17
**Begun**
[1] 99:16
**Behalf**
[3] 65:24 69:13 96:9
**Behave**
[1] 55:20
**Behavior**
[4] 15:15 15:16 55:15 57:15
**Behaviors**
[1] 55:16
**Belabor**
[1] 97:19
**Below**
[2] 81:1 81:8
**Bench**
[3] 22:3 22:7 37:19
**Beneficial**
[1] 87:22
**BENNETT**
[1] 1:7
**Bensonhurst**
[1] 64:15
**Bentele**
[11] 1:14 2:7 2:7 8:20 39:16 63:3 63:22 60:7 80:21 89:11 104:25
**Better**
[6] 6:4 26:19 43:13 54:5 58:6 89:23
**Between**
[14] 28:9 29:20 30:1 41:8 69:6 74:2 84:23 89:16 92:25 93:6 96:8 97:13 100:11 102:21
**Big**
[4] 16:3 16:3 20:10 58:22
**Binge**
[1] 15:4
**Binged**
[1] 102:15
**Birthday**
[14] 13:16 13:17 13:18 14:2 14:12 32:20 33:1 33:3 33:4 33:7 33:9 33:10 33:11 33:12
**Bit**
[2] 17:21 100:1
**Blackouts**
[3] 53:8 53:9 53:14
**Body**
[1] 10:4
**Bona**
[1] 83:9
**Bother**
[1] 56:14

**Bothering**
[1] 55:14
**Bottom**
[5] 47:18 77:8 77:13 77:15 77:18
**Bound**
[1] :21
**e**
[52] 1:15 2:8 4:2 4:7 4:15 4:25 39:15 63:5 63:8 63:13 70:5 70:12 72:5 74:16 75:9 75:13 75:19 77:24 77:25 86: 21 86:22 87:3 87:8 87:18 87:25 88:5 88:10 88:13 89:19 89:20 90:4 90:9 90:22 91:13 92:1 92:4 92:23 93:4 93:9 93:12 93:21 94:6 94:11 94:22 95:11 95:25 96:13 97:5 99:1 99:8 99:16 99:23
**Breaking**
[5] 11:10 28:13 59:22 57:10 102:16
**Brief**
[4] 4:16 26:3 80:5 80:12
**Bright**
[1] 20:10
**Bring**
[1] 82:23
**Brings**
[1] 102:7
**Brooklyn**
[4] 1:6 1:21 2:7 65:6
**Brother**
[2] 60:1 60:1
**Brother-in-law**
[1] 60:1
**Brought**
[6] 34:7 34:24 37:14 37:19 37:23 82:3 83:2 85:6
**Browsed**
[1] 73:19
**Buffer**
[4] 40:3 52:15 52:22 53:3
**Bullets**
[1] 97:3
**Burton**
[5] :6 :20
**[ ]** :0:2 51:21
**Buy**
[3] 15:12 56:10 56:15

---

**C**

**Cadman**
[1] 1:21
**Calendar**
[1] 72:12
**Calm**
[3] 55:5 55:6 56:24
**Calmed**
[1] 56:24
**Cannot**
[7] 58:11 57:15 57:21 81:12 81:13 81:15 81:19
**Car**
[4] 10:1 10:2 10:4 33:19
**Case**
[59] 2:1 3:9 32:4 32:9 32:14 35:9 36:6 37:15 37:25 38: 22 39:4 39:8 40:13 47:6 62:3 63:11 64:5 64:11 64:20 85:5 85:9 65:16 65:19 65:25 67:21 68:6 71:13 72:10 78: 19 78:22 79:3 79:4 79:9 79:10 79:11 79:16 79:18 79:21 80:12 81:15 81:25 82:16 89:4 90:6 90:20 90:21 90:22 91:20 91:22 91:25 92:20 94:1 95:12 95:21 97:4 98:13 99:13 100:10 100:14
**Cases**
[5] 38:19 92:13 92:21 93:13 94:22
**CAT**
[1] 1:25
**Catch**
[1] 10:2
**Celebrating**
[ ]:17 33:7
**Certain**
[1] 96:1

**Certainly**
[8] 3:11 47:8 47:13 65:4 65:15 70:1 95:21 98:19
**Challenge**
[1] 66:14
**Challenges**
[1] 66:15
**Chance**
[4] 42:4 61:14 61:16 61:20 96:4 96:5
**Charge**
[28] 23:8 23:10 23:12 23:20 23:21 23:23 23:24 23:25 40:21 50:5 50:10 50:14 50:15 50:15 50:16 50:21 67:25 68:7 68:10 76:9 76:12 76:17 76:18 76:21 76:19 79:24 83:22 96:9
**Charged**
[9] 29:21 38:25 40:10 40:20 40:25 50:13 78:21 79:5 86: 10
**Charles**
[1] 2:13
**Cheer**
[1] 61:1
**Child**
[1] 12:13
**Choice**
[1] 67:23
**Chose**
[1] 67:23
**Chow**
[1] 45:14
**Cigarettes**
[3] 15:12 56:10 56:15
**Circuit**
[3] 61:15 82:12 95:12
**Circumstances**
[2] 57:5 91:22
**CJA**
[1] 105:2
**Claim**
[11] 70:19 70:22 80:24 81:25 82:2 82:3 82:7 92:2 98: 15 102:7 104:9
**Claimed**
[1] 52:15
**Claims**
[10] 70:14 70:16 70:24 80:25 81:11 81:14 83:1 100:11 100:25 102:4
**Classrooms**
[1] 91:7
**Clear**
[13] 9:14 9:17 57:11 68:6 75:15 86:13 86:15 87:4 88:2 89:14 93:7 96:16 98:17
**Clearly**
[6] 81:8 87:12 94:7 97:9 98:20 101:25
**CLERK**
[3] 2:2 2:10 5:5
**Client**
[12] 8:15 66:11 68:7 74:4 74:18 82:8 89:22 93:5 96:3 96:11 103:7 103:7
**Client's**
[1] 76:20
**Clients**
[1] 69:3
**Close**
[2] 5:18 9:12
**Closed**
[1] 104:22
**Clouded**
[1] 101:12
**Cocaine**
[9] 7:5 7:8 8:10 15:6 24:19 25:7 30:21 66:21 66:24
**Colloquies**
[1] 87:10
**Colloquy**
[4] 74:1 74:25 87:10 93:6
**Coming**
[6] 16:3 18:4 22:8 37:4 55:23 84:15 85:17 102:2
**Commence**

[1] 47:20
**Committed**
[7] 8:17 54:10 54:12 61:15 89:16 89:16 103:22
**Communicate**
[12] 93:1 93:12 93:16 94:14 95:2 95:8 95:14 95:18 98: 10 98:12 101:13 104:6
**Communicated**
[1] 89:21
**Communicates**
[1] 82:6
**Communicating**
[1] 93:17 95:6 103:11
**Communication**
[3] 67:5 73:13 96:7
**Communications**
[2] 71:7 71:8
**Compassion**
[1] 90:2
**Competence**
[6] 65:14 83:10 91:1 92:5 98:3 99:9
**Competency**
[20] 3:11 3:14 3:16 4:12 73:11 80:16 81:11 81:14 81: 20 81:21 83:7 83:11 86:19 87:4 94:16 95:16 99:11 99: 24 103:4 104:17
**Competent**
[6] 65:15 70:19 92:10 99:6 99:8 104:10
**Complete**
[2] 28:2 28:3
**Completed**
[2] 2:24 27:24
**Complicated**
[3] 94:24 95:2 97:16
**Compromise**
[1] 89:6
**Concepts**
[1] 101:10
**Concerned**
[2] 61:2 101:11
**Concerns**
[1] 61:5
**Concerted**
[1] 95:3
**Conclude**
[1] 101:20
**Conclusion**
[1] 101:23
**Concurred**
[1] 78:19
**Conditions**
[2] 66:18 96:12
**Conduct**
[2] 83:8 83:11
**Conducting**
[1] 4:19
**Confer**
[4] 47:8 49:18 74:4 96:3
**Conference**
[2] 67:25 74:5
**Conferences**
[13] 67:8 67:14 67:19 82:9 83:21 84:20 85:5 85:7 85: 10 85:12 85:18 85:20 85:22
**Conferred**
[2] 74:18 92:11
**Conferring**
[2] 84:25 96:3
**Confounded**
[1] 97:13
**Confused**
[6] 60:16 60:19 85:9 87:9 90:23 92:24 94:14 94:23
**Confusing**
[2] 89:6 95:7
**Confusion**
[3] 32:22 86:9 86:10
**Connection**

**Consider**
[1] 102:8

**Consideration**
[1] 98:5

**Consider...**
[1] 81:3

**...sidered**
...1

**Consistent**
[1] 98:25

**Constantly**
[1] 68:25

**Constitute**
[1] 4:3

**Constitutionally**
[2] 81:17 85:24

**Consult**
[1] 83:14

**Continuation**
[1] 85:8

**Continue**
[4] 8:19 8:21 47:20 84:2

**Continued**
[2] 13:15 14:2

**Control**
[1] 96:1

**Conversation**
[2] 68:9 68:9

**Conversations**
[5] 19:21 19:25 67:13 67:18 70:18

**Convicted**
[4] 6:17 13:7 95:23 98:20

**Conviction**
[4] 6:23 7:1 14:3 93:23

**Convictions**
[1] 73:5

**Convince**
[1] 97:22

**Cops**
...:25

**Copy**
[4] 47:3 59:9 59:12 105:2

**Corpus**
[3] 6:14 82:4 82:17

**Correct**
[26] 6:8 14:3 17:12 25:1 25:4 25:5 26:4 26:24 35:7 36:9 37:3 45:19 48:9 48:12 48:16 48:21 51:2 51:8 52:12 54:25 56:20 61:9 73:9 78:2 79:17 87:15

**Correctional**
[1] 6:6

**Counsel**
[21] 2:5 2:21 3:16 3:19 70:18 70:22 80:17 81:13 81:24 82:2 82:7 89:3 92:5 92:25 93:5 95:14 95:19 95:20 95:21 95:24 101:22

**Counsel's**
[1] 86:23

**County**
[6] 1:19 2:12 2:15 10:23 25:23 26:3

**Couple**
[3] 16:8 16:9 30:13

**Course**
[5] 65:10 68:3 89:24 79:20 104:1

**Court**
[226] 1:1 1:20 2:5 2:16 2:18 2:19 2:24 3:4 3:7 3:12 3:13 3:16 3:20 3:23 3:25 4:6 4:11 4:13 4:23 5:4 5:9 5:12 5:17 7:4 7:6 7:8 7:10 7:13 7:15 7:18 7:20 7:23 7:25 8:3 8:6 8:9 8:12 8:16 8:21 9:7 9:12 9:16 12:5 23:3 24:13 24:21 24:25 25:3 25:6 25:10 25:16 25:18 26:7 27:8 34:6 34:24 37:10 37:14 37:16 37:19 37:22 37:23 38:23 46:24 46:25 47:1 47:5 47:5 47:8 47:10 47:13 47:18 47:23 50:17 50:18 51:22 52:2 53:17 53:19 54:6 54:11 58:11 62:22 62:25 63:2 63:4 63:12 63:19 63:21 63:23 64:1 65:5 66:12 70:8 71:4 71:7 71:8 71:17 71:20 71:23 72:2 72:...10 74:11 74:13 74:13 74:18 74:19 75:8 76:10 75:...17 76:11 77:2 77:8 77:18 78:5 78:18 78:23 79:2 79:15 79:25 80:3 80:5 80:19 80:22 81:4 81:6 82:1 82:12 82:14 82:21 82:24 83:2 83:4 83:6 83:10 83:12 84:...

