UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X
                                              :
                                              :
ORVILLE ETORIA (97-A-3708),                   :
                                              :
                 Petitioner,                  :       MEMORANDUM,
                                              :       JUDGMENT & ORDER
                                              :       01-CV-07421 (JBW)
      – against –                             :       03-MISC-0066 (JBW)
                                              :
FLOYD G. BENNETT, Superintendent of           :
Elmira Correctional Facility,                 :
                                              :
                 Respondent.                  :
                                              :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

JACK B. WEINSTEIN, Senior District Judge:

    This case reflects, as do so many others, the psychological and psychiatric problems of

those caught in the criminal justice system. Were those prisoners whose mental functioning rises

just above the minimum level of competence immune to prosecution, many now in prison would

need to be released. *See* Part VII.B. The problem of mentally ill defendants and prisoners is a

pervasive one and raises serious questions about how our courts and penal institutions should

deal with such persons. Resolving such important issues of public policy is, however, outside the

domain of a federal habeas corpus court.

    A hearing was held in this matter. Petitioner was present by telephone and was ably

represented in person at the hearing by counsel from Brooklyn Law School Legal Services and

several student interns. Petitioner gave sworn testimony, as did his mother. His trial counsel

also testified under oath.

    Respondent, rather than following normal procedure and addressing petitioner's claims in

an affidavit and brief opposing the application for the writ, has referred this court generally to its



scattered arguments in briefing papers filed in relation to the direct appeal, motion to vacate judgment and application for a writ of error coram nobis, increasing the difficulty of disposing of this matter.

The petition for a writ of habeas corpus is denied. This memorandum briefly addresses petitioner's claims.

I. Facts and Procedural History

Petitioner was tried for the shooting death of Garth Frazier. The primary proof of his guilt was the testimony of two frequent patrons of the neighborhood leather-goods shop in which the victim was killed. The two men, Gerard Howard and Peter Mohamad, were occupied with a video game when they saw petitioner enter the shop, walk by them with a bag in his hand and enter the restroom, where he remained for several minutes. Howard recognized petitioner because he had known him for eighteen years; Mohamad knew petitioner by sight, but not by name, as a frequent visitor to the store, which was something of a neighborhood hangout. According to both men, when petitioner emerged from the restroom he walked toward Garth Frazier and shot him twice in the head, then a third time in the head as Frazier collapsed to the ground.

Petitioner then left the shop, entered a black car and drove away. An undercover police officer near the scene heard the shots and arrived in time to note that the getaway car had Pennsylvania license plates; he was only able to discern several numbers on the plate and a subsequent search was unable to match the plate. A New York City Criminal Justice Agency employee testified that petitioner had listed a Pennsylvania address as a prior residence when his pedigree information was taken upon arrest.

2

The accused presented no evidence at trial. Convicted of second degree (intentional) murder and second degree criminal possession of a weapon, he was sentenced to 25 years to life in prison.

The Appellate Division affirmed. Leave to appeal to the New York Court of Appeals was denied.

A motion to vacate judgment, in which petitioner presented a number of allegation of ineffective assistance of trial counsel, was denied by the trial court. Leave to appeal the Appellate Division was denied.

An application for a writ of error coram nobis was denied by the Appellate Division. No further state collateral proceedings were initiated.

In his application for a writ of habeas corpus, petitioner claims that (1) he was mentally incapacitated during the course of his trial and was incapable of rationally and factually understanding or appreciating the significance of the charges and proceeding or of assisting in preparing his defense; (2) the trial court's failure to *sua sponte* order a psychiatric examination of petitioner and to conduct a hearing to determine his mental competence to stand trial, deprived him of a fair trial guaranteed by the Due Process Clause of federal Constitution; (3) the trial court failed to ascertain whether petitioner understood the nature of his right to have the jury consider the lesser included offense of first degree manslaughter; (4) trial counsel provided petitioner with ineffective assistance by failing (a) to conduct an investigation into the law and facts of this case, (b) to move to stop the trial when it became apparent that petitioner could not rationally or factually understand the significance of the charges or proceeding, (c) to request an intoxication instruction; (d) to object to the prosecutor's improper questioning of prospective jurors; (e) to

3

timely object to the prosecutor's bolstering identification evidence; and (f) to move for an inquiry regarding a venire-person's knowledge that petitioner was in jail; and (5) appellate counsel's failure to raise the instant claims constituted ineffective assistance.