**Court's**
[5] 75:15 77:16 80:15 102:1 104:20

**Courthouse**
[1] 1:6

**Courtroom**
[20] 5:15 19:7 19:8 19:18 20:3 20:23 20:25 21:2 21:8 34:12 37:17 42:17 47:25 48:23 62:23 78:9 84:15 85:4 100:16 101:19

**Courts**
[3] 81:17 81:21 94:23

**Credibility**
[1] 79:13

**Credible**
[2] 89:2 95:22

**Credit**
[3] 88:7 98:24 99:2

**Crime**
[10] 6:24 13:6 41:9 58:22 61:15 89:18 92:16 94:4 103:22 104:5

**Crimes**
[4] 8:17 89:8 89:9 94:19

**Criminal**
[4] 95:23 95:23 98:20 102:12

**Criticism**
[1] 98:8

**Cross**
[4] 25:15 25:20 58:11 70:5

**CROSS-EXAMINATION**
[5] 58:13 70:11 75:20

**Cues**
[1] 104:18

**Cunningly**
[1] 104:9

**Cure**
[1] 12:19

**Custom**
[2] 66:10 69:2

**Cut**
[4] 9:9 18:1 92:22 95:10

**CV**
[1] 1:3

---

**D**

**DA's**
[2] 25:24 99:10

**Daily**
[1] 105:2

**DANIELE**
[1] 1:16

**Danielle**
[1] 2:6

**Dasky**
[2] 83:12 98:13

**Date**
[7] 31:7 41:4 41:8 41:9 47:2 69:6 69:7

**Dated**
[1] 61:2

**Dates**
[3] 28:18 28:23 32:22

**Days**
[11] 14:10 15:6 16:7 16:8 16:9 51:10 51:11 51:12 88:19 88:22 94:7

**Dead**
[7] 52:20 52:20 52:21 52:22 52:22 52:24 52:24

**Dealing**

**December**
[2] 39:6 39:16

**Decide**
[1] 47:14

**Decided**
[3] 46:8 82:15 87:24

**Decision**
[13] 23:14 68:1 68:14 77:16 78:20 89:21 90:24 90:25 91:10 91:13 91:16 104:20 104:23

**Decisions**
[9] 67:16 87:18 88:13 89:4 91:11 92:11 97:4 97:6 97:8

**Declined**
[4] 68:10 76:1 77:5 77:14

**Deep**
[1] 92:19

**Default**
[2] 80:24 81:17

**Defaulted**
[6] 80:11 80:25 81:9 81:11 81:12 81:13

**Defendant**
[31] 1:3 64:5 74:12 78:12 81:16 81:19 83:13 87:12 87:22 88:9 91:4 92:25 93:7 93:13 93:14 94:17 96:8 97:6 97:23 98:10 99:14 98:18 100:20 102:7 102:24 103:3 103:5 103:14 103:15 104:15 104:19

**Defendant's**
[6] 3:11 69:9 74:12 95:13 100:18 103:18

**Defendants**
[2] 47:14 89:7

**Defense**
[26] 17:15 17:18 17:19 17:23 18:2 20:1 32:12 35:19 36:5 41:11 41:13 41:16 41:17 41:18 64:24 65:22 85:25 66:1 78:13 89:18 92:25 93:5 95:15 95:19 95:19 100:1 100:17 103:12

**Deficiency**
[1] 70:20

**Deficient**
[1] 86:23

**Define**
[1] 103:13

**Defining**
[1] 99:3

**Degree**
[6] 28:10 68:8 68:11 79:6 79:24 83:14

**Demeanor**
[4] 20:7 55:2 58:7 70:2

**Demonstrated**
[1] 86:7

**Denied**
[1] 104:21

**Department**
[2] 10:23 68:24

**Depth**
[1] 95:2

**Describe**
[13] 10:21 11:20 13:10 15:18 16:1 19:5 21:25 23:6 42:9 54:6 55:2 55:15 67:8

**Destroyed**
[1] 64:16

**Detail**
[1] 73:19

**Determination**
[2] 3:21 68:4

**Determine**
[2] 104:12 104:17

**Determined**
[1] 3:13

**Diagnosed**
[2] 11:13 29:3

**Diagnoses**
[1] 104:4

**Diagnosis**
[5] 11:1 11:15 57:14 100:1 102:19

**Died**
[1] 23:25

**Differ**

[2] 98:18 101:24

**Difference**
[4] 33:6 33:7 97:13 100:11

**Different**
[10] 22:1 23:24 31:24 37:18 37:20 39:7 45:16 91:8 93:
:7

**Difficult**
[4] 90:19 90:21 90:22 95:8

**Difficulty**
[2] 84:3 91:25

**Dinner**
[1] 56:9

**Diploma**
[1] 27:25

**Dire**
[3] 66:7 66:9 67:12

**Direct**
[8] 5:22 21:22 53:23 64:6 81:22 82:2 82:10 100:12

**Directly**
[1] 86:9

**Disappeared**
[1] 102:20

**Discharged**
[1] 102:20

**Discovery**
[1] 72:12

**Discuss**
[8] 13:5 20:17 49:18 66:2 66:14 67:7 67:25 68:12

**Discussed**
[2] 20:19 68:21

**Discussing**
[2] 49:22 66:9

**Discussions**
[8] 64:24 65:13 68:19 68:20 84:23 84:25 85:2 100:19

**Disorder**
[5] 11:2 11:16 29:4 100:2 102:20

**Dissipates**
[2] 88:11 88:13

**__ance**
__:15

**Distinct**
[1] 53:18

**Distinction**
[1] 82:16

**Distort**
[2] 95:24 95:24

**Distributing**
[1] 8:13

**District**
[10] 1:1 1:1 1:12 1:18 2:12 2:12 2:15 25:23 82:15 82:22

**Divided**
[1] 5:2

**Divulging**
[1] 71:4

**Dizzy**
[1] 20:11

**Doctor**
[5] 43:8 55:25 56:1 56:3 57:13

**Dolores**
[1] 4:18

**Done**
[2] 68:22 82:5

**Door**
[2] 16:3 20:10

**Doubt**
[2] 83:10 95:13

**Dowling**
[2] 46:7 46:24

**Dowling's**
[1] 81:2

**Down**
[__]:19 28:23 29:5 29:6 47:14 49:17 68:7 77:7 79:5
__:81:16 81:25 91:18

**Draw**
[1] 101:24

**Drug**
[3] 13:10 14:5 24:21 30:7 63:6 63:8 100:3

**Drug-induced**
[1] 100:3

**Drugs**
[71] 8:21 6:22 8:25 7:4 7:4 7:10 7:20 8:4 8:12 8:13 12:
21 12:25 13:1 13:8 13:22 13:24 14:1 14:9 16:15 17:8
20:14 26:21 26:23 27:2 27:7 29:25 30:1 30:4 30:5 30:
16 31:20 32:19 32:25 33:4 33:10 37:2 37:4 37:5 37:7
37:9 42:7 42:10 42:15 42:16 43:1 43:2 43:3 43:9 43:19
43:21 44:10 51:6 51:9 51:19 63:15 63:16 66:21 66:23
67:1 67:3 69:22 70:1 88:25 89:1 91:5 100:4 102:14 102:
15 102:18 103:10 103:22

**Due**
[1] 81:3

**Duly**
[3] 5:20 53:21 64:4

**During**
[37] 4:20 8:9 15:15 18:24 20:8 20:8 20:15 24:14 24:15
27:5 29:23 38:20 53:8 53:9 53:13 54:18 54:20 55:24 65:
10 66:5 66:11 86:25 67:12 67:18 68:3 69:4 69:24 84:22
84:25 86:16 87:6 87:9 87:9 88:22 103:21 103:23 104:5

**Duty**
[8] 92:5 92:6 93:14 94:12 94:15 94:16 94:20 95:11

**Dwell**
[1] 100:9

**E**

**Ease**
[1] 4:4

**East**
[1] 1:21

**EASTERN**
[1] 1:1

**Edgy**
[1] 55:4

**Educated**
[3] 91:4 101:5 101:8

**Effectively**
[1] 98:11

**Eight**
[1] 9:24

**Either**
[6] 51:19 100:17 101:1 101:22 104:14 104:18

**Elucidated**
[1] 84:14

**Emotional**
[1] 101:11

**End**
[6] 51:14 54:22 70:6 86:11 86:13 86:17

**Ending**
[1] 4:16

**English**
[1] 3:5

**Enhance**
[1] 97:3

**Entire**
[1] 88:22

**Enunciated**
[1] 95:12

**Equate**
[1] 99:11

**Equated**
[1] 99:9

**Equates**
[1] 78:14

**Equivalency**
[1] 26:4

**ESQ**
[3] 1:14 1:17 1:18

**Essentially**
[1] 79:16

**Establishes**
[1] 92:6

**Estimated**
[1] 92:14

**Etoria**
[91] 1:4 2:4 2:16 4:18 4:21 5:24 6:5 6:7 6:15 6:23 9:20
10:17 10:21 10:25 12:19 13:13 13:16 14:7 14:12 15:8
15:22 16:10 16:17 17:12 17:21 18:13 20:5 22:12 23:3
24:15 24:18 24:20 25:12 25:22 26:2 31:24 42:6 45:19
46:21 47:11 47:15 47:20 51:8 51:25 52:6 53:15 53:25
54:2 54:6 54:13 58:2 59:15 62:19 64:9 64:22 65:8 65:
11 66:12 66:9 67:1 69:5 70:19 71:5 72:7 72:20 73:14
74:2 75:4 76:1 76:12 76:17 78:20 77:14 77:21 78:1 83:
8 83:19 84:12 84:18 84:22 85:9 86:21 85:25 86:4 86:7
86:15 86:23 86:24 96:8 96:16 98:14