## II. AEDPA

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a federal court may grant a writ of habeas corpus to a state prisoner on a claim that was "adjudicated on the merits" in state court only if it concludes that the adjudication of the claim "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

An "adjudication on the merits" is a "substantive, rather than a procedural, resolution of a federal claim." *Sellan v. Kuhlman*, 261 F.3d 303, 313 (2d Cir. 2001) (quoting *Aycox v. Lytle*, 196 F.3d 1174, 1178 (10th Cir. 1999)). Under the "contrary to" clause, "a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412–13 (2000) (O'Connor, J., concurring and writing for the majority in this part). Under the "unreasonable application" clause, "a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413. Under this standard, "a federal habeas court may not issue the writ simply because that court concludes in its

4

independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id.* at 411. In order to grant the writ there must be "some increment of incorrectness beyond error," although "the increment need not be great; otherwise, habeas relief would be limited to state court decisions so far off the mark as to suggest judicial incompetence." *Francis S. v. Stone*, 221 F.3d 100, 111 (2d Cir. 2000) (internal quotation marks omitted).

"[F]ederal law, as determined by the Supreme Court, may as much be a generalized standard that must be followed, as a bright-line rule designed to effectuate such a standard in a particular context." *Overton v. Newton*, 295 F.3d 270, 278 (2d Cir. 2002); *see also Yung v. Walker*, No. 01-2299, 2002 U.S. App. LEXIS 28137 (2d Cir. Aug. 1, 2003) (amended opinion) (district court's habeas decision that relied on precedent from the Court of Appeals is remanded for reconsideration in light of "the more general teachings" of Supreme Court decisions). The Court of Appeals for the Second Circuit has also indicated that habeas relief may be granted if a state court's decision was contrary to or an unreasonable application of "a reasonable extension" of Supreme Court jurisprudence. *Torres v. Berbary*, No. 02-2463, 2003 U.S. App. LEXIS 16167, at *25 (2d Cir. Aug. 7, 2003). Determination of factual issues made by a state court "shall be presumed to be correct," and the applicant "shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

III. Exhaustion

In the past, a state prisoner's federal habeas petition had to be dismissed if the prisoner did not exhaust available state remedies as to any of his federal claims. *See Rose v. Lundy*, 455 U.S. 509, 522 (1989). "This exhaustion requirement is . . . grounded in principles of comity; in a

federal system, the States should have the first opportunity to address and correct alleged violations of [a] state prisoner's federal rights." *Coleman v. Thompson*, 501 U.S. 722, 731 (1991). The exhaustion requirement requires the petitioner to have presented to the state court "both the factual and legal premises of the claim he asserts in federal court." *Daye v. Attorney General*, 696 F.2d 186, 191 (2d Cir. 1982) (en banc).

Pursuant to AEDPA, a district court may now, in its discretion, *deny* on the merits habeas petitions containing unexhausted claims—so-called "mixed petitions." *See* 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the state."). In addition, the state may waive the exhaustion requirement, but a "State shall not be deemed to have waived the exhaustion requirement or be estopped from reliance upon the requirement unless the State, through counsel, expressly waives the requirement." *Id.* § 2254(b)(3); *see also Ramos v. Keane*, No. 98 CIV. 1604, 2000 U.S. Dist. LEXIS 101, at *10 (S.D.N.Y. 2000) (state's failure to raise exhaustion requirement does not waive the issue).

IV. Procedural Bar

A federal habeas court may not review a state prisoner's federal claims if those claims were defaulted in state court pursuant to an independent and adequate state procedural rule, "unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman*, 501 U.S. at 750. In determining whether a procedural bar is sufficient to preclude habeas review, a federal court must consider as "guideposts" the following:

(1) whether the alleged procedural violation was actually relied on in the trial court, and whether perfect compliance with the state rule would have changed the trial court's decision; (2) whether state caselaw indicated that compliance with the rule was demanded in the specific circumstances presented; and (3) whether petitioner had "substantially complied" with the rule given "the realities of trial," and, therefore, whether demanding perfect compliance with the rule would serve a legitimate governmental interest.

*Cotto v. Herbert*, 331 F.3d 217, 240 (2d Cir. 2003) (quoting *Lee v. Kemna*, 534 U.S. 362 (2002)).

If a state court holding contains a plain statement that a claim is procedurally barred then the federal habeas court may not review it, even if the state court also rejected the claim on the merits in the alternative. *See Harris v. Reed*, 489 U.S. 255, 264 n.10 (1989) ("a state court need not fear reaching the merits of a federal claim in an *alternative* holding" so long as it explicitly invokes a state procedural rule as a separate basis for its decision).