**Etoria's**
[5] 84:13 85:8 85:19 88:2 94:8

**Evaluated**
[2] 4:12 44:3

**Evaluation**
[4] 10:24 10:25 56:19 94:8

**Event**
[2] 23:6 57:5 67:8 90:14 102:11 103:14

**Events**
[8] 6:18 6:20 8:24 13:6 18:19 54:16 100:15 104:5

**Evidence**
[8] 3:9 3:10 3:22 4:4 4:14 63:2 79:7 100:22

**Evince**
[1] 101:1

**Exact**
[2] 54:21 85:2

**Exactly**
[11] 13:14 13:16 16:5 16:8 18:11 34:20 49:2 54:20 71:
10 73:3 76:24

**Exam**
[3] 73:11 86:19 103:4

**Examination**
[8] 4:20 4:20 5:22 25:20 52:4 53:23 64:6 80:16

**Examined**
[5] 5:21 53:22 64:5 102:10 102:11

**Example**
[1] 100:10

**Except**
[1] 3:18

**Excerpts**
[1] 4:7

**Excuse**
[3] 44:18 48:8 68:23

**Excused**
[3] 53:18 62:24 80:2

**Exhausted**
[1] 3:15

**Exhibit**
[2] 38:15 76:3

**Exhibited**
[1] 87:12

**Exhibiting**
[1] 15:15

**Exhibits**
[1] 4:3

**Existence**
[2] 106:17 103:13

**Expense**
[1] 106:2

**Experienced**
[1] 89:3

**Explain**
[18] 21:17 21:18 22:23 23:19 47:16 47:17 47:22 49:14
50:17 51:6 67:15 74:6 84:6 84:11 85:21 96:4 98:1 98:13

**Explained**
[10] 8:15 49:12 50:19 50:23 50:24 51:4 74:8 85:2 85:
22 96:21

**Explaining**
[2] 67:17 95:7

**Explanations**
[1] 101:16

**Expressed**

**[1]** 100:25
**Extended**
**[1]** 9:13
**Extensively**
**[1]** 14:2

---

### F

**Face**
**[2]** 64:1 100:12
**Faced**
**[1]** 91:5
**Fact**
**[24]** 3:19 16:20 21:9 21:18 22:16 23:12 26:13 29:3 47: 47: 48:8 48:20 49:2 50:6 52:15 58:3 61:5 77:21 81:14 82:6 87:14 87:23 91:22 99:10 99:12
**Facts**
**[2]** 39:7 90:6
**Factual**
**[2]** 83:15 95:17
**Failed**
**[1]** 81:5
**Failing**
**[2]** 81:21 87:3
**Failure**
**[2]** 81:5 82:1
**Fair**
**[2]** 99:5 99:21
**Fairly**
**[1]** 97:15
**Falling**
**[1]** 90:18
**Falls**
**[1]** 90:16
**Familiar**
**[1]** 59:25
**Family**
**[9]** 11:11 11:11 26:17 26:19 31:9 41:2 59:22 89:14 103:

**...** :11 101:10 103:25
**Fax**
**[1]** 1:22
**Federal**
**[1]** 82:17
**Feed**
**[1]** 14:10
**Feelings**
**[1]** 20:8
**Fell**
**[1]** 10:5
**Fellow**
**[1]** 103:10
**Felonies**
**[1]** 89:9
**Felony**
**[2]** 26:13 89:15
**Felt**
**[1]** 62:3
**Feman**
**[6]** 1:16 2:6 80:12 80:23 82:23 83:1
**Few**
**[6]** 25:24 42:13 58:12 59:21 88:20
**Fide**
**[1]** 83:10
**File**
**[4]** 64:11 64:14 64:15 71:11
**Files**
**[1]** 64:18
**Finally**
**[1]** 77:4
**...ish**
**...** :14
**Punished**
**[2]** 49:16 105:4

**Fired**
**[1]** 97:3
**First**
**[32]** 4:3 4:11 5:20 9:20 9:21 9:23 15:3 34:7 37:7 37:13 42:22 43:7 45:7 45:9 46:6 47:24 50:13 53:21 54:22 62: 7 64:4 68:8 68:11 74:1 79:6 79:24 81:1 84:21 85:16 94: 9 102:6 102:8
**Fit**
**[2]** 102:10 103:5
**Five**
**[2]** 20:4 74:16
**Flood**
**[1]** 64:16
**FLOYD**
**[1]** 1:7
**Focusing**
**[1]** 80:9
**Follow**
**[1]** 77:10
**Followed**
**[3]** 18:19 68:17 93:6
**Following**
**[2]** 47:10 56:14
**Follows**
**[3]** 5:21 53:22 64:5
**Forgive**
**[1]** 101:7
**Forgo**
**[1]** 23:14
**Forth**
**[3]** 82:9 85:17 86:25
**Forward**
**[1]** 93:12
**Four**
**[7]** 51:12 74:18 77:7 77:11 77:15 77:18 88:19
**Frankly**
**[1]** 97:5
**Frazier**
**[6]** 40:2 40:3 40:10 40:17 40:22 52:16 52:24 53:3
**Frequent**
**[1]** 66:9
**Friedman**
**[38]** 19:20 19:23 20:1 20:2 36:8 36:23 37:22 38:1 39:7 40:24 42:12 42:13 42:18 44:8 44:9 44:11 44:13 44:21 47:7 47:9 48:6 49:18 50:2 52:11 58:15 61:9 61:12 61: 20 62:4 63:25 64:1 64:8 70:13 74:17 75:23 95:3 96:5 98:8
**Friedman's**
**[1]** 99:2
**Friend's**
**[2]** 15:3 58:21
**Friends**
**[6]** 14:22 30:25 31:9 31:10 33:8 56:13
**Front**
**[6]** 28:16 34:25 37:15 39:12 46:20 103:7
**Funds**
**[1]** 104:24
**Funny**
**[1]** 15:20
**Furnish**
**[1]** 105:1

---

### G

**Galley**
**[1]** 4:18
**Garth**
**[8]** 40:2 40:3 40:10 40:18 40:22 52:16 52:24 53:3
**Gate**
**[2]** 16:4 55:23
**Generally**
**[1]** 71:13
**George**
**[1]** 59:24
**Given**

**Gloster**
**[3]** 45:5 50:23 51:6
**Goods**
**[2]** 90:9 90:10
**Grant**
**[1]** 3:13
**Great**
**[1]** 82:24
**Grendal**
**[1]** 58:25
**Ground**
**[2]** 10:5 90:17
**Group**
**[1]** 92:17
**Grown**
**[1]** 56:14
**Guess**
**[2]** 40:1 90:2
**Guilty**
**[11]** 26:9 26:12 26:13 26:20 27:1 32:4 32:5 32:8 94:2 94:4 102:11
**Gun**
**[1]** 90:15
**Guys**
**[4]** 7:22 7:23 7:24 29:24

---

### H

**Habeas**
**[5]** 6:14 70:14 82:4 82:17 101:19
**Habit**
**[1]** 14:10
**Haldol**
**[5]** 11:21 11:22 29:11 30:10 102:19
**Hallucinations**
**[1]** 18:12
**Hand**
**[2]** 86:8 93:22
**Handcuff**
**[1]** 33:18
**Handcuffed**
**[1]** 33:17
**Handing**
**[1]** 4:3
**Handle**
**[1]** 70:8
**Hangout**
**[1]** 90:13
**Happy**
**[1]** 4:25
**Hard**
**[3]** 5:13 13:22 96:22
**Hate**
**[1]** 97:19
**Head**
**[14]** 10:4 10:5 10:6 10:9 12:12 12:14 12:15 12:16 24:4 43:21 57:25 57:26 79:19
**Headache**
**[1]** 12:22
**Headaches**
**[8]** 12:15 12:17 12:20 12:20 13:4 13:24 14:11 100:5
**Hear**
**[18]** 3:25 5:13 5:25 12:7 42:20 42:23 42:25 43:3 43:4 43:8 43:21 43:24 48:24 52:6 54:11 80:5 80:20
**Heard**
**[3]** 5:14 42:22 100:16
**Hearing**
**[22]** 1:11 2:24 3:14 6:8 6:10 9:9 9:13 13:5 41:22 41:25 42:7 42:11 72:24 75:2 76:2 81:20 81:22 83:7 83:11 91: 24 94:16 104:22
**Hearings**
**[3]** 66:8 83:20 84:1
**Heavy**
**[2]** 94:20 100:3

**Held**
[3] 19:25 60:21 92:12

**Hello**
[2] 22:4 71:16

**Help**
[4] 76:12

**ped**
[2] 45:2 73:22

**Helping**
[1] 26:17

**Henderson**
[1] 81:16

**Herein**
[1] 81:4

**Heroin**
[9] 7:9 7:9 8:10 13:12 15:5 24:19 25:6 30:21 68:21

**High**
[6] 27:24 27:25 28:2 28:3 28:3 93:18

**Himself**
[14] 55:5 55:7 57:6 60:13 60:13 96:6 100:25 102:18 102:25 103:14 103:15 103:20 103:23 104:19

**Hired**
[1] 26:17

**History**
[8] 61:13 69:17 69:18 72:21 91:4 94:17 102:21 103:1

**Hit**
[7] 10:2 10:3 10:4 10:5 10:9 20:11 57:25

**Hold**
[4] 8:1 8:3 82:1 82:16

**Holding**
[2] 8:4 8:12

**Home**
[7] 27:20 29:17 30:22 32:17 56:20 57:4 102:13

**Homicide**
[3] 6:17 40:21 40:22

**Homicides**
[1] 4:19

**or**
[26] 3:18 4:1 4:2 6:1 5:14 8:20 9:11 9:15 9:19 24:24 25:5 58:12 63:1 63:9 63:10 63:20 70:7 70:10 75:18 76:9 77:3 79:4 80:1 80:4 80:7 83:5 86:21 90:23