When a state court says that a claim is "not preserved for appellate review" and then rules "in any event" on the merits, such a claim is not preserved. *See Glenn v. Bartlett*, 98 F.3d 721, 724–25 (2d Cir. 1996). When a state court "uses language such as 'the defendant's remaining contentions are either unpreserved for appellate review or without merit,' the validity of the claim is preserved and is subject to federal review." *Fama v. Comm'r of Corr. Svcs.*, 235 F.3d 804, 810 (2d Cir. 2000). Where "a state court's ruling does not make clear whether a claim was rejected for procedural or substantive reasons and where the record does not otherwise preclude the possibility that the claim was denied on procedural grounds, AEDPA deference is not given, because we cannot say that the state court's decision was on the merits." *Su v. Filion*, No. 02-2683, 2003 U.S. App. LEXIS 13949 at *15 n.3 (2d Cir. July 11, 2003) (citing *Miranda v. Bennett*, 322 F.3d 171, 178 (2d Cir. 2003)). This congeries of holdings leaves it an open question whether there are "situations in which, because of uncertainty as to what the state courts

7

have held, no procedural bar exists and yet no AEDPA deference is required." *Id.*

V. Ineffective Assistance of Counsel

The Counsel Clause of the Sixth Amendment provides that a criminal defendant "shall enjoy the right . . . to have the Assistance of Counsel for his defence." U.S. Const. amend. VI. This right to counsel is "the right to *effective* assistance of counsel." *McMann v. Richardson*, 397 U.S. 759, 771 n.14 (1970) (emphasis added). The Supreme Court has explained that in giving meaning to this requirement we must be guided by its purpose—"to ensure a fair trial"—and that therefore the "benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland v. Washington*, 466 U.S. 668, 686 (1984). In order to prevail on a Sixth Amendment claim, a petitioner must prove both that counsel's representation "fell below an objective standard of reasonableness" measured under "prevailing professional norms," *id.* at 688, and that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," *id.* at 694. *See also Wiggins v. Smith*, 539 U.S. __, No. 02-311, slip op. at 8–10 (June 26, 2003); *United States v. Eyman*, 313 F.3d 741, 743 (2d Cir. 2002). A "reasonable probability" is "a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694.

The performance and prejudice prongs of *Strickland* may be addressed in either order, and "[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice . . . that course should be followed." *Id.* at 697. In evaluating the prejudice suffered by a petitioner as a result of counsel's deficient performance, the court looks to the "cumulative weight of error" in order to determine whether the prejudice "reache[s] the constitutional

8

threshold." *Lindstadt v. Keane*, 239 F.3d 191, 202 (2d Cir. 2001). The court must also keep in mind that "a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support." *Strickland*, 466 U.S. at 696. "The result of a [criminal] proceeding can be rendered unreliable, and hence the proceeding itself unfair, even if the errors of counsel cannot be shown by a preponderance of the evidence to have determined the outcome." *Purdy v. Zeldes*, No. 02-7468, 2003 U.S. App. LEXIS 2053, at *18 (2d Cir. Feb. 6, 2003) (quoting *Strickland*, 466 U.S. at 694). Ineffective assistance may be demonstrated where counsel performs competently in some respects but not in others. *See Eze v. Senkowski*, 321 F.3d 110, 112 (2d Cir. 2003).

As a general matter, strategic choices made by counsel after a thorough investigation of the facts and law are "virtually unchallengeable," though strategic choices "made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Strickland*, 466 U.S. at 690–91. Counsel, in other words, "has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Id.* at 691. Where counsel fails to make a reasonable investigation that is reasonably necessary to the defense, a court must conclude that the decision not to call an expert cannot have been based on strategic considerations and will thus be subject to review under *Strickland*'s prejudice prong. *See Pavel v. Hollins*, 261 F.3d 210, 223 (2d Cir. 2001) (counsel ineffective in a child sexual abuse case where his failure to call a medical expert was based on an insufficient investigation); *Lindstadt*, 239 F.3d at 201 (same). The Court of Appeals for the Second Circuit has recently gone so far as to imply that all of counsel's significant trial decisions must be justified by a sound strategy—a significant raising of the bar

9

that would appear to require an unrealistic degree of perfection in counsel. *See Eze*, 321 F.3d at 136 (remanding to district court for factual hearing because it was "unable to assess with confidence whether strategic considerations accounted for . . . counsel's decisions").

There is "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689.

Each factual claim made in support of an allegation of ineffective assistance of counsel must be fairly presented to a state court before a federal habeas court may rule upon it. *See Rodriguez v. Hoke*, 928 F.2d 534, 538 (2d Cir. 1991) (dismissing petition as unexhausted where petitioner's claim of ineffective assistance of counsel alleged more deficiencies before the habeas court than were presented to the state court, because "[t]he state courts should have been given the opportunity to consider all the circumstances and the cumulative effect of all the claims as a whole" (quotation omitted)). Where an additional factual claim in support of the ineffective-assistance allegation merely "supplements" the ineffectiveness claim and does not "fundamentally alter" it, dismissal is not required. *Caballero v. Keane*, 42 F.3d 738, 741 (2d Cir. 1994). Each significant factual claim in support of an ineffective-assistance allegation premised on appellate counsel's deficient performance must be exhausted. *See Word v. Lord*, No. 00 CIV. 5510, 2002 U.S. Dist. LEXIS 19923, at *34–*35 (S.D.N.Y. Mar. 18, 2002) (Magistrate's Report and Recommendation).