**HONORABLE**
[1] 1:11

**Hope**
[7] 6:4 54:4 58:22 61:15 61:24 61:25 104:7

**Hopeless**
[1] 62:3

**Hospital**
[12] 10:15 11:12 12:3 26:4 26:12 28:24 30:5 58:25 57: 7 58:1 62:16 102:20

**Hospitalization**
[5] 11:18 38:7 57:9 57:18 100:1

**Hospitalizations**
[5] 11:25 12:1 38:3 61:19 68:17

**Hospitalized**
[9] 10:12 10:17 10:22 11:5 26:3 26:6 57:22 102:17 104: 3

**Hour**
[1] 60:5

**House**
[10] 11:10 11:11 15:9 15:13 16:2 17:9 29:17 33:16 65: 6 102:17

**Household**
[1] 28:13

**Huge**
[1] 55:22

**Hurt**
[2] 12:16 43:21

**Hurting**
[4]

**nes**
[1] 2:13

---

**Idea**
[4] 29:21 50:12 76:11 88:2

**Identification**
[5] 41:14 86:1 68:5 79:15 89:18

**Identified**
[1] 90:15

**Identifiers**
[1] 90:20

**In**
[1] 91:4

**Illustrative**
[1] 84:3

**Imagine**
[1] 71:13

**Immediate**
[1] 100:3

**Immediately**
[2] 74:5 74:13

**Impose**
[2] 94:14 95:11

**Impression**
[2] 65:13 65:15

**Impressions**
[1] 68:12

**In-court**
[1] 71:7

**Inability**
[4] 92:25 93:12 93:15 94:13

**Incarcerated**
[5] 7:13 7:15 7:21 65:7 69:24

**Incarceration**
[1] 28:9

**Incident**
[1] 16:24

**Incidentally**
[1] 103:18

**Included**
[6] 4:9 4:10 23:4 86:5 87:9

**Includes**
[1] 4:7

**Incompetence**
[1] 100:18

**Incompetency**
[2] 57:8 94:24

**Incompetent**
[9] 45:10 45:13 81:18 81:19 87:5 101:3 101:22 104:10 104:15

**Inconsistent**
[1] 91:2

**Increased**
[1] 14:5

**Indeed**
[1] 73:6

**Independent**
[6] 64:19 69:11 73:7 74:24 75:11 77:22

**Indicate**
[8] 3:20 75:6 76:20 77:1 83:18 96:7 96:14

**Indicated**
[7] 53:7 71:12 75:8 77:13 85:19 99:17 102:21

**Indicates**
[8] 84:5 84:16 88:10 94:7 96:10 103:3 104:7 104:11

**Indicating**
[1] 84:17

**Indication**
[1] 86:13

**Indications**
[2] 86:15 87:8

**Indicia**
[5] 87:4 92:5 93:13 94:24 104:14

**Indictment**
[1] 94:9

---

**Individuals**
[1] 78:8

**Ineffective**
[8] 70:21 80:17 81:12 81:24 82:2 82:6 92:1 104:13

**Influence**
[10] 26:21 27:2 42:7 42:15 43:1 43:2 43:3 43:19 61:9 66:20 66:24 67:1 67:2 69:21 69:25 103:10

**Influences**
[1] 68:22

**Inform**
[1] 84:11

**Information**
[1] 63:6

**Informed**
[3] 84:8 84:17 84:24

**Informing**
[1] 84:21

**Injuries**
[6] 10:6 10:12 12:12 12:14 24:4 104:3

**Inquire**
[2] 3:14 73:6

**Inquired**
[1] 73:4

**Inside**
[2] 16:2 56:11

**Insinuation**
[1] 63:14

**Instance**
[4] 10:21 20:22 84:21 86:2

**Instances**
[15] 7:2 9:1 9:6 10:11 11:4 15:24 15:24 22:1 38:18 55: 6 55:20 83:16 86:14 86:17 88:20

**Instead**
[1] 85:4

**Institution**
[1] 6:6

**Insure**
[1] 63:25

**Intake**
[2] 13:10 14:5

**Intelligence**
[2] 100:20 100:23

**Intend**
[2] 79:22 97:2

**Intensively**
[1] 13:1

**Intention**
[1] 48:15

**Interaction**
[1] 21:22

**Interactions**
[5] 19:1 19:3 19:5 21:25 22:20

**Interest**
[3] 71:3 71:3 71:4

**Interested**
[1] 104:1

**Interpretation**
[1] 102:1

**Interpreted**
[1] 101:25

**Interrupt**
[2] 101:6 101:6

**Introduced**
[1] 3:10

**Investigate**
[5] 57:3 92:5 93:14 94:16 95:12

**Investigated**
[3] 93:23 94:1 94:12

**Investigation**
[2] 96:25 104:16

**Investment**
[1] 101:11

**Involved**
[4] 78:5 92:15 94:19 99:13

**Involving**
[1] 79:16
**Irrational**
[4] 55:15 55:18 87:13 94:4
**Island**
[8] :3 17:14 37:6 44:10 51:14 58:23 59:15 59:19 60: :22 65:6 66:25
**Issue**
[6] 23:4 74:9 80:17 80:18 81:23 97:15
**Issues**
[15] 5:1 5:2 66:6 66:9 68:24 80:8 80:10 80:20 81:1 81: 5 81:8 81:10 82:10 94:24 95:2
**Item**
[1] 4:11
**Itself**
[2] 94:7 98:7

## J

**JACK**
[1] 1:11
**Jail**
[12] 7:24 8:6 27:4 27:8 28:6 38:4 37:9 37:10 37:11 91: 5 99:13 103:24
**Jails**
[2] 63:6 63:8
**January**
[1] 81:2
**Jerry**
[2] 50:23 51:6
**Jewish**
[1] 58:1
**Job**
[2] 27:22 29:18
**Jones**
[4] 1:16 2:9 80:15 83:5
**Judge**
[57] 1:12 2:18 3:3 18:1 19:6 20:6 20:14 20:18 21:23 22: :21 22:23 23:7 23:16 32:11 34:7 34:14 34:23 35:3 :5:10 36:8 37:15 38:14 38:16 44:6 46:4 46:6 46: :24 48:25 49:4 49:9 50:20 53:11 67:9 68:6 68:10 71:23 74:2 74:5 74:6 79:8 81:2 84:10 88:21 90:2 91:21 92:19 93:6 93:16 95:1 95:5 95:7 98:3 98:9 99:4
**Judge's**
[2] 65:21 78:2
**Judges**
[2] 37:19 37:20
**Judgment**
[1] 102:5
**July**
[3] 54:17 54:22 54:24
**Jurors**
[7] 22:8 48:24 49:3 49:17 68:12 67:20 85:14
**Jury**
[23] 18:16 18:19 18:21 22:9 22:14 22:15 22:22 42:4 48: 20 49:19 49:25 66:11 86:15 67:19 84:23 85:13 85:16 87:23 89:6 96:23 96:24 97:1 98:5
**Justice**
[1] 102:13
**Justify**
[1] 81:5

## K

**Keep**
[12] 5:9 5:12 6:17 9:8 45:14 49:23 54:11 84:15 85:11 94:23 96:14 97:21
**Kept**
[3] 34:2 50:17 64:14
**Kill**
[2] 52:21 97:2
**Killed**
[...] :2:15 52:20
**d**
[...] :8:14 82:13 90:8 91:6 102:21
**Kings**

**Kleinman**
[6] 1:19 2:12 2:15 10:23 25:23 26:3
[1] 34:11
**Knowing**
[3] 78:8 99:3 99:4
**Knowledge**
[1] 77:1
**Known**
[1] 3:22

## L

**Lack**
[3] 89:19 96:10 100:25
**Lady**
[1] 35:13
**Last**
[4] 77:24 85:6 86:2 88:18
**Late**
[2] 51:16 54:17
**Laughing**
[1] 42:17
**Law**
[5] 2:7 60:1 91:7 92:4 102:3
**Lawyer**
[17] 18:2 19:21 21:12 22:22 23:7 38:17 50:20 58:17 83: 14 85:16 102:25 102:25 103:6 103:20 104:6 104:12 104:14
**Lawyer's**
[1] 22:7
**Lawyers**
[1] 84:23
**Learn**
[2] 69:16 103:17
**Learned**
[1] 69:18
**Least**
[3] 89:18 89:10 89:11
**Leather**
[2] 90:9 90:10
**Leave**
[3] 15:8 15:11 85:4
**Led**
[4] 6:18 8:24 57:9 104:5
**Left**
[2] 15:4 56:15
**Legal**
[4] 5:1 94:24 95:2 97:15
**Length**
[1] 100:9
**Lengthy**
[1] 93:8
**Less**
[2] 101:4 101:8
**Lesser**
[4] 23:4 24:9 50:19 98:6
**Lesser-included**
[24] 23:14 23:18 24:9 68:1 76:2 76:4 76:12 78:17 76: 21 77:8 77:14 78:20 83:21 86:3 86:6 87:11 89:5 89:12 90:6 90:18 96:2 96:17 97:16 98:2
**Letters**
[1] 82:9
**Level**
[1] 98:10
**Life**
[3] 8:18 13:1 16:11
**Light**
[1] 89:7
**Lights**
[1] 20:10
**Limited**
[3] 100:18 100:20 100:22
**Linchpin**
[1] 79:21
**Line**

**Lines**
[4] 77:7 77:11 77:15 77:16
**Lineups**
[1] 34:4
**Listen**
[1] 2:22
**Listening**
[2] 22:5 53:13
**Live**
[1] 31:8
**Lived**
[3] 34:18 34:18 59:23
**Living**
[4] 30:22 30:24 32:17 34:21
**Locked**
[1] 37:5
**Long-term**
[2] 89:13 91:6
**Look**
[5] 39:11 74:25 76:3 76:4 103:2
**Looked**
[4] 16:20 16:3 45:17 73:21
**Looking**
[6] 17:4 17:5 17:6 75:14 91:10 103:6
**Looks**
[1] 58:8
**Loser**
[1] 42:18
**Louder**
[2] 9:7 17:21