Although the *Strickland* test was formulated in the context of an ineffective assistance of trial counsel claim, the same test is used with respect to claims of ineffective appellate counsel. *See Claudio v. Scully*, 982 F.2d 798, 803 (2d Cir. 1992). Appellate counsel does not have a duty to advance every nonfrivolous argument that could be made, *see Jones v. Barnes*, 463 U.S. 745,

10

754 (1983), but a petitioner may establish that appellate counsel was constitutionally ineffective "if he shows that counsel omitted significant and obvious issues while pursuing issues that were clearly and significantly weaker," *Mayo v. Henderson*, 13 F.3d 528, 533 (2d Cir. 1994). Either a federal or a state law claim that was improperly omitted from an appeal may form the basis for an ineffective assistance of appellate counsel claim, "so long as the failure to raise the state . . . claim fell outside the wide range of professionally competent assistance." *Id.* (quotations omitted).

VI. Certificate of Appealability

A certificate of appealability may be granted with respect to any one of petitioner's claims only if petitioner can make a substantial showing of the denial of a constitutional right. **Petitioner has a right to seek a certificate of appealability from the Court of Appeals for the Second Circuit.** *See* 28 U.S.C. § 2253; *Miller-El v. Cockrell*, 123 S.Ct. 1029 (2003). The court has taken into account the rule of section 2253(c)(3) of Title 28 of the United States Code that a certificate of appealability "shall indicate which specific issue or issues satisfy the [substantial showing of the denial of a constitutional right] required by paragraph (2)." *See also Shabazz v. Artuz*, No. 02-2320, 2003 U.S. App. LEXIS 14450, at *15 (2d Cir. July 18, 2003).

This opinion complies with *Miranda v. Bennett*, 322 F.3d. 171, 175–77 (2d Cir. 2003), and Rule 52 of the Federal Rules of Civil Procedure.

VII. Analysis of Claims

Respondent concedes that all of petitioner's claims have been presented to the state courts and are exhausted. Respondent contends, however, that a number of petitioner's claims were rejected on procedural grounds in the state courts and that federal review is therefore barred.

11

While it is true that some claims were rejected on procedural grounds—such as petitioner's ineffective assistance claims pertaining to the failure to seek a competency hearing—it is doubtful that in each instance the asserted procedural ground was an adequate bar to federal review. It is unclear why, for instance, the trial court deemed petitioner's ineffective assistance claims to be defaulted, when raised in a motion to vacate judgment, due to petitioner's "failure to raise these issues on appeal"; because the claims were premised on information *de hors* the record, petitioner appears to have properly raised them in the motion to vacate judgment.

At any rate, it is unnecessary to engage in lengthy analysis of whether petitioner's claims have been properly preserved for appellate review or of the correct standard of review to be deployed by this court since the claims are not meritorious substantively. Unless otherwise noted below, all of petitioner's claims are reviewed under a *de novo* standard.

A. Mental Competency Claims

The bulk of petitioner's claims are premised on his assertion that he was not competent at the time of trial and therefore unable to assist in his own defense. In brief, he asserts that he was denied procedural due process because no competency examination was ordered *sua sponte* by the court, that he was denied substantive due process because he could not assist in his own defense, and that he was denied effective assistance of trial and appellate counsel due to their failure to request a hearing and preserve the competency issues for appellate review.

The "criminal trial of an incompetent defendant violates due process." *Medina v. California*, 505 U.S. 437, 453 (1992). This rule "is fundamental to an adversary system of justice." *Drope v. Missouri*, 420 U.S. 162, 172 (1975)). In determining competence to stand trial, the court must consider "whether he has sufficient present ability to consult with his lawyer

12

with a reasonable degree of rational understanding—and whether he has a rational as well as factual understanding of the proceedings against him." *Dusky v. United States*, 362 U.S. 402, 402 (1960). Three relevant areas of inquiry include defendant's irrational behavior, his demeanor at trial, and medical opinion. *Id.* at 180. The trial court has an independent duty to order a hearing, *sua sponte*, on the issue of a defendant's fitness to stand trial where a *bona fide* doubt is raised. *Pate v. Robinson*, 383 U.S. 375 (1966). The duty to protect a defendant from being tried while incompetent persists throughout trial, so "even when a defendant is competent at the commencement of his trial, a trial court must always be alert to circumstances suggesting a change that would render the accused unable to meet the standards of competence to stand trial." *Drope*, 420 U.S. at 181.