## M

**Ma'am**
[75] 26:1 28:1 28:14 28:19 29:12 29:19 30:3 30:11 30: 23 31:2 31:16 31:17 31:22 32:2 32:8 32:10 32:13 32:18 32:21 33:2 33:5 33:19 34:1 34:5 34:15 35:8 35:17 36:7 36:10 36:18 36:20 36:22 37:21 37:24 38:4 38:21 39:21 40:14 40:16 40:23 41:5 41:7 41:10 41:17 41:21 41:24 42:8 42:21 42:23 43:11 43:16 43:20 44:2 44:5 44:11 44: 12 44:20 45:4 45:11 45:23 46:5 46:10 48:14 46:22 47: 12 49:1 49:5 49:11 49:21 49:24 50:11 51:10 51:15 51: 20 51:23
**Machines**
[1] 90:11
**Mad**
[2] 85:17 98:14
**Madam**
[2] 4:23 62:22
**Main**
[1] 92:16
**Man**
[16] 16:3 16:4 16:4 19:20 34:12 34:25 34:25 35:1 35: 18 36:12 52:20 52:20 90:16 92:10 97:2 97:2
**Manipulate**
[1] 104:8
**Manner**
[1] 85:24
**Manslaughter**
[9] 23:8 50:6 50:10 50:14 68:8 68:11 76:6 76:24 91:2
**Margaret**
[1] 59:24
**Marijuana**
[10] 7:7 6:10 13:11 15:5 25:7 30:21 31:19 33:8 37:13 66:21
**Mark**
[1] 63:12
**Marked**
[1] 4:13
**Marks**
[1] 97:16
**Marshals**
[1] 105:4
**Massaro**
[2] 81:25 82:16

**Matter**
[2] 83:3 90:1

**McCann**
[1] 59:24

**Mean**
[ ]:23 8:3 11:2 16:11 17:5 18:11 38:20 42:19 45:16
[ ] 72:9 72:9 76:14 90:5 94:3 98:13 98:22 90:2

**Meaning**
[2] 19:11 19:14

**Means**
[7] 36:3 76:13 87:24 97:24 98:18 98:23 99:1

**Meant**
[3] 23:18 60:18 98:2

**Mechanical**
[1] 1:24

**Medication**
[10] 11:17 12:5 12:10 24:16 25:1 26:3 29:9 30:9 57:17
61:22

**Medications**
[4] 11:20 24:14 24:18 57:20

**Meet**
[4] 45:7 58:15 58:17 99:24

**Meeting**
[1] 58:20

**Meetings**
[2] 72:7 72:9

**Member**
[1] 103:17

**Members**
[1] 59:22

**Memory**
[8] 29:1 29:2 29:4 29:6 29:13 29:14 60:10 95:22

**Men**
[1] 52:22

**Mental**
[11] 24:2 61:3 65:14 86:18 72:20 81:11 92:5 92:15 94:
17 99:24 102:8

**Mention**
[ ]:6 75:25 76:5

**...tioned**
[5] 12:12 12:24 23:4 99:12 103:21

**Merit**
[1] 81:7

**Met**
[7] 65:3 85:4 65:5 72:9 72:10 99:14 99:22

**Michael**
[1] 32:1

**Middle**
[2] 76:5 76:8

**Might**
[21] 3:16 27:22 27:22 31:25 46:9 48:19 46:23 70:5 70:
24 87:25 88:14 91:15 93:15 95:2 96:7 98:8 101:1 101:4
101:8 101:9 101:12

**Mind**
[4] 25:19 57:11 66:10 78:24

**Minds**
[1] 101:24

**Minute**
[1] 46:24

**Minutes**
[4] 20:3 20:4 42:13 88:21

**Misdemeanor**
[1] 32:15

**Misidentification**
[5] 79:11 89:5 90:19 91:2 98:22

**Miss**
[3] 4:21 80:12 80:18

**Misunderstanding**
[1] 88:8

**Mixed**
[1] 32:21

**...ney**
[ ]:25 31:14

**Month**

**Months**
[5] 31:7 33:15 59:16

**Months**
[5] 7:17 7:18 7:19 30:13 91:5

**Morning**
[1] 51:19

**Most**
[4] 34:3 51:10 80:15 94:18

**Mother**
[9] 4:17 11:11 14:22 15:1 34:18 34:21 69:9 69:13 103:
19

**Mother's**
[7] 14:23 14:24 15:8 15:13 17:9 29:17 33:16

**Motion**
[4] 45:13 81:6 91:24 102:4

**Motions**
[2] 45:2 72:12

**Motive**
[3] 79:12 79:13 89:19

**Move**
[2] 25:18 92:1

**Moved**
[1] 31:3

**Multiple**
[2] 88:16 100:2

**Murder**
[5] 29:21 32:23 50:13 54:10 54:12

**Murdered**
[1] 50:9

**Murdering**
[1] 40:18

**Must**
[1] 83:13

**N**

**Name**
[8] 2:2 11:21 25:22 31:24 32:1 33:24 75:22 86:21

**Named**
[1] 40:16

**Names**
[1] 59:24

**Nature**
[2] 85:2 85:5

**Necessarily**
[2] 90:25 92:18

**Need**
[2] 17:19 71:18

**Needed**
[4] 17:23 18:1 103:11 104:16

**Neighbor**
[4] 15:19 55:8 55:10 55:12

**Neighborhood**
[1] 96:13

**Nervous**
[2] 54:3 54:4

**Never**
[20] 24:25 28:3 36:14 36:25 41:6 41:8 42:12 44:11 50:
2 50:2 58:14 61:18 61:18 61:21 69:18 88:10 88:13 89:
25 99:24 103:21

**New**
[14] 1:1 1:8 1:21 4:5 14:20 14:21 15:1 15:4 23:10 23:
12 23:20 23:24 31:1 81:16

**Next**
[9] 4:15 5:10 5:11 17:6 20:3 37:5 51:19 53:19 93:19

**Night**
[3] 10:15 15:19 51:19

**Nobody**
[6] 43:5 43:6 43:23 43:23 63:17 98:4

**None**
[2] 25:9 63:1

**Noninduced**
[1] 100:4

**Normal**
[2] 87:22 99:21

**Normally**

**Note**
[5] 2:5 3:9 63:13 62:14 100:10

**Noted**
[1] 93:13

**Notes**
[1] 71:12

**Nothing**
[11] 3:20 4:4 6:6 12:22 17:20 44:11 63:11 94:5 94:6
101:21 102:21

**Notice**
[1] 56:12

**November**
[2] 1:8 82:15

**Number**
[7] 25:17 35:7 37:14 39:11 83:20 83:20 83:21

**NYSIIS**
[1] 103:2

**O**

**Object**
[2] 63:9 63:10

**Objective**
[2] 88:1 97:7

**Obligated**
[1] 63:10

**Obligation**
[6] 5:5 75:5 75:4 60:15 83:6 86:18

**Observations**
[2] 67:5 103:9

**Observe**
[1] 88:21

**Obviously**
[1] 75:4

**Occasions**
[3] 35:7 37:15 104:9

**Occurred**
[1] 74:2

**Occurrences**
[1] 88:16

**Off-the-record**
[1] 68:9

**Offense**
[22] 23:4 23:15 23:18 24:9 68:2 76:2 76:4 77:8 77:14
78:20 83:22 86:3 86:6 87:11 89:5 89:12 90:6 90:18 96:
2 96:17 97:18 98:2

**Offer**
[1] 76:1

**Offering**
[1] 79:8

**Offhand**
[1] 59:1

**Office**
[6] 1:18 2:12 2:14 25:24 64:14 64:14

**Officer**
[2] 33:24 52:19

**Officers**
[2] 40:2 40:5

**Often**
[2] 37:9 69:5

**Older**
[1] 10:9

**Olivier**
[9] 1:15 2:8 4:19 5:24 8:23 52:8 52:8 75:19 75:22

**On-the-record**
[1] 100:15

**Once**
[2] 59:7 59:16

**One**
[30] 3:21 15:19 20:3 22:1 22:2 26:18 32:16 39:13 45:1
45:14 45:17 49:1 53:7 54:15 55:8 55:24 56:20 64:17 64:
18 70:24 77:24 83:20 85:6 89:10 89:11 90:20 92:23 96:
15 97:10 101:17

**Ones**

**Ongoing**
[1] 83:8
**Open**
[1] 12:13
**Open**
[2] 2:19 94:1
**nion**
[ ]:25 67:2 75:14
**Opportunity**
[2] 86:13 88:21
**Order**
[7] 80:16 81:2 83:7 96:24 98:15 103:12 104:16
**Ordered**
[2] 73:11 94:8
**Original**
[1] 74:16
**Orville**
[13] 1:4 2:4 31:24 54:7 54:9 56:7 56:18 57:6 57:17 58:23 62:13 84:9 83:7
**Orville's**
[1] 58:17
**Otherwise**
[1] 92:15
**Ought**
[1] 45:12
**Outcome**
[1] 101:11
**Outpatient**
[2] 12:2 30:8
**Outside**
[9] 4:21 4:23 20:2 55:9 56:10 56:23 72:16 82:8 98:14
**Own**
[9] 31:8 69:13 78:13 91:23 95:15 98:9 102:24 103:8 104:1

**P**

**P.m.**
[1] 1:8
**age**
[ ]:7:1 47:2 47:18 74:15 74:17 76:4 76:5 76:8 76:16 77:8 77:13
**Pages**
[1] 46:11
**Paper**
[6] 21:7 21:9 28:17 28:21 29:14 68:11
**Papers**
[5] 63:14 80:15 81:4 99:10 103:6
**Pardon**
[2] 6:12 63:7
**Parker**
[11] 20:19 21:21 46:6 74:1 75:2 83:20 83:23 83:25 84:17 97:10 97:10
**Part**
[4] 46:20 47:7 92:13 100:18
**Participate**
[4] 46:20 66:12 76:12 99:11
**Participated**
[1] 86:5
**Participation**
[3] 56:18 76:14 98:9
**Particular**
[4] 67:21 67:21 78:22 92:20
**Particularly**
[3] 27:23 89:7 89:18
**Partly**
[1] 91:10
**Parts**
[2] 45:25 46:3
**Passing**
[1] 55:8
**Past**
[ ]:4:1 24:4 38:3 61:13 66:17 71:19 71:25 78:5 103:8
**ched**
[ ] 10:16
**Pause**