1. Trial Judge's Failure

Petitioner claims in particular that two separate colloquies during the proceedings should have raised a *bona fide* doubt in the mind of the trial court as to petitioner's competency. The first discussion concerned petitioner's waiver of his right to attend sidebar conferences at trial:

> THE DEFENDANT: As far as when I approached you, it was to be said that we were picking a jury; am I correct your Honor?
> THE COURT: I mentioned two instances: That you had a right to be present at all bench side conferences during jury selection as well as a trial. That is a right you have. . . . It was my understanding . . . that you wanted to be present during all side bar conferences before the bench.
> THE DEFENDANT: Is it to my understanding now that that part—That's to do with law and not has to do with the jury because I don't know nothing about the law as far as coming up there and just listening to the district attorney and what my lawyer is saying. I don't know nothing about that part.
> THE COURT: That is correct. However, you would have a right to be present to listen to what is being said during the side bar conferences on the issues of law. Whether you claim you understand them or not, you still have a right to physically be present to hear everything that's going on. That is your right as a defendant.

13

THE DEFENDANT: Being that I know nothing about law, I guess I'd have to waive this part being that I already.

THE COURT: You do not have to waive it sir. You are saying things that are not correct. You don't have to waive it. It's a choice that you make. If you say it's not necessary for me to be at a side bar conferences or you know I don't have to enforce that right, then that's one thing. You can't say, Well, because I don't understand it being it's not really necessary. No. You have a right. You have to say I'm going to waive that right to be present at the side bar conferences even though issues of law are being discussed. That is a right you have and you have to knowingly give up the right that you have. . . .

Unless you tell me that you understand the right that you have and you are voluntarily giving up that right without any questions from your lawyer or anything else, that's what I need to hear from you.

THE DEFENDANT: My main part was only being interested in speaking to—the jury is already picked, so I guess I'll have to give it up.

THE COURT: No. You have to tell me that that is what you want to do . . . . It's a right you have and it's not whether you guess you give it up. You have to do so knowingly and voluntarily . . . .

THE DEFENDANT: Well, for the record I don't know anything about law so I guess I have to give it up.

THE COURT: I'm not accepting that. I can't accept that. I'm saying that it's not sufficient as far as I'm concerned . . . . [S]o at this point , you know, we'll have to—you will have to attend the side bar conferences.

THE DEFENDANT: I'm going to waive my right to be present on the side bar.

THE COURT: I'm saying this to you, sir. At this point I'm going to ask you whether or not, in fact, you are doing this of your own free will, are you giving up this right of your own free will.

THE DEFENDANT: Your Honor, the way I really like to answer that question—I don't want to put myself in jeopardy, because you say, like, I was coming up there before and all of a sudden I don't know any law as far as this case is concerned.

THE COURT: No, that's not what I'm saying. . . . I need to know from you whether you wish to use that right to attend side bars as I explained to you during the jury selection which is a voir dire as well as during the course of the trial. Okay?

. . . .

THE DEFENDANT: I understand that I could. I refused to go up there now. That's what I should say?

THE COURT: Not that you refuse to, but that you are giving up the right to attend the side bar conferences.

THE DEFENDANT: I am giving up the right to attend the side bar conferences.

14

Trial Tr. at 63–68.

The trial court accepted this waiver after giving petitioner an opportunity to consult again with his attorney. Contrary to petitioner's contention, the above-excerpted conversation does not demonstrate petitioner's inability to understand the proceedings or to assist in his own defense. To the contrary, petitioner's conversation was lucid and he evinced, with the patient help of the trial court, a ready and rational understanding of the nature of the choice he was being asked to make. It seems unlikely that any trial judge, based on a similar colloquy, would have harbored a doubt as to the defendant's competence.

The second portion of the transcript to which petitioner draws this court's attention concerned whether he wished to have the trial court charge the jury on the lesser-included offense of first degree manslaughter:

> THE COURT: .... Is that correct that you don't wish to have any lesser included offenses considered? You need to let me know.
>
> THE DEFENDANT: I don't wish nothing at all but to go through with this.
>
> THE COURT: What I'm saying to you when you say you wish to go through with this, certainly the law provides that at this point one of the things that the jury will be considering is murder in the second degree but your attorney has indicated to you that you could have them consider a lesser charge which would be manslaughter in the first degree.
>
> THE DEFENDANT: I don't understand what that means.
>
> THE COURT: Certainly you need to speak to your attorney to find out because, again, if that is the case I am not going to submit it but I want to make sure that you understand it.
>
> (Pause in the proceedings.)
>
> THE COURT: Let me say this—I don't know whether this would assist you. Certainly in terms of in submitting the lesser included offense of manslaughter in the first degree it would carry a lesser sentence. That is the only thing that you are to consider. In terms of—I don't want you to come back at any later point in time and say well nobody told me I had a right to ask the jury to consider a lesser charge, that's why I'm telling you now because once I know this we can proceed from here but I don't want you to come back and say the judge

15

didn't tell me I had a right to have my attorney to request that a lesser charge be considered by the jury which carried a lesser penalty as far as sentencing is concerned and that's why I'm telling you that now.

    THE DEFENDANT:  Then why didn't they charge me when they arrested me for it?