**Pay**
[3] 39:14 47:9 59:13 75:1
**Pay**
[1] 8:2
**Pedagogical**
[1] 80:19
**Penalty**
[1] 5:7
**Pencil**
[1] 66:11
**Pennsylvania**
[1] 34:16
**Pens**
[1] 47:15
**People**
[14] 20:12 43:22 50:9 52:21 66:22 66:23 69:2 79:12 83:24 91:7 92:14 92:17 94:16 98:17
**Percent**
[1] 92:14
**Perceptions**
[1] 71:4
**Peremptory**
[1] 66:14
**Perfectly**
[2] 89:4 91:19
**Performance**
[1] 86:23
**Period**
[5] 8:9 28:3 29:23 54:21 102:18
**Perjury**
[1] 5:7
**Permitted**
[1] 98:12
**Person**
[16] 40:4 45:9 50:7 53:1 53:4 55:11 55:23 69:12 79:22 90:7 92:9 94:1 94:3 98:19 98:19 101:22
**Person's**
[1] 88:1
**Personal**
[2] 71:3 103:1
**Personality**
[2] 11:2 100:2
**Petition**
[2] 6:11 6:14
**Petitioner**
[23] 1:14 2:4 2:5 2:17 2:23 3:3 3:8 3:25 4:12 4:16 5:4 5:8 83:7 83:23 84:6 84:9 84:10 85:1 85:3 85:4 85:15 104:24 105:3
**Petitioner's**
[5] 4:17 83:9 84:7 87:3 88:24
**Philadelphia**
[5] 14:14 14:15 14:19 31:4 31:18
**Phone**
[9] 6:10 6:11 6:13 6:7 9:8 9:12 55:4 69:6 69:10
**Physician**
[1] 24:22
**Pick**
[2] 50:3 50:3
**Picked**
[1] 22:22
**Piece**
[2] 21:9 28:21
**Pieces**
[1] 28:16
**Pinball**
[1] 90:11
**Place**
[4] 13:14 54:16 56:22 104:16
**Placed**
[1] 34:4
**Places**
[1] 31:13
**Placing**
[1] 94:20
**Plaintiff**

**Plausible**
[1] 71:1
**Play**
[2] 82:11 101:16
**Plaza**
[1] 1:21
**Plead**
[6] 26:9 26:12 27:1 32:3 32:5 32:6
**Pleaded**
[2] 94:2 94:4
**Pleading**
[2] 26:13 26:20
**Pled**
[1] 102:11
**Plenty**
[1] 82:5
**Point**
[27] 3:22 12:25 15:8 20:17 24:1 31:3 36:8 37:7 39:3 43:14 50:22 52:10 75:14 77:4 86:2 86:4 86:7 88:1 91:13 92:24 96:1 96:15 97:7 97:10 97:20 98:4 98:13
**Pointing**
[1] 87:13
**Points**
[3] 20:16 87:6 93:4
**Police**
[2] 11:12 33:17
**Portion**
[1] 77:19
**Position**
[3] 3:23 67:10 67:11
**Possible**
[2] 24:4 92:19
**Possibly**
[4] 81:18 94:4 98:10 99:24
**Practice**
[2] 89:2 73:8
**Precinct**
[4] 33:20 33:22 33:23 34:2
**Prefer**
[1] 89:7
**Preparation**
[2] 19:25 73:18
**Prepared**
[5] 5:3 80:8 80:13 80:18 83:17
**Prescribed**
[2] 24:22 29:10
**Presence**
[3] 19:8 22:14 84:7
**Present**
[39] 4:15 19:6 19:9 19:10 19:12 20:19 20:23 20:24 21:2 22:12 22:25 23:1 46:7 46:8 47:19 47:25 48:2 48:2 48:9 48:11 48:13 48:14 48:15 49:2 48:3 67:7 67:11 67:13 67:16 67:23 67:24 75:3 84:22 84:25 85:6 97:11 97:12 97:14 97:14
**Presentability**
[1] 83:13
**Presentence**
[1] 68:23
**Presents**
[1] 76:11
**Pressure**
[3] 86:24 87:19 88:15
**Pretrial**
[3] 66:8 72:13 84:1
**Previous**
[2] 72:23 73:7
**Principles**
[1] 65:20
**Prison**
[13] 6:15 27:8 27:12 27:14 37:9 43:10 44:1 44:4 45:1 54:9 58:3 92:14 103:19
**Prisoner**
[1] 105:5
**Prisoners**

**Probation**
[2] 62:17 82:18

**Probation**
[3] 32:16 68:22 68:26

**Problem**
[9] 22:24 46:1 47:21 57:15 91:20 92:13 92:19 96:6 102:

**Problems**
[11] 12:13 24:2 30:9 45:18 73:13 74:13 75:5 79:13 91:23 92:15 102:8

**Procedural**
[3] 80:23 81:17 100:9

**Procedurally**
[9] 80:11 80:25 81:9 81:11 81:12 81:13 81:15 81:23 83:2

**Proceed**
[6] 4:2 9:16 47:5 70:19 72:4 80:22 102:10 103:5

**Proceeding**
[5] 70:14 71:8 82:4 95:14 95:18

**Proceedings**
[20] 1:24 66:5 71:2 71:6 72:16 75:6 78:7 78:15 83:16 83:19 84:2 84:4 84:7 84:19 86:16 94:25 97:14 98:16 99:11 99:18

**Process**
[1] 101:18

**Produced**
[1] 1:25

**Program**
[3] 30:7 30:8 30:12

**Prolonged**
[1] 100:4

**Prominently**
[1] 89:15

**Properly**
[1] 90:16

**Prosecution**
[2] 25:12 58:9

**Prosecutor**
[6] 32:11 35:12 35:14 36:5 53:6 54:7

**Prosecutor's's**
[1] 35:21

**Prosecutors**
[1] 78:1

**Prospective**
[2] 66:12 85:13

**Protecting**
[1] 36:7

**Prove**
[1] 79:12

**Provided**
[1] 85:13

**Provides**
[1] 89:6

**Provisional**
[1] 102:19

**Psychiatric**
[10] 10:23 43:25 56:19 61:13 69:17 69:18 70:20 91:24 92:19 103:14

**Psychiatrist**
[1] 44:3

**Psychological**
[2] 30:9 103:14

**Psychosis**
[2] 100:3 100:4

**Psychotherapy**
[1] 11:24

**Psychotropic**
[2] 24:21 68:21

**Pull**
[1] 9:16

**Purpose**
[2] 7:6:10 8:13 13:5

**Pushing**
[2] 6:14 97:21

**Put**

**Q**

**Questioned**
[2] 42:6 42:14

**Questioning**
[1] 5:17

**Questions**
[22] 6:5 21:16 22:10 25:12 25:17 25:24 34:14 37:1 41:1 46:4 46:12 48:10 49:17 51:24 52:1 52:10 54:5 56:3 58:5 58:12 62:13 70:4

**Quiet**
[1] 91:12

**Quite**
[7] 16:10 66:6 72:9 87:20 89:6 90:2 100:1

**Quoted**
[1] 76:6

**R**

**Raise**
[3] 61:5 81:22 82:2

**Raised**
[4] 80:14 81:11 83:8 102:4

**Ran**
[1] 10:1

**Rang**
[1] 55:4

**Rap**
[5] 93:21 94:5 94:6 94:12 103:2

**Rational**
[13] 83:15 89:24 89:4 89:21 90:24 90:25 91:10 91:12 91:15 92:10 92:12 97:4 102:1

**Rationally**
[1] 85:17

**Read**
[12] 41:13 45:16 45:19 45:21 45:21 45:22 46:3 73:17 74:22 77:7 77:15 77:19

**Reading**
[3] 46:1 46:11 46:13

**Reality**
[1] 103:25

**Really**
[7] 18:21 28:6 43:17 57:3 61:4 96:24 98:13

**Reason**
[9] 15:21 16:2 55:12 57:1 78:18 95:13 95:24 95:24 104:19

**Reasonable**
[6] 79:7 83:14 88:14 98:17 101:20 102:2

**Reasonably**
[1] 3:13

**Reasons**
[6] 15:22 80:19 80:24 81:10 82:5 82:13

**Receive**
[1] 69:5

**Recently**
[2] 58:3 73:17

**Recollection**
[17] 46:24 49:25 64:19 65:4 66:4 68:3 69:12 72:6 72:18 73:3 73:6 73:23 74:24 75:12 77:22 78:3 79:17

**Recollections**
[1] 65:2

**Recommendation**
[3] 65:16 66:16 68:17

**Record**
[31] 3:10 4:9 4:10 4:11 16:5 68:9 76:11 76:22 82:8 82:11 83:16 84:5 86:10 86:14 86:17 86:6 88:8 88:8 88:10 93:4 94:7 95:25 96:16 97:9 100:12 100:13 100:15 101:17 101:21 104:11 104:19

**Recorded**
[1] 1:24

**Records**
[3] 59:10 94:20 103:19

**Redirect**
[2] 52:2 52:4

**Reference**
[2] 4:4 74:16

**Referred**
[2] 93:8 99:10

**Referring**
[2] 28:17 28:20

**Refers**
[1] 76:3

**Reflect**
[1] 90:26

**Refresh**
[1] 46:23

**Refreshed**
[1] 73:23

**Refused**
[3] 84:16 85:1 91:15

**Regard**
[11] 6:8 66:7 66:15 67:19 67:20 68:24 75:3 76:9 84:20 85:7 88:3

**Regarding**
[2] 3:10 87:11

**Regards**
[3] 81:14 81:24 83:23

**Regular**
[3] 14:8 30:21 105:2

**Reiterated**
[1] 97:11

**Relationship**
[1] 54:7

**Relatives**
[4] 56:13 59:2 59:3 69:5

**Released**
[3] 27:14 27:18 29:16

**Relevance**
[2] 90:23 97:6

**Relevant**
[1] 3:12

**Reluctant**
[1] 100:21

**Remain**
[3] 4:21 4:23 14:15

**Remand**
[2] 36:2 36:3

**Remember**
[109] 6:20 7:3 8:24 9:1 9:5 9:6 14:25 15:6 15:15 16:24 17:9 18:13 18:15 18:16 18:19 19:3 19:17 20:5 20:7 20:18 20:22 21:22 23:3 26:6 26:9 27:14 27:18 28:7 29:7 29:8 29:19 30:16 30:19 31:15 31:18 32:1 32:14 32:23 33:12 33:15 33:16 33:20 33:24 34:2 34:4 34:6 34:7 34:10 34:12 34:13 34:15 34:16 34:17 34:20 37:16 37:21 37:22 38:2 39:3 39:5 39:6 39:19 41:11 41:13 41:16 44:13 44:17 44:19 44:22 44:22 44:24 44:25 46:5 46:11 46:13 46:16 46:18 46:23 49:16 49:19 49:22 51:11 54:20 55:7 55:8 56:6 57:21 58:20 59:14 59:16 60:2 60:7 60:6 60:8 64:22 66:6 66:13 67:16 68:8 68:21 69:6 69:11 69:13 72:15 73:22 95:16 101:19 104:4