    THE COURT:  That's not the issue.  If you don't want the jury to consider it I need to know what you wish to do, sir.

    THE DEFENDANT:  I wish to go through.

    THE COURT:  You don't want me to charge a lesser included, is that correct, sir?  That's a yes or no answer.  You need to tell me right now.

    THE DEFENDANT:  What I am charged with that's what I am going through with.

    THE COURT:  Your answer is no?

    THE DEFENDANT:  What they charged me that's what I am interested to know about.

    THE COURT:  Then the answer to that question is no.  Thank you.

Trial Tr. at 373–75.  As with the first-quoted portion of the transcript, this colloquy demonstrates that petitioner, though at first unclear about the import of the legal decision he was being asked to make, was able to engage meaningfully with the court and to decide knowingly.  It seems unlikely that any trial judge would have come to doubt petitioner's competence to assist in his own defense based upon this colloquy alone or in conjunction with any other.

    Petitioner provides no further evidence that he acted act irrationally at trial.  There is nothing in the transcript to support such a claim.

    There is no merit to petitioner's contention that the trial court's failure to *sua sponte* order a competency hearing was an abuse of its discretion or denied petitioner a fair trial and due process of law.

    2.  Counsel's Failure

    Petitioner further asserts that trial counsel's neglect to make a rudimentary investigation of his client's background resulted in his failing to learn that petitioner had been ordered by a

16

previous trial judge to undergo a psychiatric evaluation and that petitioner had a documented
history of head trauma and mental illness. According to petitioner, defense counsel, upon being
provided with his rap sheet, should have conducted an independent investigation into petitioner's
prior convictions. If he had done so, he would have learned that a trial court had once ordered a
competency examination. The result of that examination, however, was that petitioner was found
competent to stand trial. Nonetheless, contends petitioner, notice of a prior competency hearing
would have spurred defense counsel to investigate his mental history, which would have revealed
that petitioner had twice been admitted to the psychiatric ward at Kings County Hospital, that he
had been diagnosed with shizophreniform disorder and that he had suffered multiple head trauma
in the past.

> Petitioner summarizes his psychiatric history as follows:

> At the age of eight (8) petitioner, Orville Etoria, was hit by a car and
> sustained a very serious head injury. As a result of this injury petitioner lost
> consciousness, developed severe headaches that made his head feel "like
> exploding." Petitioner now suffers chronic "dizziness." At the age of seventeen,
> petitioner's injuries were exacerbated when he was hit in the head with a baseball
> bat. . . .
> On February 23, 1981, petitioner was charged with attempted murder,
> kidnapping and robbery, stemming from an incident that occurred in Brooklyn,
> New York. On March 6, 1981, a Justice of the Kings County Criminal Court
> ordered that petitioner be taken directly from court to Kings County Hospital
> Center, Department of Psychiatry for an evaluation. . . .
> The in-take impression at petitioner's psychiatric evaluation revealed that
> his affect, mood, and thought processes and associations were all within normal
> limits. Petitioner was then deemed "fit to proceed" to trial in the attempted
> murder-kidnapping matter (*See*: Exhibit B, p. 3). On March 11, 1981, petitioner's
> "Consultant's Notes" indicate that he could not "remember what exactly
> happened" to him. Petitioner was discovered on the bathroom floor, having
> suffered three bouts of "syncope," i.e., fainting, associated with insufficient
> oxygen and blood flow to his brain, characterized by sudden pallor, coldness of
> skin and partial or complete unconsciousness. According to these "notes,"
> petitioner was determined to be "confused as to place and time". . . .

17

In a "Discharge Summary" from the Kings County Psychiatric Center, dated March 12, 1981, the clinician reported the following regarding petitioner's mental status:

> Mental status on admission: Cooperative, passive 17 year old Jamaican male whose speech was relevant and coherent. Elements of thought control and paranoid ideations. Auditory and visual hallucinations are both reported by the patient, as is periodic suicidal ideations, including presently. No loosening of associations was noted. Mood depressed; affect tearful and appropriate. Oriented to the three sphere. Memory and intellect intact. Insight and judgment good.

Petitioner's initial diagnosis and formulations were then reported as:

✦ "Unspecified psychosis. Code 299.0
✦ "Rule out Organic Brain Syndrome
✦ "Multiple substance abuse. Code 304.8
✦ "History of head trauma. Code 309.9

. . . .

The Kings County Psychiatric clinician, Franklin S. Klaf, M.D., requested that the judge return petitioner to the Psychiatric Hospital "for further treatment." Instead, following his court appearance, the judge discharged petitioner from hospital custody. The clinician's observation at the time of petitioner's discharge was of dread: *"Other aspects of [petitioner's] mental status were not assessed since it was not expected that the patient would not [sic] return from his court appearance"* (*id.*). The clinician further commented that: *"Patient's condition may be still unstable due to the fact that his departure reflected failure of the court to follow recommendation to return patient to Kings County Hospital for further treatment"* (emphasis added). . . . For the indictment charging attempted murder, kidnapping and robbery, petitioner, following a plea of guilty, served a sentence of from three to six years in an Upstate New York prison. . . .