**Remembering**
[1] 9:22

**Remembers**
[2] 95:20 104:2

**Removed**
[2] 102:18 103:25

**Repeat**
[2] 6:12 14:7

**Repeatedly**
[1] 92:11

**Report**
[4] 63:18 68:22 68:23 96:5

**Reported**
[1] 93:5

**Reporter**
[3] 1:20 2:19 105:1

**Reports**
[1] 74:17

**Represent**

**Represented**
[4] 36:8 58:19 64:8 64:22
**Represented**
[1] 69:20
**Representing**
[2] 38:17 69:8
**Request**
[1] 86:18
**Requested**
[1] 85:6
**Require**
[1] 91:24
**Reserves**
[1] 104:23
**Respect**
[4] 67:11 74:1 82:25 88:9
**Respond**
[4] 5:1 5:3 98:4 100:7
**Respondent**
[8] 1:17 2:10 2:13 63:23 80:8 80:10 81:4 105:3
**Response**
[4] 34:9 74:12 76:15 94:23
**Responses**
[3] 87:9 92:24 94:14
**Responsible**
[3] 82:9 92:18 92:18
**Rest**
[1] 8:18
**Result**
[6] 10:25 11:17 11:25 12:14 57:17 87:25
**Return**
[2] 15:13 105:4
**Revealed**
[1] 99:25
**Reviewed**
[1] 100:12
**Reviewing**
[1] 101:18
**Rid**
[1] 96:10
**Rights**
[4] 8:16 47:17 84:10 84:12
**Rikers**
[14] 8:8 17:14 37:6 44:10 51:14 58:23 59:15 59:19 60:
15 60:22 63:15 65:6 72:17 88:25
**Robbery**
[1] 26:9
**Robe**
[1] 93:18
**Robinson**
[1] 32:1
**Role**
[9] 35:2 35:20 65:20 65:21 65:21 78:2 78:2 99:4 99:4
**Roles**
[2] 78:4 78:8
**Room**
[2] 20:12 31:10
**Rosenblum**
[16] 1:17 2:11 2:11 3:8 3:18 3:24 63:10 63:17 89:14 90:
12 100:8 100:24 101:4 101:8 101:15
**Rule**
[1] 81:18

**S**

**Sale**
[1] 31:19
**Sandoval**
[2] 72:24 94:13
**Satisfy**
[1] 101:5
**Saw**
[9] 15:19 20:2 24:25 45:16 54:20 55:22 55:22 91:17
95:5 100:16
**Scared**
[4] 15:21 15:21 15:22 20:9

**Schizophreniform**
[4] 11:16 24:4 100:2 102:19
**School**
[7] 2:7 27:24 27:25 28:2 28:3 28:3 91:7
**Scream**
[1] 65:19
**Scribble**
[2] 28:23 29:6
**Scribbled**
[2] 28:21 29:5
**Scribbles**
[1] 28:21
**Second**
[9] 26:10 39:13 50:7 76:24 80:14 80:17 81:15 82:12 84:
18
**See**
[14] 25:3 25:6 25:8 38:2 54:18 55:4 55:25 56:1 56:3 56:
16 70:1 89:17 91:20 91:20
**Seeing**
[2] 37:22 72:15
**Seem**
[10] 60:15 60:21 60:23 61:6 78:5 89:2 91:11 94:15 103:
10 103:24
**Selected**
[1] 87:23
**Selection**
[8] 18:17 18:20 18:21 48:20 50:1 66:11 66:16 67:19
**Selectively**
[1] 104:2
**Self**
[1] 104:1
**Self-Incrimination**
[1] 8:16
**Self-interested**
[1] 104:1
**Sell**
[1] 31:13
**Send**
[1] 8:18
**Sense**
[3] 90:18 90:19 90:7
**Sensible**
[5] 87:17 87:20 87:25 88:3 91:19
**Sent**
[2] 10:16 10:23
**Sentence**
[7] 24:10 32:14 32:15 50:19 69:1 69:4 69:7
**Separate**
[2] 72:16 102:4
**Serious**
[2] 8:17 94:19
**Served**
[1] 102:11
**Set**
[2] 86:25 102:4
**Settings**
[1] 95:9
**Several**
[3] 37:18 72:13 85:23
**Severe**
[2] 12:15 100:4
**Shawangunk**
[1] 6:5
**Sheet**
[6] 93:21 94:5 94:6 94:12 103:2 103:2
**Sheryl**
[3] 1:18 2:14 25:22
**Shirt**
[1] 55:9
**Shooting**
[2] 40:10 90:7
**Shoots**
[1] 90:16
**Shop**

**Short**
[3] 56:9 74:12 102:17
**Shortly**
[1] 18:5
**Shot**
[4] 40:2 79:19 90:8 90:15
**Shout**
[1] 9:12
**Shouting**
[1] 9:8
**Show**
[2] 73:25 79:13
**Showed**
[1] 94:5
**Showing**
[2] 74:13 75:5
**Shown**
[1] 93:23
**Shows**
[2] 88:8 88:10
**Shulamit**
[2] 1:17 2:11
**Shut**
[1] 94:1
**Sidebar**
[21] 49:3 67:8 67:12 67:13 67:18 67:19 67:19 83:21 84:
20 84:22 85:5 85:7 85:10 85:18 85:20 85:22 87:10 91:
14 91:10 97:12 97:15
**Sidebars**
[2] 22:18 87:23
**Sign**
[7] 21:4 21:6 21:7 21:9 39:5 59:15 84:16
**Signing**
[1] 39:3
**Silverstein**
[1] 81:16
**Similar**
[1] 15:24
**Simply**
[5] 3:9 63:18 97:15 98:16 104:18
**Sister**
[2] 56:15 60:1
**Sit**
[2] 49:17 67:20
**Sitting**
[4] 4:17 53:9 93:16 93:19
**Situation**
[3] 86:8 102:6 104:8
**Six**
[5] 7:17 7:18 7:19 59:18 91:5
**Skillful**
[1] 88:9
**Sleeping**
[1] 17:10
**Slight**
[1] 82:16
**Small**
[1] 99:25
**Smart**
[1] 96:20
**Smoke**
[2] 56:11 58:12
**Smoking**
[3] 13:11 15:5 33:8
**Snorting**
[2] 13:11 15:4
**Someone**
[5] 40:16 45:2 49:12 49:14 104:8
**Sometime**
[7] 28:9 30:14 38:2 42:24 43:20 45:5 53:12
**Sometimes**
[15] 6:1 12:18 12:18 14:9 14:22 20:6 27:11 37:25 43:
21 43:22 45:23 47:14 53:9 55:19 91:7

**Somewhere**
[1] 27:22
**Son**
[7] 54:8 54:16 54:20 55:16 55:19 56:21 57:22
**Son's**
...11 61:12
...n
[1] 37:12
**Sophisticated**
[1] 101:10
**Sorry**
[7] 10:12 12:6 58:2 75:16 76:7 77:3 77:10
**Sort**
[1] 90:12
**Sound**
[2] 59:17 59:25
**Southern**
[2] 82:15 82:21
**Speaking**
[8] 2:18 22:2 60:2 65:16 67:16 69:9 69:13 99:1
**Specific**
[6] 13:13 18:10 20:17 55:6 71:3 71:14 72:19 73:3
**Specifically**
[5] 4:8 65:19 67:18 70:23 81:3
**Speculate**
[1] 75:11
**Speculation**
[1] 76:25
**Spend**
[1] 62:2
**Spinning**
[1] 20:12
**Spoken**
[3] 23:17 76:5 76:8
**Sponte**
[3] 80:15 80:16 83:6
**Stage**
...18:23 18:24 93:18
...d
...1:2 61:4 64:1 65:18 76:24 83:11
**Standard**
[2] 86:25 95:11
**Standing**
[3] 5:9 35:13 35:19
**Staring**
[1] 53:10
**Start**
[12] 6:4 9:20 9:21 9:23 13:4 20:12 30:20 39:22 39:23 39:23 48:5 48:6
**Started**
[19] 9:22 11:10 12:24 13:14 13:16 13:17 13:21 13:21 30:18 32:19 33:1 33:8 33:10 37:12 38:12 39:17 71:9 72:8 72:11
**Starting**
[2] 4:16 74:17
**State**
[9] 3:12 3:13 3:20 82:18 101:20 101:23 102:1 104:12 104:20
**Statement**
[2] 69:2 69:5
**States**
[5] 1:1 1:6 1:12 81:3 83:12
**Stating**
[1] 86:12
**Stay**
[2] 43:22 56:23
**Stayed**
[2] 15:3 31:10
**Staying**
[1] 34:21
**Stenography**
...24
...s
[1] 15:19

**Stick**
[1] 66:10
**Still**
[6] 12:17 65:4 65:9 86:7 97:5 98:22
**Stop**
[4] 13:24 30:4 30:12 96:13
**Stopped**
[3] 30:5 30:14 56:21
**Store**
[4] 16:12 33:16 79:18 90:8
**Story**
[1] 98:25
**Strategy**
[1] 79:23
**Street**
[2] 10:1 96:19
**Streets**
[2] 14:8 30:25
**Stretch**
[1] 60:10
**Strickland**
[1] 86:25
**Strike**
[1] 49:23
**Strong**
[1] 92:7
**Struck**
[1] 99:6
**Students**
[1] 80:7
**Stuff**
[10] 8:1 8:3 11:11 17:2 17:4 17:5 28:22 31:13 38:12 45: 15
**Sua**
[3] 80:15 80:16 83:6
**Submit**
[1] 63:5
**Submitted**
[2] 81:4 102:23
**Successful**
[1] 98:15
**Sudden**
[1] 23:23
**Suffering**
[1] 100:4
**Sufficient**
[5] 83:13 85:24 93:10 93:13 104:13
**Sufficiently**
[1] 91:21
**Suggest**
[1] 2:21
**Suggested**
[1] 45:9
**Suits**
[1] 104:10
**Sulzer**
[1] 1:20
**Summarily**
[2] 86:10 86:12
**Summer**
[5] 14:17 33:5 54:18 54:21 55:22
**Supply**
[1] 73:20
**Supported**
[1] 79:8
**Supposed**
[10] 22:9 22:15 22:16 22:17 22:18 36:18 48:2 48:2 48: 22 103:13
**Supreme**
[5] 82:1 82:12 83:12 86:25 102:3
**Surely**
[1] 72:25
**Suspicious**
[1] 52:18