Petitioner's February 1985, in-take process reported that:

✦ "Patient appears to be anxious and guarded."
✦ "Thought disorder present."
✦ "Deni[ed] hallucinations at present. *Paranoid delusions present."*
✦ "Mood is anxious. Affect is constricted."
✦ "Oriented X3, and"
✦ "INSIGHT AND JUDGMENT IMPAIRED"

. . . .

Indeed, the specific "problem" noted by Dr. Krumholz was a diagnosis of *"paranoid psychosis"*. After his admission, i.e., February 26, 1985, the "Primary Therapist[s]" report indicates that "[petitioner] admits to marijuana abuse and occasional alcohol abuse. On the day of admission, he had been smoking pot. Apparently he began *hearing voices* and then became extremely *paranoid*. He

18

> began to smash up all the furniture and windows with a baseball bat" . . . .
> (emphasis added). Petitioner was treated with *Haloperidol* 5 mg., twice per day
> and at bedtime. After one week of treatment, his mental health reverted within
> normal limits. That is, "[t]here was no evidence of thought disorder,
> hallucinations or delusions. Judgment was improved." Petitioner was discharged
> to out-patient care in Kings County Hospital's "N" building, with a diagnosis of
> SCHIZOPHRENIFORM DISORDER.

Defendant-Petitioner's Memorandum of Law at 1–3. For purposes of this proceeding,

petitioner's summary of his psychiatric medical history is accepted as accurate.

Petitioner testified at the hearing in this court that from early childhood, as a result of two

head traumas, he regularly used cocaine, heroin and marijuana. This use, he claims, continued

for the six months while he was incarcerated, awaiting trial and during trial. He described

hallucinations and visions shortly before his arrest and when he used a "lot of drugs."

Petitioner never revealed to his lawyer that he suffered from any mental disease or defect,

or that he had received head injuries or hospitalizations, and there is nothing from the face of his

rap sheet that would have alerted reasonably diligent defense counsel to any psychological or

psychiatric problem relating to petitioner. There is no evidence that his use of drugs in jail or at

the time of trial was known to counsel. Armed with the information that he had acquired

through a reasonable preparation for the trial, defense counsel performed above a reasonable

professional standard.

Petitioner's testimony that he only saw his attorney twice, for a few moments before trial,

is not credited. He admits his memory is poor—probably, so he says, from the use of illegal

drugs.

The testimony of his trial attorney that petitioner appeared competent, that he did not

appear to be under the influence of prescribed or illegal drugs, and that he participated effectively

at the trial is credited.

Petitioner has not demonstrated that he suffered prejudice from counsel's failure to more fully investigate his potential incompetency. The transcripts of pretrial hearings and the trial itself reveal petitioner to be a defendant capable of understanding the proceedings and of assisting in his own defense. He did not act unusually during the proceedings and he did nothing either volitionally or involuntarily to alert his lawyer to the fact that he was not competent. Moreover, since his conviction petitioner has apparently neither sought treatment for mental illness nor has he been treated for any psychological or psychiatric problem, notwithstanding that he was routinely screened at least once for such problems.

On two prior occasions he pleaded guilty to serious crimes. He admitted in his testimony in this court that he understood those proceedings and his pleas.

Under these circumstances, petitioner's contention that he was denied the effective assistance of counsel with respect to his competency claims is without merit.

Habeas corpus relief is not warranted with respect to any of petitioner's claims concerning his alleged incompetency during trial.

B. Remaining Ineffective Assistance of Counsel Claims

Petitioner's second set of claims alleges that his trial counsel was ineffective for failing (a) to conduct an investigation into the law and facts of this case; (b) to investigate or offer an affirmative defense of not responsible by reason of mental disease or defect; (c) to request an intoxication instruction; (d) to object to the prosecutor's improper questioning of prospective jurors; (e) to timely object to the prosecutor's bolstering identification evidence; and (f) to move the court to conduct an inquiry regarding a venire-person's knowledge that petitioner was in jail.

20

He also alleges that appellate counsel was ineffective for choosing to pursue weak claims in lieu of the "stronger" claims alleged by petitioner in his habeas application. These claims are without merit.

Petitioner first contends that counsel was ineffective for failing to conduct an investigation into the law and facts of this case. Aside from the alleged ineffectiveness with respect to competency claims, discussed above, petitioner asserts that counsel's lackluster opening and closing remarks demonstrate that he had no strategy at all for defending petitioner. The evidence against petitioner was strong. Defense counsel nonetheless urged the jurors to assess the credibility of the state's witnesses carefully and to consider whether their identification of petitioner as the shooter was reliable. In summation counsel did as well as could be expected of a lawyer with a bad case, highlighting minor inconsistencies in the testimony of prosecution witnesses and relying on the inability of the undercover police officer to identify petitioner from a lineup. Counsel was not ineffective in this regard.