**Swear**
[1] 5:4
**Swore**
[2] 39:6 39:6
**Sworn**
[4] 2:20 5:20 63:21 64:4
**System**
[1] 102:13

**T**

**Tactic**
[1] 79:4
**Tactical**
[1] 90:1
**Tactics**
[1] 79:2
**Telephone**
[2] 2:2 61:10
**Tendall**
[2] 69:24 69:25
**Term**
[1] 69:13
**Terminate**
[2] 71:20 71:24
**Terms**
[3] 50:5 65:3 99:3
**Testified**
[12] 5:21 26:2 29:9 29:18 32:17 32:25 50:5 50:8 53:22 64:5 78:1 88:23
**Testify**
[6] 8:18 41:25 42:2 65:22 68:13 88:16
**Testifying**
[5] 28:16 28:18 28:1 29:13 62:21 63:17
**Testimony**
[15] 4:15 4:16 4:22 73:18 75:25 77:5 84:13 88:2 88:4 88:5 88:7 88:24 99:3 103:9 104:1
**Thanked**
[1] 69:8
**Thanking**
[1] 44:14
**Theoretically**
[1] 96:23
**Theories**
[1] 96:24
**Theory**
[6] 79:9 79:10 79:11 89:5 91:2 96:21
**Therefore**
[2] 79:22 83:1
**Thinking**
[2] 14:8 86:8
**Third**
[3] 80:16 86:2 95:12
**Thoughts**
[2] 17:15 17:17
**Three**
[18] 15:8 27:5 37:8 46:11 47:2 47:18 51:12 74:17 79: 19 80:8 80:24 83:17 83:21 88:14 87:6 88:19 91:11 97:3
**Thrown**
[1] 90:1
**Today**
[12] 6:2 6:7 12:17 13:5 54:2 62:21 71:2 73:21 84:14 88: 4 88:5 88:7
**Together**
[3] 9:16 94:11 94:15
**Took**
[7] 13:14 33:20 37:16 37:18 54:18 56:25 57:17
**Totally**
[1] 98:14
**Towards**
[1] 54:22
**Transcript**
[12] 1:11 1:24 2:25 2:25 4:8 45:16 45:19 45:22 46:12 46:20 73:17 101:25
**Transcripts**

**Traumas**
[1] 45:21

**Treat**
[1] 100:3

**[...]ted**
[1] 82:24
[...]:24

**Treatment**
[2] 30:7 43:25

**Tree**
[1] 13:11

**Trial**
[92] 3:11 3:12 7:16 8:7 14:3 17:16 17:17 18:5 18:12 18:
13 18:25 20:2 20:5 20:8 20:10 20:15 20:18 20:19
24:14 24:15 38:12 38:17 38:20 38:22 40:15 40:18 42:2
43:8 45:10 45:20 46:8 46:6 47:5 47:19 48:4 48:5 48:16
50:13 51:5 51:9 51:11 53:8 54:13 58:18 61:2 61:4 61:5
62:12 64:9 64:19 65:9 65:10 65:11 65:12 65:16 68:6 67:
1 68:3 69:22 69:24 70:20 71:6 71:9 72:7 72:11 79:20
83:6 83:9 83:10 83:11 84:2 84:8 85:3 85:9 86:4 86:16
86:18 87:6 87:9 88:17 88:17 88:18 88:21 89:3 91:21 94:
13 97:11 99:21 101:21 103:23 104:6

**Trick**
[3] 39:19 50:20 50:21

**Tried**
[5] 7:11 84:11 85:3 85:21 89:4

**Trouble**
[5] 3:4 45:17 84:19 101:9 102:16

**Troubled**
[1] 103:25

**Troublesome**
[1] 92:21

**True**
[2] 3:18 91:3

**Trust**
[5] 30:19 39:24 40:25 52:20 102:24

**Truth**
[3] 9:8 5:6 5:6

**Try**
[...]:24 14:10 19:6 62:4 97:22

**[...]ing**
[15] 14:6 14:10 17:10 22:7 22:23 23:10 23:19 39:18 50:
20 50:21 52:19 60:10 95:1 104:8 104:8

**Twice**
[3] 90:15 99:14 99:22

**Two**
[19] 10:14 13:11 15:6 20:2 20:3 22:1 30:6 30:17 30:19
50:8 50:21 52:1 52:10 52:21 52:22 70:5 81:10 83:20 99:
18

## U

**Ultimate**
[2] 87:16 87:18

**Ultimately**
[1] 87:24

**Unaware**
[1] 3:19

**Unclear**
[1] 68:18

**Under**
[33] 5:7 7:10 10:21 12:5 24:13 24:16 24:18 24:21 26:
20 27:1 42:7 42:10 42:15 42:16 42:25 43:2 43:3 43:18
61:9 68:20 68:22 66:23 67:2 69:21 89:25 82:4 86:
24 87:19 88:14 92:6 96:12 103:10

**Undergone**
[1] 56:19

**Underlying**
[1] 73:4

**Understood**
[16] 22:12 32:11 48:8 48:11 51:4 78:14 76:20 78:22 83:
25 84:8 91:1 93:5 93:7 95:8 96:17 97:8

**Undoubtedly**
[...]5:21

**[...]ortunately**
[...]71:11

**United**

**[1] 1:1 1:6 1:12 83:12**

**Unless**
[1] 57:3

**Unlikely**
[2] 63:14 69:25

**Unnecessarily**
[2] 9:13 98:5

**Unreasonable**
[2] 101:23 102:3

**Unreasonably**
[1] 104:12

**Unspecified**
[2] 11:1 11:2

**Unusual**
[4] 60:11 88:9 89:17 89:20

**Up**
[31] 5:9 5:12 6:18 9:8 9:17 10:16 11:10 14:2 17:9 21:
19 22:8 28:13 32:21 35:13 37:6 44:6 44:7 49:2 54:11
56:22 57:10 61:1 70:6 74:13 75:5 87:22 90:1 91:16 93:
18 102:16 104:5

**Upheld**
[1] 104:20

**Uphold**
[1] 93:14

**Ursula**
[2] 1:14 2:7

**Usual**
[1] 66:10

## V

**Vacate**
[1] 102:5

**Various**
[1] 86:15

**Verdict**
[4] 44:13 68:18 88:20 69:6

**Versus**
[1] 81:16

**View**
[4] 79:7 88:1 89:18 97:7

**Violent**
[1] 26:13

**Visions**
[1] 16:12

**Visit**
[8] 58:4 58:6 58:23 58:25 59:1 59:15 59:21 72:17

**Visitation**
[1] 59:9

**Visited**
[11] 58:3 58:24 59:2 59:3 59:5 59:7 59:17 59:22 60:3
80:9 103:24

**Visiting**
[1] 103:18

**Visits**
[1] 60:3

**Vividly**
[1] 68:13

**Voice**
[10] 5:9 6:12 9:8 9:17 54:11 71:18 71:16 71:22 71:25
72:3

**Voices**
[14] 6:18 41:22 42:1 42:7 42:11 42:20 42:22 42:23 42:
24 42:25 43:3 43:4 43:8 43:21

**Voir**
[3] 66:7 66:9 67:12

**Voluntarily**
[1] 84:1

## W

**Waive**
[15] 18:8 19:11 22:23 22:24 28:1 48:1 67:12 75:4 81:
19 84:6 84:24 85:1 85:22 91:14 91:15

**Waived**
[1] 85:23

**Walk**
[1] 20:10

**Walked**
[1] 79:18

**Walking**
[1] 33:16

**Wander**
[2] 14:6 14:9

**Wandering**
[2] 17:2 17:3

**Wants**
[1] 86:12

**Warning**
[1] 21:22

**Warnings**
[8] 20:20 46:6 74:1 83:23 83:24 84:17 87:10 97:10

**Watch**
[1] 42:18

**Ways**
[1] 91:8

**Wear**
[1] 17:10

**Week**
[1] 54:22

**Weeks**
[2] 18:5 37:8

**Weinstein**
[2] 1:11 44:8

**Weird**
[1] 15:15

**Well-established**
[1] 86:24

**Whereas**
[1] 95:24

**Whole**
[3] 5:6 10:4 96:21

**Wilkins**
[35] 1:15 2:8 4:1 4:18 5:23 5:24 8:22 8:19 24:12 25:11
25:15 42:14 52:1 52:3 52:5 52:8 53:24 59:11 60:11 62:
20 63:1 63:20 70:10 75:21 76:22 80:1 98:15 97:19 97:
22 98:12 98:25 99:12 99:17 101:3 101:7

**Wish**
[3] 2:20 75:10 90:8

**Withdraw**
[1] 43:22

**Withdrawn**
[1] 60:7

**Witness**
[39] 5:11 5:14 5:20 7:5 7:7 7:9 7:12 7:14 7:17 7:19 7:
22 7:24 8:1 8:5 8:8 8:14 8:14 9:11 9:15 24:23 25:2 25:
5 26:8 53:16 53:19 53:21 62:24 64:4 75:10 77:3 78:22
78:24 79:4 79:10 79:17 80:2 80:3 85:15 95:22

**Witnesses**
[4] 4:20 62:25 65:23 79:14

**Woke**
[1] 17:9

**Word**
[1] 36:2

**Words**
[4] 19:11 19:14 36:16 76:25

**Writ**
[1] 104:20

**Write**
[1] 45:2

## Y

**Year**
[3] 32:15 32:23 94:10

**Years**
[8] 27:5 29:22 30:1 30:6 30:17 30:19 90:20 99:13

**Yell**
[1] 55:19

**York**
[9] 1:1 1:6 1:21 14:20 14:21 15:1 15:4 31:1 81:16

**Young**
[3] 9: 24  12: 25  42: 23

**Yourself**
[2] 9: 16  62: 4

**Firm Name Here**

**Burton H. Sulzer**

**From Young to Yourself**