Petitioner next contends that counsel was ineffective for failing to investigate or offer an affirmative defense of not responsible by reason of mental disease or defect. In Part A, *supra*, it was noted that defense counsel's trail preparation was reasonable and that he was not ineffective for failing to discover that petitioner had a history of mental disease or defect. Counsel cannot be faulted for failing to raise an affirmative defense based on petitioner's alleged insanity at the time of the crime if he had no reason to doubt petitioner's sanity. In addition, petitioner's psychiatric history alone is insufficient to support an argument that there was a reasonable probability that, had defense counsel mounted a psychiatric affirmative defense, petitioner would not have been convicted of second-degree murder.

21

Petitioner contends that counsel was ineffective for failing to request a voluntary intoxication instruction to negate the element of petitioner's intent to commit murder. Although there was evidence that patrons in the shop had been drinking on the evening in question, there was nothing in the evidence to indicate that petitioner had been drinking. Because an instruction on voluntary intoxication would not have been given to the jury under these circumstances, defense counsel was not ineffective for failing to request one.

Petitioner contends that counsel was ineffective for failing to object to allegedly improper remarks by the prosecutor to prospective jurors. In all petitioner lists over twenty questions and statements made by the prosecutor which he deems objectionable. *See* Defendant-Petitioner's Memo. of Law at 41–43. They need not be enumerated here. Nearly all of the statements query the prospective jurors about whether they could impartially assess witness's credibility. None of the statements and questions appear improper nor is there any reasonable likelihood that a timely objection to the statements would have been sustained. The prosecutor's questions did not deprive petitioner of a fair trial. Defense counsel was not ineffective for having failed to object to them.

Petitioner contends that counsel was ineffective for failing to timely object to the prosecutor's bolstering identification evidence. In particular, he complains that the prosecutor elicited testimony from a detective that two witnesses had chosen petitioner from the lineup. Because those witnesses testified at trial that they chose petitioner from the lineup, any error that might have been rectified by a timely objection was harmless.

Petitioner contends that counsel was ineffective for failing to seek an inquiry regarding a venire-person's knowledge that petitioner was in jail. During the voir dire a venire-person stated

22

that he recognized petitioner from prison. The entire panel was, on consent of both parties, excused. One member of the excused panel was mistakenly commingled with a new panel and was excused by the court. No further inquiry was made of the excused juror. Petitioner can show no way in which he was harmed by the failure of counsel to ask the court to inquire further of the panel member. Petitioner's contention that the stray venire-person informed other potential jurors that petitioner had once been in prison is pure speculation. Counsel was not ineffective in this regard.

Petitioner finally contends that appellate counsel was ineffective for choosing to pursue weak claims in lieu of the "stronger" claims made by petitioner in his habeas application. Because none of the claims raised by petitioner in the instant application have merit, appellate counsel was not ineffective for having chosen not to raise them in lieu of other claims.

Neither individually nor cumulatively do petitioner's ineffective assistance claims merit habeas corpus relief.

There is little doubt that petitioner has suffered from psychiatric problems. But so do a large number of those who are incarcerated. *See, e.g.*, Fox Butterfield, *Study Finds Hundreds of Thousands of Inmates Mentally Ill*, N.Y. Times, Oct. 22, 2003 at A14 (study by Human Rights Watch shows that "[a]s many as one in five of the 2.1 million Americans in jail and prison are seriously mentally ill, far outnumbering the number of mentally ill who are in mental hospitals"); Sally Satel, *Out of the Asylum, Into The Cell*, N.Y. Times, Nov. 1, 2003 at A15 (noting that "16 percent of American inmates have serious psychiatric illnesses like schizophrenia, manic-depressive illness and disabling depression" and that Riker's Island functions as the second largest psychiatric in-patient institution in the United States); *Treating Mental Illness in*

23

*Prison*, N.Y. Times, Nov. 2, 2003 at § 4, p.10 (study by Human Rights Watch suggests that 25%

of inmates in New York State are mentally ill)

C. Other Issues

No other issue open to consideration by this court has merit. *See Sumner v. Mata*, 449

U.S. 539, 548 (1981) ("a court need not elaborate or give reasons for rejecting claims which it

regards as frivolous or totally without merit").

VIII. Conclusion

The petition for a writ of habeas corpus is denied.

No certificate of appealability is granted with respect to any of petitioner's claims,

petitioner having made no substantial showing of the denial of a constitutional right.

SO ORDERED.

Jack B. Weinstein
Senior District Judge

Dated:       November 20, 2003
             Brooklyn, NY

24